EDWARD P. MORIARITY (5622)
BRADLEY L. BOOKE (9984)
SHANDOR S. BADARUDDIN (9999)
MORIARITY, BADARUDDIN & BOOKE
124 West Pine,
Missoula, Montana 59802
Telephone: (406) 728- 6868
Facsimile:  (406) 728-7722
Email: brad@mbblawfirm.com
       ed@mbblawfirm.com
       shandor@mbblawfirm.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF UTAH

| | |
|---|---|
| The Estate of James D. Redd, M.D, by and through Jeanne H. Redd, the personal representative for and on behalf of, Plaintiffs Decedent James D. Redd, as an individual in a survivorship action; The Estate of James D. Redd, M.D. by and through his personal representative Jeanne H. Redd and his heirs, and Plaintiffs Decedent James D. Redd in a wrongful death action | Case No. |
| Plaintiffs, | Complaint<br>(*Bivens* Action)<br>(Survivorship)<br>(Wrongful Death) |
| vs. | |
| Daniel Love, Bureau of Land Management Special Agent, in his individual capacity; Dan Barnes, Bureau of Land Management Special Agent, in his individual capacity; Brent Range, Special Agent Bureau of Land Management, in his individual capacity; Loren Good, | |

1

Special Agent Bureau of Land
Management, in her individual
capacity; Jon Edwards, Special
Agent Bureau of Land Management,
in his individual capacity; Jennifer
Vanderveer, Special Agent Bureau of
Land Management, in her individual
capacity; David Kice, BLM Special
Agent, in his individual capacity;
Selma Sierra, Former BLM Agent
Director, in her individual capacity;
Juan Palma, BLM Utah Director, in
his individual capacity; Lynda Viti,
FBI Special Agent, in her individual
capacity; Neil Rogers, FBI Special
Agent, in his individual capacity;
Diane Eden Kisabeth, FBI Agent, in
her individual capacity; Gibson M.
Wilson, FBI Special Agent, in his
individual capacity; Timothy
Fuhrman, FBI Special Agent In
Charge, in his individual capacity;
James McTighe, FBI Special Agent
In Charge, in his individual capacity;
Seth Footlik, FBI Special Agent, in
his individual capacity; and 21 or
more unknown federal agents,

        Defendants.

---

The Constitution of the United States begins with this Preamble: "We the People of the United States in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defense, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the

United States of America." Thus starts the document that defines the very political order that governs the affairs of this country.

Likewise the Constitution defines the role of the Judiciary. "The judicial Power of the United States shall be vested in one supreme Court ... " It says that "The judicial Power shall extend to all Cases, in Law and Equity. arising under this Constitution ..."

Thus was created the most wondrous experiment in self-governance in mankind's history. The most striking reference in the Preamble is that it is a statement of the source of the power of the United States of America and the Constitution: The sovereign power in this document is of the United States."

Knowing that power of government could be misused, "We the People of the United States" provided next for a "Bill of Rights" intended to make clear that rights were retained by the real sovereign, The People of the United States, rights that were not lent to government or those who seize the power for their own purposes.

It is for the Judges of the Supreme Court of the United States and such inferior Courts as the Congress may from time to time ordain and establish, by their Oath to support this very same Constitution.

Therefore, it is by the authority of the Constitution created by "We the People of the United States," that the Supreme Court in *Bivens v. Six Unknown of the Named Agents,* 403 U.S.388 held that individual agents of the federal government could be held liable when the Constitutional rights retained by the people were violated, resulting in damage to the People of the United States, so that:

COMES NOW the Plaintiffs, The Estate of James D. Redd, M.D, by and through Jeanne H. Redd, the personal representative for and on behalf of Plaintiffs Decedent James D. Redd, as an individual in a survivorship action;

and The Estate of James D. Redd, M.D. by and through his personal representative Jeanne H. Redd and his heirs, and Plaintiffs Decedent James D. Redd in a wrongful death action; by and through their attorneys, and herein make a complaint against Defendants as recognized and authorized in the manner of *Bivens* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 91 S.Ct. 1999, 29 L.Ed.2d (1971), for violation of Plaintiff's Constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, and by violating Plaintiff James D. Redd's constitutional rights to equal protection afforded under the Constitutions of the United States and the State of Utah as follows:

1)    On June 10, 2009, approximately eighty (80) federal agents, mostly armed with automatic weapons, carried out "Operation CERBERUS Action" 'raiding,' the Mormon enclave of Blanding, Utah, a small town of 3,000 located in the Four Corners region of the Southwest United States.  Of the 24 arrests made that day, 16 were in Blanding. "CERBERUS" was based on two and a half years of undercover operations costing millions of dollars. Decedent, Dr. James D. Redd, was one of the persons arrested. The next day, June 11, 2009, reflecting on the excessive, overreaching and abusive treatment he had been subjected to, after making a recording based upon his tragic experience, Dr. Redd took his own life.  His final words connected his death to the Defendants' egregious actions. This Bivens cause of action, requesting survival action damages and wrongful death damages for Dr. Redd, is the direct and proximate result of the wrongful acts and omissions of the Defendants as set forth below.

## IDENTIFICATION OF PARTIES

**PLAINTIFFS:**

2)      Decedent Dr. James D. Redd had been a community physician in Blanding, Utah, for over 30 years, serving as the sole doctor during a significant portion of this time. He had been, and was at the time of his death, a resident of the State Of Utah.  Everyone in the community knew him: he had birthed their babies, performed their surgeries, and saved their grandchildren. On Sundays, Dr. Redd often taught gospel doctrine, delivered lessons, and presented his testimony, all of which helped inspire religious life in Blanding, in a manner akin to his oath as a physician to help physical life in the Community and surrounding area.  In fact, the Sunday before June 10, 2009, at temple, Dr. Redd gave his testimony on the sanctity of life and how good it was to be alive.  Dr. Redd was a very devoted person, a pillar of his community, and had much to be thankful for.  He was the father of five children with a happy marriage and successful medical practice.  He loved baseball, hunting, and was an active member of his Mormon community. He was well-liked in the local Native American community too.  Often his office could be found composed entirely of Native American patients and, in the months leading to his untimely death, Dr. Redd helped the Navajo Nation draft legislation to improve American Indian health. Beyond the community, he enjoyed being outdoors, often taking family walks. On one such walk with some of his family members he picked up a ¼ inch long, by ⅛ inch wide, and 1/16 inch thick shell that appeared to be a bird effigy. Little did he know, federal agents inebriated with power and acting with no remorse, would use this shell to attempt to justify the arrest of Dr. Redd—for a felony–ultimately shattering the sanctity of his life.

3)      The Estate of Dr. James Redd has been established pursuant to Utah law. Jeanne Redd, the widow of Dr. Redd, is the personal representative of the Estate of James Redd, deceased. The Estate of Dr. James Redd has the duty and responsibility to bring all claims, including Survival Actions, Dr. Redd could have filed had he lived. The Estate also has the duty and responsibility to bring all claims for his wrongful death. Both claims include but are not limited to claims for violations of Dr. Redd's constitutional rights. The present lawsuit is brought by and through the Estate of Dr. James Redd to recover all such damages for the above actions and any and all resulting damages Dr. Redd, individually, as Plaintiffs decedent, and to which his Estate is entitled as more particularly described below.

**DEFENDANTS:**

4)      The following individuals (hereinafter referred to as "BLM Defendants," or collectively "FBI Defendants," or simply "Defendants") are sued in their individual capacity: Daniel Love, Bureau of Land Management Special Agent, in his individual capacity; Dan Barnes, Bureau of Land Management Special Agent, in his individual capacity; Brent Range, Special Agent Bureau of Land Management, in his individual capacity; Loren Good, Special Agent Assistant team leader, Bureau of Land Management, in her individual capacity; Jon Edwards, Special Agent Bureau of Land Management, in his individual capacity; and Jennifer Vanderveer, Special Agent Bureau of Land Management, in her individual capacity; and David Kice, BLM Special Agent, in his individual capacity; and Selma Sierra, Former BLM Utah Director, in her individual capacity; and Juan Palma, BLM Utah Director, in his individual capacity; were at all times relevant hereto employed as Special Agents of the Bureau of Land Management, an

agency of the Department of the Interior, of the United States of America, acting in their individual capacity. Each was part of "Operation CERBERUS Action" where they conspired to participate in the acts and omissions that were the proximate cause of the actions and damages set forth in this complaint.  Each participated in one way or another in the planning and execution of the operation which was to match and outdo CERBERUS and to act like a multi-headed hound (usually three-headed) from Greek and Roman mythology which guards the gates of The Underworld to prevent those who have crossed the river Styx from ever escaping.  They all agreed to do what it takes to protect the gates of the underworld and to violate whatever constitutional rights that may have existed in Greek or Roman mythology, and for sure in the Untied States of America in 2009.  These violations of the constitutional rights of James D. Redd illustrated their intent that the end justified the means to attain their goal no matter what the cost and potential exposure and effect on Dr. Redd.

5)     The following individuals are sued in their individual capacity: Lynda Viti, FBI Special Agent, team leader in her individual capacity; Diane Eden Kisabeth, FBI Agent, in her individual capacity; Gibson M. Wilson, FBI special agent, in his individual capacity; Timothy Fuhrman, Special FBI Agent In Charge, in his individual capacity; James McTighe, Special FBI Agent In Charge, in his individual capacity; Seth Footlik Special FBI Agent, in his individual capacity; were at all times relevant hereto employed as Special Agents of the Federal Bureau Of Investigation an agency of the United States of America, acting in their individual capacity.  Each was part of "Operation CERBERUS Action" where they all conspired to participate in the acts and omissions that were the proximate cause of the actions and damages set forth in this complaint.  Each participated in one way or another

in the planning and execution of the plan which was to match and outdo CERBERUS and to act like a multi-headed hound (usually three-headed) from Greek and Roman mythology which guards the gates of The Underworld to prevent those who have crossed the river Styx from ever escaping.  They all agreed to do what it takes to protect the gates of the underworld and to violate what ever constitutional rights that may have existed in Greek or Roman mythology, and for sure in the Untied States of America in 2009.  These violations of the constitutional rights of James D. Redd illustrated their intent that the end justified the means to attain their goal no matter what the cost and potential exposure and effect on Dr. Redd.

6)    There were many other unknown federal agents and other agents who at times relevant hereto acted with a federal cloak of authority, whose identities will be revealed by discovery in the course of this action, acting in their individual capacities.  The allegations against the Defendant Unknown Federal Agents are the same as set forth above and as included in this complaint. Each unknown federal agent has an identity of interest with the named defendants, and each claim against them arises out of the same transaction and occurrence that gives rise to this action.

## JURISDICTION

7)    This Court has jurisdiction in this case, because it is a federal matter and pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, it is an action arising under the Constitution of the laws of the Untied States, against Defendants, including an unknown number of law enforcement officers and agents of the Bureau of Land Management, the Federal Bureau of Investigation, the Department of Justice, and others unknown are all officers and agents of the Federal Government acting under color of law.  These individual agents in their individual capacity are liable for the individual acts

and omissions in which they participated and which they carried out in the Cerberus Action including the constitutional rights of Dr. James D. Redd and the damages that flowed from these violation.  See: *Bivens*, *supra*.

8)     Further, jurisdiction is conferred by 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States, and 28 U.S.C. § 1343 in that this is a civil action commence by a person to recovery damages as a result of a deprivation of right.

9)     Any claim of immunity from this action is wholly without merit. The federal government of the United States employs all those persons engaged in the enforcement of the laws of the United States. The acts alleged amount to a blatant violation of the Constitution and the rights guaranteed therein. Since the Defendants have acted outside their constitutional limitations, they have lost their umbrella of immunity in this case and are ripe for suit.

## FACTS COMMON TO ALL CAUSES OF ACTION

10)     In the early morning hours of June 10, 2009, federal agents from the Department of Interior (DOI) and Federal Bureau of Investigation (FBI) descended on the Mormon enclave of Blanding, Utah, a small town of 3,000 residents located in the Four Corners region of the southwest.

11)     The officer's were culminating a two and a half year undercover operation christened, "Operation CERBERUS Action."

12)     CERBERUS was the "largest investigation ever into the looting of Native American artifacts on public lands."

13)     "Operation CERBERUS Action" is named after CERBERUS from Greek and Roman mythology which is a multi-headed hound (usually three-headed) which guards the gates of The Underworld to prevent those who have crossed the river Styx from ever escaping.

14)    The planning of  "Operation CERBERUS Action" was in essence a conspiracy of the Defendants, (the federal agents named above in their individual capacity) who decided to put together a taxpayer financed operation intended to stop a tradition of groups living in the Four Corners Area of the United States who went out and collected artifacts. The collection of these artifacts was not against the law if the collection occurred on private property.  If the artifacts were found on and taken from tribal or United States Government land collection thereof was against the law. Historically, everyone sort of looked sideways at the individuals who collected with pride the various artifacts and the source of the items were rarely questioned.

15)    There were a few individuals, such as Ted Gardiner, who was a Native American artifacts collector and dealer, who engaged in the collection and sale of artifacts for a profit.  When he was under investigation by Federal Authorities the Defendants turned him into a confidential informant and undercover agent

16)    In 2006, the Defendants were approached by Ted Gardiner.  He decided to try to scam the Federal Agents by trading his knowledge for a confidential informants pay check and immunity.  He indicated to the agents that through his "significant" sales and transaction experience in the artifacts marketplace, there were supposedly major "kingpins" trafficking items illegally obtained from federal or tribal lands. He represented his "Black Book" contained valuable information the agents could pay him to disclose.

17)    In October of 2006, the Defendants, despite knowing Mr. Gardiner's history of drug and alcohol abuse problems, and struggles with mental health, took his word at face value.  Meanwhile, Gardiner was down and out on his luck, having burned most of his bridges in the Native artifacts

marketplace by overcharging, disrespecting, and simply ripping clients off. But, Gardiner realized he had something valuable in his "little black book," which had been his customer list.  He spun a story to the Defendants of an illicit black market that the Defendants were all too willing to accept, without any precautionary assessment of veracity.

18)    By comparison, in contrast to the Defendants' actions, federal agents outside Utah were already cooperating with reputable and established dealers in the artifacts business, who reported the few illicit traffickers to authorities in order to maintain the integrity of the marketplace.  The concept of "kingpins" and a large illicit market just did not exist in the artifacts trade, yet it was a sham Defendants willing bought into

19)    On November 30, 2006, the FBI and BLM Defendants jointly initiated an investigation based on the development of Ted Gardiner as a confidential informant and what Defendants misperceived to be a chronic problem of violations in the Intermountain West, Four Corners area of the United States.

20)    From March of 2007 until November of 2008, Ted Gardiner acting at the direction of the FBI and BLM Defendants, purchased over $300,000 worth the artifacts, some legal and some illegal, all while being paid  $7,500.00 per month by the Defendants as an informant.

21)    Defendants utilized Ted Gardiner as an undercover informant to make friends with various individuals in Blanding, Utah, and elsewhere, and to encourage them to have, or to continue to have a interests in artifacts, and then to obtain secret audio and video recordings of these individuals allegedly swapping, selling, or offering to sell Indian artifacts to Mr. Gardiner, mostly at inflated prices so the "Operation CERBERUS Action" would look good.

22)    Ted Gardiner held himself out as a Native American artifacts collector and dealer, but in reality Ted Gardiner was working for the Defendants, and was attempting to entrap the individuals into allegedly selling or offering to sell or swap Indian artifacts to him while he wore a wire so the Defendants could listen and tape the transactions.

23)    The Defendants armed Ted Gardiner with a bottomless supply of taxpayer funds so he could enticed unsuspecting individuals, often average citizens with no history or propensity to sell an artifact, to convey to him artifacts at exorbitant prices.

24)    The Defendants trained, directed and encouraged Ted Gardiner to raise the value he paid for the undercover purchases so he could use his undercover sales, swaps, and purchases to entrap the customers and to artificially raise the alleged market value of the artifacts.

25)    Raising the artificially enhanced value of the artifacts could result in a more serious criminal charge, the potential charges could be enhanced from misdemeanors to felonies, so that "Operation CERBERUS Action" could make more headlines and justify its existence to the taxpayers.   Defendants made no effort to inform or educate Gardiner or themselves regarding the limits of the criminal laws.   In particular, Defendants did not distinguish between articles found on private land, or articles obtained prior to the Artifact Protection Act, or articles that were from Native American civilizations that did not exist in Utah.

26)    Cumulatively, the Defendants through Ted Gardiner paid $335,685 for 256 alleged relics during CERBERUS.

27)    Meanwhile, the Defendants' monthly  $7,500 payments to Gardiner, cost taxpayers an astonishing $224,000 for Gardiner's undercover services during the course of CERBERUS.

12

28)   As a result of "Operation CERBERUS Action", 16 of the entire 24 CERBERUS arrests made June 10, 2009, were in Blanding, Utah, with 19 of the 24 arrests being Utah residents.

29)   The costs involved in "Operation CERBERUS Action" demanded that there be as many arrests as possible, as many convictions as possible, and as much publicity as possible, so law enforcement agencies could justify their expenditures on an alleged criminal activity that did not endanger physical health, did not kill anyone, did not deprive any individuals of their property, and gave an excuse to the Defendants to spend money and tell war stories at their gatherings and attempt to change a culture.

30)   A reported 80 federal agents, including but not limited to the named Defendants, armed with a ridiculous and disproportionate number of assault rifles, while clothed in flak-jackets, raided and searched "Operation CERBERUS Action" targets in Blanding, Utah, including Dr. Redd's home. Defendants were present at the Redd residence from 6:40 A.M. on June 10, 2009, until 5:45 P.M. that evening.

31)   At 6:55 A.M. on June 10, 2009, Dr. Redd was accosted, as he returned to his residence from his early morning visit to his clinic. As Dr. Redd  exited his car he was restrained, subjected to excessive force, and arrested.

32)   Dr. Redd was manhandled and handcuffed, followed by four hours of interrogation in the garage.

33)   This period of confinement and loss of liberty constituted illegal detainment and a violation of his constitutional rights.

34)   The Defendants rebuked, terrified, and humiliated Dr. Redd.

35)    The Defendants accused Dr. Redd of unlawful activity of which he was not guilty.

36)    The Defendants repetitively called Dr. Redd a liar while taunting him that a felony offense meant revocation of his medical license.

37)    The Defendants wrongfully harassed Dr. Redd and taunted him that he would never practice medicine again.

38)    The Defendants were aware of the physical and psychological impact of their assault on Dr. Redd, knowing that his life focused on his family, his religion, his profession, and his community.  They intended to use his goals to try to get him to admit to a crime he did not commit using his own fears as their weapon of choice knowing that their weapon was deadly.

39)    The Defendants did convey, and intended to convey, the physical and psychological impact cause by their acts and omissions for the purpose of harming Dr. Redd, causing him physical and psychological injuries, and depriving him of his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights, and equal protection rights under the Constitution of the United States of America, and the similar provisions under the Constitution of the State of Utah.

40)    Dr. Redd was arrested on June 10, 2009, based upon an Indictment that was issued on May 29, 2009 and placed under seal.  The indictment only had one count against Dr. James D. Redd, COUNT 4, which reads:

> On or about **March 27, 2008**, in the Central Division of the District of Utah, JEANNE H. REDD and JAMES D. REDD, defendants herein, did receive, conceal, and retain property belonging to an Indian tribal organization, with a value of

> more than $1,000 to wit: an effigy bird pendant,
> knowing such property to have been embezzled,
> stolen, or converted, and did aid and abet therein,
> all in violation of 18 U.S.C. § 1163 and 2.

41)    There was no evidence Dr. Redd possessed, actually or constructively, the item that was the subject of Count 4. There was no evidence that Dr. Redd knew that the item that was the subject of Count 4 was in his home. In fact, no agent documented the fact that the "effigy bird pendant" was found in the home of Dr. Redd, or that it existed at all. Whether it existed, or whether it was in the Redd home, there was no evidence that the item was worth in excess of $1,000. The best most favorable evidence available to the Defendants could only prove a value of $125.00.

42)    The representation of the false value in the indictment was a deliberate, reckless misrepresentation of value provided under oath by the Defendants. This false value was manufactured by the Defendants, with the aid and assistance of the paid informant Ted Gardiner, for the deliberate, reckless, and untruthful purpose of having Count 4 of the May 29, 2009, indictment allege a felony.  The Defendants then willfully and wantonly, with intent to do harm, misrepresented the severity of the alleged crime against Dr. Redd and physically and mentally harassed him in an attempt to get an admission to a crime they knew, or should have known, Dr. Redd did not commit. The Defendants continued these acts and omission in an attempt to justify their intentional denial of the constitutional rights of Dr. Redd as set forth in this complaint.

43)    Additionally, Count 4 of the indictment referenced an "effigy bird pendant" that Dr. Redd, did not have, did not have possession thereof,

and which  Defendants incorrectly identified as the object in Count 4, that Dr. Redd was allegedly associated with.

44)    There were seven Counts in the May 29, 2009, indictment, and it is acknowledged that the seven counts, including Count 4, were alleged against Jeanne H. Redd.  It is further acknowledged that this complaint and BIVENS action is not brought on behalf of said Jeanne H. Redd as an individual nor are the charges brought against her relevant and admissible in this case.

45)    The Defendants spent a great deal of their eleven hour search time trying to locate the item they alleged was illegally obtained By Dr. Redd, but did not even have a proper identification of said item.  It was impossible for them to have an honest true value to present to the grand jury.

46)    Dr. Redd was the primary subject of the Defendants in this case due to his status in the community, his profession which was utilized and respected by all members of the community and surrounding area including but not limited to the Native Americans of Branding, Utah and the surrounding area.

47)    Additional reasons why the Defendants were out to get Dr. Redd as a suspect will be proved at trial but include and are not limited to the following;

     a.    Defendants intent for "Operation CERBERUS Action" was to change a culture of many individuals who collected with pride, and respected with honor the artifacts they collected;

     b.    Defendants intent was for "Operation CERBERUS Action" to provide them with some excitement and something out of the ordinary to do other than their normal mundane everyday tasks;

     c.    To Retaliate against Dr. Redd for what the defendants

considered getting away with a similar incident in 1995:

In 1995 the Defendants assisted in bringing a similar state based charge against Dr. Redd.  The charge was dismissed by the Utah Court of Appeals for insufficient evidence, and on re-prosecution, the charges against Dr. Redd were dismissed and Jeanne Redd opted to concede and pay a fine. Defendants were aware of the distress and anxiety this prior baseless charge had caused Dr. Redd.

d.  The Defendants made a display of arresting Dr. Redd on June 10, 2009, by waiting until he drove up to his house and exited his vehicle after returning from his medical clinic.  At that time, the Defendants, armed with assault rifles, and wearing flak jackets with conspicuous law enforcement decals, pulled Dr. Redd out of his vehicle, handcuffed him, , and isolated him in his garage for interrogation.  This kind of treatment violated Dr. Redd's constitutional rights, was not justified in any way, (he was not and never had been a threat and there was absolutely no reason for the Defendants to fear for their safety especially when they had already cleared his residence), and the above was undertaken and completed in order to embarrass, intimidate, humiliate Dr. Redd and to try to make an example of him to community members, not for any legitimate purpose but for the reasons set forth in this complaint.

e.  It should also be noted, given the historical tension between federal powers and Mormons dating back to 1857 when President Buchanan sent the US Army to crush the LDS church in the "Utah War," followed by the 1887 Edmunds-Tucker Act

that dis-incorporated the LDS church and forced forfeiture of all LDS property worth more than $50,000, it's no surprise the Defendants were fervent to bust a prominent member of the Mormon community. Dr. Redd was such an ideal icon.

f.    The Defendants knew that their acts and omissions constituted a discrimination so unjustified as to be a violation of due process as well as a class base violation of Due Process under the Fifth Amendment and that they wanted to make as much of the situation that they could prior to the charges being reduced or dismissed.

g.    To prove the Defendants could use excessive and unreasonable force.

h.    The Defendants knew that they really did not have a felony case against Dr. Redd and that it would be reduced or dismissed.

48)    Dr. Redd was arrested on the above Count 4 of the May 29, 2009, charges and  the Indictment on its face proves that Dr. Redd was not guilty:

a.    Defendants alleged the date of the crime as March 27, 2008, a date impossible under the circumstances and a date known by the Defendants to be impossible to be the date of the alleged crime.

b.     Defendants valuation cannot be proven and it is a deliberate, reckless misrepresentation of the value, which is a material element in the crime being charged.

c.    At the time the artifact was discussed by the informant its value by him was not more than $500.00.

d.    The item identified in Count 4 is not an item the confidential

informant acquired information to substantiate and there is no evidence that Dr. Redd received, concealed, and retained an "effigy bird pendant."

49)   Defendants gave deliberate falsehoods or had a reckless disregard for the truth in making any statements of value for the artifact alleged to be the property of Dr. Redd.

50)   Defendants used excessive and unreasonable force set forth in this complaint.

51)   Nowhere in the investigation or in the Cerberus Action was there any evidence as to Dr. Redd, or anyone connected with him ever having any weapons or being a threat in any way to the Defendants.  The use of the excessive force was not and cannot be justified in any way.

52)   Defendants used deliberate falsehoods and/or reckless disregard for the truth in reference to the interrogations of the Dr. Redd and Redd family on June 10, 2009, made with the purpose of deception and violating the constitutional rights of Dr. Redd.

53)   The Defendants acts and omissions, intended to deprive Dr. Redd of his constitutional rights, shock the conscience of reasonable people, constitute threats, were intended to destroy Dr. Redd's rights to Life, Liberty, and pursuance of happiness, and exhibit the Defendants deliberate indifference to the life of Dr. Redd, his right to equal protection of laws, his right to be free from unlawful dentition, and his right to be free from unlawful arrest.

54)   The Defendants violated Dr. Redd's Fifth Amendment right which prohibits discrimination and the unjustifiable violation of due process as set forth in *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

55)   The Defendants' manner of execution of the warrants was

unreasonable. The arrest warrant did not justify the manner of execution and the search warrant as it pertained to Dr. Redd and did not justify the manner of execution. The planning and manner of execution of the warrants as they pertained to Dr. Redd was a violation of Dr. Redd's constitutional rights as set forth in this complaint.   The manner of execution resulted in the unconstitutional use of excessive force under the circumstances including the use of physical force, the use of handcuffs, the use of shackles, the unnecessary restraints, the isolation in the garage, the hostile interrogation, the disrespectful human treatment, and the overall inhuman treatment.

56)    Defendants plan was to make an example of the arrest of Dr. Redd so they utilized an excessive number of agents, an excessive number of governmental vehicles, excessive numbers of weapons, and excessively brandished weapons, utilized false allegations and deliberate and reckless disregard of the truth, and overall mistreatment as set forth in this complaint, which was unreasonable under the circumstances.

57)    The following day, on June 11, 2009, shaken to the core and overwhelmed by the Defendants overpowering and egregious behavior, with his livelihood and standing in the community unjustly assaulted, Dr. Redd walked out on the patio of his home.   He looked towards Colorado and recorded his thoughts to his wife and five children, telling them how much he loved them.   He paused to reflect on the attributes that made each of them unique and positive individuals. He also recalled his life growing up in Blanding.   He repetitively noted the impact of the misguided acts and omissions of the Defendants and the federal felony charges against him and referred to the Defendants Federal authorities' unchecked ability to invade his family and financial affairs.   Thereafter, he went to his vehicle, hooked a hose to the exhaust pipe of the car, and asphyxiated himself.

58)     Over a thousand people attended Dr. Redd's funeral.  He was a linchpin in the Blanding community.  Sadly, but not surprisingly, Dr. Redd's suicide was only one of four triggered by roughshod, inhumane, and unjust acts by the Defendant BLM and FBI actors that day.  On June 19, 2009, a week and a half after the initial arrests, Steven Shrader of Santa Fe, New Mexico, also accused of "looting artifacts" died of two self-inflicted gunshot wounds.  Most tellingly on March 1, 2010, Ted Gardiner, the sole federal informant in Operation CERBERUS, realizing that he had played a key role in "killing two people," as noted by one of his Alcoholics Anonymous friends, took his own life with a handgun.  Mr. Gardiner had a history of substance abuse and mental health problems.  Not only did he feel responsible for both Dr. Redd's and Mr. Shrader's deaths, he also felt federal authorities had "thrown him to the curb."   Just recently, yet another vicitim of Operation Cerebus, took their life.

59)     The Defendants acts and omissions were so egregious and against public policy, not only just at the Redd's residence but throughout Blanding, that statewide outrage ensued.  The outrageous conduct of the Defendants was condemned by local and statewide law enforcement as contrary to law enforcement standards and policy that some law enforcement agencies considered bringing state charges against the Defendants.   The Utah legislature actually took action, passing House Bill 146, which restricted federal law enforcement by land management agencies. Both of Utah's United States Senators personally wrote United States Attorney Eric Holder requesting an investigation into the excessive use of force that day, and as of the date of this complaint, no investigation has been conducted. The resulting allegation is the acts and omissions on June 10, 2009, and the actions thereafter were against public policy, were overkill, defied rationale

law enforcement standards and practices, and the failure of Defendants supervisors to even investigate the incident illustrates their lack of control and demands that the remedy for the unacceptable behavior be this *Bevins* action.

60)     Utah's Senior United States Senator, Orin Hatch, praised Dr. Redd "as an outstanding and critical member of his community, a decent and honorable man, whom given the unnecessary and brutal actions by federal agents was overwhelmed and overwrought thus taking his life despite being strong person."  Senator Hatch pointed out the Department of Justice and Department of Interior's fanfare press conference announcing the glowing success of Operation CERBERUS was the biggest "dog and pony show" Senator Hatch had seen in his 33 years as a Senator. The Defendants violated Dr. Redd's constitutional rights and standard operating procedure for law enforcement officers by all of their acts and omissions set forth in this complaint, including but not limited to taunting Dr. Redd who was an outstanding member of his community, and threatening the loss of his medical licenses when arrested for a felony, based upon a trumped up and exaggerated value to support a felony charge -- for an item the Defendants cannot even adequately describe or identify.

61)     The Defendants, and most specifically Defendant Dan Love, directly participated in a taking of property without due process of law in their acts and omissions that took place after the death of Dr. Redd, while his widow was suffering from grief.  Defendant Dan Love and the other Defendants took advantage of Dr. Redd's widow's fragile condition and intimidated and coerced her into giving up all of artifacts taken from her home on June 10, 2009, and July 7, 2009. The Defendants had promised the return a number of the artifacts and personal property that were not part of

the case and as of the date of this complaint the property has still not been returned.

62)   Congruent with the roughshod, egregious, and malicious acts and omissions of the Defendants on June 10, 2010, in violation of the constitutional rights of Dr. Redd, the Defendants, specifically Defendant Dan Love, continue to engage in activity indicative of disregard for the individuals targeted, their constitutional rights, and in particular the deceased Dr. Redd and his family. In June 2010, Defendant Dan Love the primary BLM detective behind operation CERBERUS, attended a meeting of the Dixie Archeology Society in St. George, Utah.  Despite the fact prosecutions of numerous defendants in the case were still pending, Defendant Love gave a formal presentation on "Operation CERBERUS."  In the middle of the presentation, Detective Love postulated that "stealing artifacts" was a way of life for the people involved, and was a family affair in one case, showing a picture of the Redd family outdoors (confiscated during the ransacking of the family home) claiming they were out "pot hunting." Not only is this behavior contrary to the professional standards of law enforcement, the disregard for the Redd family's privacy, the untruth that was presented, and the fundamental unchecked power of Defendant Love to do or say whatever he pleases, would understandably drive a non-empowered citizen to consider suicide when faced by such blatant, unchecked, and relentless abuse of power and denial of constitutional rights.  Officer Love has also had the audacity to tell the Redd family that James (Dr. Redd) "took one for the team".  Defendant Love's lack of caring, disrespect, lack of respect for the constitution, and malfeasance continues today.  Despite most aspects of the Redd's case being closed, Defendant Love, either individually or as a representative of the government, continues to retain personal property of

the Redd's not subject to forfeiture, despite requests to return these items.

63) Defendant Love's lack of the respect for the constitution and proper law enforcement procedures was illustrated when in April of 2008, 48 artifacts alleged to have been traded in August 2007 by informant Ted Gardiner with Jeanne Redd failed to appear in the case evidence file, and were instead discovered by FBI agent Gibson M. Wilson in Defendant Love's vehicle.  These 48 items of evidence had been kept over nine months by Defendant Love, and were not recorded as evidence until Defendant Love was written up by Defendant Gibson.

64)    Each and every denial of the constitutional rights of Dr. Redd by the Defendants as set forth in this complaint is sufficient to justify relief under this *Bivens* complaint and when all are taken into consideration under the totality of the circumstances set forth herein, there is more than enough evidence to hold the Defendants liable under the law for this tragic situation.

65)    The Defendants by their acts and omissions have violated the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights of Dr. Redd, denied Dr. Redd equal protection and due process as provided in the Constitutions of the United States and the State of Utah, and their acts and omissions have directly and proximately caused James D. Redd immeasurable personal and emotional injury which resulted in his death, and have directly and proximately caused the injury and damages as set forth in this complaint.

## First Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiffs' rights under the Fourth Amendment of the Constitution of the United States by denying Plaintiffs' right to due process, freedom from unlawful dentition, freedom from

unlawful restraints, freedom from deliberate falsehoods, reckless disregard for the truth, and the denial of life, liberty and pursuit of happiness without due process and equal protection under the law.

### Second Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiffs' rights under the Fourth Amendment of the Constitution of the United States by violating Plaintiff James D. Redd's right to be secure from unreasonable search of his residence.

### Third Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiff James D. Redd's  rights under the Fourth Amendment of the Constitution of the United States by violating Plaintiffs' right to be secure from unreasonable seizure.

### Fourth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiff James D. Redd's rights under the Fourth Amendment of the Constitution of the United States by violating Plaintiffs' right to be secure from unreasonable search of his person.

### Fifth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiffs rights under the Fourth Amendment of the Constitution of the United States by violating Plaintiff James D. Redd's  right to be secure from unreasonable search and seizure by reason of the false allegation of Defendants' commission of a crime.

### Sixth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and

assert the Defendant(s) violated Plaintiffs' rights under the Fourth Amendment of the Constitution of the United States by violating Plaintiff James D. Redd's right to be secure from unreasonable search and seizure by the use of excessive and unreasonable force by the Defendants.

### Seventh Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiffs' rights under the Fourth Amendment of the of the Constitution of the United States by violating Plaintiff James D. Redd's right to be secure from unreasonable treatment and human disrespect by the Defendants.

### Eighth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiffs' rights under the Fourth Amendment of the Constitution of the United States by violating Plaintiffs' right to be secure from gross and unreasonable treatment resulting in intentional disregard of a human being and reckless disregard for a human by the Defendants and the denial of life, liberty and pursuit of happiness without due process and equal protection under the law.

### Ninth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiffs' rights under the Fourth Amendment of the Constitution of the United States by violating Plaintiffs' right to be secure from unreasonable search and seizure unless there exists probable cause for a proper search and seizure compatible with the crime charged, the existing facts, and the manner of by the warrant is served by the Defendants.

### Tenth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiffs' rights under the Fifth Amendment of the Constitution of the United States by violating Plaintiff James D. Redd's right against self incrimination in a custodial interrogation and by not violating the Plaintiff James D. Redd's right against discrimination and class so unjustified as to be in violation of due process by the Defendants and the denial of life, liberty and pursuit of happiness without due process and equal protection under the law.

### Eleventh Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiffs' rights under the Fifth Amendment of the Constitution of the United States by violating Plaintiff James D. Redd's right to due process, including but not limited to inhumane treatment, thus denying Plaintiffs of liberty and/or property without due process and the denial of life, liberty and pursuit of happiness without due process and equal protection under the law..

### Twelfth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiffs' rights under the Fifth Amendment of the Constitution of the United States by violating Plaintiff James D. Redd's right to due process, by the unlawful taking property and by converting the same to the possession of the United States or others unknown and thus denying Plaintiffs of the possession of same without due process and/or just compensation.

### Thirteenth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and

assert the Defendant(s) violated Plaintiffs' rights under the Sixth Amendment of the Constitution of the United States by violating Plaintiff James D. Redd's right to counsel and the denial of life, liberty and pursuit of happiness without due process and equal protection under the law..

### Fourteenth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiff James D. Redd's rights under the Fifth and Sixth Amendments right to counsel by failure to advise Plaintiff of his Fifth Amendment right against self incrimination and his Sixth Amendment right to counsel at the time he was detained, searched, interrogated, and mistreated and the denial of life, liberty and pursuit of happiness without due process and equal protection under the law..

### Fifteenth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiffs' rights under the Eighth Amendment of the Constitution of the United States by violating Plaintiff James D. Redd's constitutional right to be free from cruel and unusual punishment both before and after any conviction and that any cruel and unusual punishment before conviction, the subject matter of which is prohibited by the Eight Amendment is a violation of due process and the denial of life, liberty and pursuit of happiness without due process and equal protection under the law.

### Sixteenth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiffs' rights under the Eighth Amendment of the Constitution of the United States by violating Plaintiff James D. Redd's constitutional right to be free from the Defendants

unlawful and unreasonable intrusion into Plaintiff James D. Redd's life and business especially while exhibiting a reckless disregard and deliberate indifference for the life of James D. Redd and the denial of life, liberty and pursuit of happiness without due process and equal protection under the law.

### Seventeenth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiffs' rights under the Fourteenth Amendment of the Constitution of the United States by violating Plaintiff James D. Redd's constitutional right to equal protection afforded under the Constitution of the United States and the State of Utah and the denial of life, liberty and pursuit of happiness without due process and equal protection under the law.

WHEREFORE, Plaintiffs, each of them, pray for judgment against the Defendants, jointly and severally as follows:

1) That Defendants be determined to have violated the Fourth, Fifth, Sixth, Eighth & and Fourteenth Amendments to the Constitution as to the Plaintiff James D. Redd.

2) That Defendants be determined to have injured the Plaintiff James D. Redd in an amount to be determined at trial.

3) That Plaintiff James D. Redd and the Estate of James D. Redd be awarded their damages against the Defendants for his survivorship cause of action and his wrongful death cause of action.

4) That Plaintiffs be awarded damages for actual, emotional intentionally inflicted emotional damages and any consequential damages as determined at trial to be in the interests of justice.

5) That Plaintiff James D. Redd be awarded punitive damages against

the Defendants as may be reasonable and justified by the facts herein.

6) That Plaintiffs be awarded their costs and fees herein including all costs of trial, reasonable attorney fees in bringing this action and any other costs the Court deems just and proper.

Respectfully submitted this 27th day May 2011.

/s/ Edward P. Moriarity
Edward P. Moriarity, Esq.
Bradley L. Booke, Esq.
Shandor S. Badaruddin, Esq.
**Attorneys for Plaintiff**

MORIARITY, BADARUDDIN & BOOKE, LLC
124 West Pine Street, Suite B
Missoula, Montana 59802-4222
Telephone:  406-728-6868
Facsimile:  406-728-7722
Email:      Ed@mbblawfirm.com
            Brad@mbblawfirm.com
            Shandor@mbblawfirm.com

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, the Plaintiffs demand that a jury try all of the above issues and allegations.

DATED this 27th day of May, 2011.

/s/ Edward P. Moriarity

Edward P. Moriarity, Esq.
Bradley L. Booke, Esq.
Shandor S. Badaruddin, Esq.
**Attorneys for Plaintiff**

MORIARITY, BADARUDDIN & BOOKE, LLC
124 West Pine Street, Suite B
Missoula, Montana 59802-4222
Telephone:  406-728-6868
Facsimile:  406-728-7722
Email:      Shandor@mbblawfirm.com;
            Ed@mbblawfirm.com;
            Brad@mbblawfirm.com