Edward P. Moriarity Bar #5622
Shandor S. Badaruddin Bar #9999
Bradley L. Booke Bar #9984
Moriarity Badaruddin & Booke, LLC
124 West Pine Street
Missoula, Montana 59802-4222
Telephone:     406-728-6868
Facsimile:     406-728-7722
Email: shandor@mbblawfirm.com
            ed@mbblawfirm.com
            brad@mbblawfirm.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF JAMES D. REDD, M.D., et. al., <br><br> Plaintiff, <br><br> v. <br><br> DANIEL LOVE, et. al., <br><br> Defendants. | Case No. 2:11-CV-00478-TS <br><br> **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO FEDERAL DEFENDANTS' CONSOLIDATED MOTIONS TO DISMISS** <br><br> Hon. Ted Stewart |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………….…iv

STATEMENT OF ISSUES…………………………………………………………..xi

STATEMENT OF FACTS…………………………………………………………...xii

SUMMARY OF ARGUMENT………………………………………………………1

ARGUMENT………………………………………………………………………2

    I.      Qualified Immunity is Not Available to the Individual Defendants…….……2

        a.  Plaintiffs Have Alleged Facts to Support Claims Against Each Individual
           Defendant………………………………………………………..…...……3

        b.  Qualified Immunity does not preclude Plaintiff's Fourth, (Counts 1-9), Fifth
           (Counts 10-13), Sixth (Count 14), Eighth (Count 15 and 16), and Fourteenth
           (Count 17) AmendmentClaims……………………………………….……10

           i.  Qualified Immunity does not bar the Plaintiffs' Fourth Amendment
              Claims (Counts 1-9)……………………………………….…….…10

           ii.  The Defendants are not entitled to qualified immunity because they
              improperly executed a search warrant in violation of the Plaintiffs'
              clearly established Fourth Amendment right to be free from
              unreasonable searches……………………………………….…...…10

           iii.  The Defendants are not entitled to qualified immunity because they
               deceived the magistrate judge into believing that probable cause
               existed in order to obtain a search warrant of the Redds' residence.12

           iv.  The Defendants are not entitled to qualified immunity because they
               violated James Redd's clearly established Fourth Amendment Right
               against the use of excessive force…………………………….……16

               1.  The Nature and Quality of the Intrusion on James Redd's
                   Fourth Amendment Interests………………………………22

               2.  Severity of the Crime at Issue………………………………22

               3.  Dr. Redd Did Not Pose an Immediate Threat to the Safety of
                   the Officers or Others……………………………………….……23

4. Dr. Redd Did Not Resist or Attempt to Evade Arrest by Flight……………………………………………..………23

5. The Totality of the Circumstances………………………. …24

v. The Defendants are not entitled to qualified immunity because they violated Dr. Redd's clearly established Fourth Amendment right to be free from unreasonable seizure………………………………………24

vi. Defendants are not entitled to Qualified Immunity because they violated Dr. Redd's Clearly Established Fifth and Sixth Amendment Rights…………………………………………………………...…26

1. Defendants are not entitled to qualified immunity because they violated Dr. Redd's right to equal protection under the law…26

2. The Defendants are not entitled to qualified immunity because they violated Dr. Redd's clearly established Fifth Amendment right against the taking of his property without just compensation………………………………………………...27

vii. The Plaintiffs' Eighth and Fourteenth Amendment Claims…………29

II.     *Heck v. Humphrey* Does Not Apply to this Case………………………………29

III.    The Tucker Act does not Preclude a *Bivens* Remedy…………………………...31

IV.     Personal Jurisdiction over Defendants Kice and McTighe………………….…...33

CONCLUSION………………………………………………………………………………35

# TABLE OF AUTHORITIES

**CASES**

*Allen v. Muskogee,*
119 F.3d 837 (10th Cir. 1997)……………………………………………………......1, 3, 4

*Anderson v. Creighton,*
483 U.S. 635 (1987)………………………………………………...……………..2

*Ashcroft v. Iqbal,*
129 S.Ct. 1937 (2009)………………………………………………………….4

*Beard v. City of Northglenn,*
 24 F.3d 110 (10th Cir. 1994)………………………………………….…………3, 13, 19

*Bivens v. Six Unknown Federal Agents Fed. Narcotics Agents,*
403 U.S. 388 (1971)……………………………………………….……………..4, 26, 29, 32-33

*Brown v. U.S.,*
74 Fed. Cl. 546 (2006)………………………………………..……………..32

*Bruner v. Dunaway,*
684 F.2d 422 (6th Cir. 1982)……………………………………….……………1, 5

*Bruning v. Pixler,*
949 F.2d 352 (10th Cir. 1991)……………………………………………15

*Bush v. Lucas,*
462 U.S. 367 (1983)…………………………………………………33

*Butcher's Union Local No. 498 v. SDC Inv., Inc.,*
788 F.2d 535 (9th Cir. 1986)…………………………………….……………34

*Butler v. Compton,*
482 F.3d 1277 (10th Cir. 2007)……………………………………..………1, 31

*Byrd v. Brishke,*
466 F.2d 6 (7th Cir. 1972)……………………………………….……….5

*Byrd v. Clark,*
783 F.2d 1002 (11th Cir. 1986)……………………………..…………………5

*Cannon v. City of Denver*,
998 F.2d 867 (10th Cir. 1993)………………………………………………………….……………3

*City of Canton, Ohio v. Harris*,
489 U.S. 378 (1989)………………………………………………………………………………….4

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)…………………………………………………………………………….……..27

*Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*,
723 F.2d 357 (3d Cir. 1983)…………………………………………………………………..………34

*Cortez v. McCauley*,
478 F.3d 1108 (10th Cir. 2007)……………………………………………………….……………...20, 21, 23-25

*Creamer v. Porter*,
754 F.2d 1311 (5th Cir. 1985)……………………………………………………………………….6

*Davis v. Passman*,
442 U.S. 228, 230 (1979)…………………………………………………………...……………………26

*Dixon v. Richer*,
 922 F.2d 1456 (10th Cir. 1991)………………………………………………….…..……………..21

*FDIC v. Meyer*,
510 U.S. 471 (1994)………………………………………………………………………………….32

*First English Evangelical Church of Glendale v. Los Angeles County, Cal.*,
482 U.S. 304 (1987)………………………………………………………………….……………….28

*Franks v. Delaware*,
438 U.S. 154 (1978)…………………………………………………………………….……………14

*Gallagher v. Shelton*,
587 F.3d 1063 (10th Cir. 2009)……………………………………………………...……………...1, 7

*Graham v. Connor*,
490 U.S. 386 (1989)………………………………………………………………….………………20, 22

*Grimsley v. MacKay*,
93 F.3d 676 (10th Cir. 1996)……………………………………….…………………3

*Gutierrez-Rodriguez v. Cartagena*,
882 F.2d 553 (1st Cir. 1989)……………………………………………….…1, 5, 7, 9

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982)………………………………………………….……………..2

*Harris v. Chanclor*,
537 F.2d 203 (5th Cir. 1976)………………………………………………………5

*Heck v. Humphrey*,
512 U.S. 477 (1994)………………………………………………….………1, 29-31

*Holland ex rel. Overdorff v. Harrington*,
268 F.3d 1179 (10th Cir. 2001)……………………………………………………21

*Huerta v. U.S.*,
548 F.2d 343 (Ct. Cl. 1977)………………………………………….……………31

*James by James v. Sadler*,
909 F.2d 834 (5th Cir. 1990)……………………………..……………………1, 6, 9

*Juriss v. McGowan*,
957 F.2d 345 (7th Cir. 1992)…………………………..……………...13

*Kaul v. Stephan*,
83 F.3d 1208 (10th Cir. 1996)……………………………………………………15

*La Compania Ocho, Inc. v. U.S. Forest Serv.*,
874 F.Supp. 1242 (D.N.M. 1995) ………………………………………………...33

*Lundstrom v. Romero*,

616 F.3d 1108 (10th Cir. 2010)……………………………………………………………25

*Malley v. Briggs,*
 475 U.S. 335 (1986)………………………………………………………………13, 24-25

*Marks v. Clarke,*
102 F.3d 1012 (9th Cir. 1996)……………………………………………………………..13

*Marron v. United States,*
275 U.S. 192 (1927)…………………………………………………………………11-12

*Maryland v. Pringle,*
540 U.S. 366 (2003)……………………………………………………………….…25

*McClesky v. Kamp,*
481 U.S. 279 (1987)……………………………………………………………….…27

*Meade v. Grubbs,*
 841 F.2d, 1512 (10th Cir. 1988)……………………………………………………….3, 7

*Melton v. Okla. City,*
879 F.2d 706 (10th Cir. 1989)……………………………………………………………..3

*Naskar v. U.S.,*
 82 Fed. Cl. 319 (2008)……………………………………………………..…………31

*Nixon v. U.S.,*
 978 F.2d 1269 (D.C. Cir. 1992)…………………………………………………………28

*O'Neil v. Krzeminski,*
839 F.2d 9 (2d Cir. 1988)…………………………………………………………….1, 5

*O'Rourke v. City of Norman,*
875 F.2d 1465 (10th Cir. 1989)…………………………………………………………...11

*Okra v. Callaghan,*
 324 F.3d 488 (7th Cir. 2003)……………………………………………..………32

*Oppenheimer Fund, Inc., v. Sanders,*
437 U.S. 340, 351, n.13 (1978)…………………………………………………………35

*Pearson v. Callahan,*
55 U.S. 223 (2009)………………………………………………………..……………2

*Peterson v. Jensen,*
371 F.3d 1199 (10th Cir. 2004)………………………………..……………………11

*Pierson v. Ray,*
386 U.S. 547 (1967)……………………………………………………..……………...2

*Putnam v. Gerloff,*
639 F.2d 415 (8th Cir. 1981)……………………………………..………………5

*Renner v. Lanard Toys Ltd.,*
33 F.3d 277 (3d Cir. 1994)………………………………………………….……34

*Rivera v. United States,*
928 F.2d 592 (2d Cir. 1991)…………………………………………………….13

*Saucier v. Katz,*
533 U.S. 194 (2001)……………………………………………..………………..2

*Schwarzenegger v. Fred Martin Motor Co.,*
374 F.3d 797 (9th Cir. 2004)………………………………………….……………33

*Sioux City Bridge Co. v. Dakota County,*
260 U.S. 441 (1923)……………………………………………………..…………...27

*Smith v. Ross,*
482 F.2d 33 (6th Cir. 1973)…………………………………………….…………5

*Snell v. Tunnell,*
920 F.2d 673 (10th Cir. 1990)………………………………………….……………3

*Tennessee v. Garner,*
471 U.S. 1, 7 (1985)……………………………………………...…………………20, 25

*U.S. v. Ludwig,*
641 F.3d 1243 (10th Cir. 2011)……………………………………..………15

*U.S. v. Williams,*
 737 F.2d 594 (7th Cir. 1984)…………………………………………………14

*United States v. Carey*,
172 F.3d 1268 (10th Cir. 1999)…………..…………………………………………………10

*Wheeler v. Mental Health & Mental Retardation Authority*,
752 F.2d 1063 (5th Cir. 1985)…………………………………………………..………3

*Yee v. City of Escondido, Cal*.,
503 U.S. 519 (1992)…………………………………………………………………28

## STATUTES

16 U.S.C. §§ 470 ee (b), (f) (2006)…………………………………………..……18

25 U.S.C. § 3002(3)(d) (2006)………………………………………………..……18

28 U.S.C. §§ 2679(a)-(b)(2006)………………………………………………..…32, 33

28 U.S.C. § 1491 (2006)……………………………………………………..…4

28 U.S.C. § 1631 (2006)…………………………………………………….…31, 32

42 U.S.C. § 1983 (2006)…………………………………………………………..33

## RULES

Fed. R. Civ. P. 10(a)…………………………………………………………29

Fed. R. Civ. P. 12(b)(2)………………………………………………………...33

Fed. R. Civ. P. 12(i)…………………………………………………………33

## OTHER AUTHORITIES

5A Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure* § 1351 at 308-312 (3d ed. 2004)............................................34

**STATEMENT OF ISSUES**

I.      Whether the Court may consider attachments to the pleadings when considering a
        Rule 12(b)(6) or 12(b)(2) Motion.

II.     Whether each Complaint alleges that each Defendant had personal involvement in the
        deprivation of Dr. Redd's Constitutional rights.

III.    Whether qualified immunity protects defendants who knowingly violate clearly
        established constitutional rights.

IV.     Whether *Heck v. Humphrey*, 512 U.S. 477, 485 (1994) requires the dismissal of a
        *Bivens* suit brought by the estate of a person who had never been convicted of a
        crime.

V.      Whether the Tucker Act, 28 U.S.C. § 1491 deprives the Court of jurisdiction to hear a
        constitutional tort case against federal agents in their individual capacity.

VI.     Whether the Court should defer ruling on the Fed. R. Civ. P. 12(b)(2) Motion.

## STATEMENT OF THE FACTS

The facts surrounding Operation CERBERUS and James Redd's resulting death are laid out

in the Complaint. However, the facts relevant to the Defendants' Motion to Dismiss are included

herein:

James Redd was a devoted father of five who, for many of the 30-odd years he lived in

Blanding, Utah, served as the sole doctor in the community. Compl. ¶ 2. The individually named

Defendants are all alleged to be members of Operation CERBERUS, a group of 80 federal agents

who, on June 10, 2009, descended upon James Redd's home, armed in flak jackets and wielding

assault rifles. Compl. ¶ 1. The raid culminated a two-and-a-half year undercover operation into

an investigation billing itself as "the largest investigation ever into the looting of Native

American artifacts on public lands." Compl. ¶ 12. Operation CERBERUS was a taxpayer-

financed conspiracy aimed at curbing the collection of Native American artifacts regardless of

whether the collection was legal. Compl. ¶ 14. The Defendants' investigation led them to Ted

Gardiner, a collector and dealer of Native American artifacts who the Defendants converted to a

confidential informant. Compl. ¶ 15. The Defendants paid no attention to the fact that Gardiner

had burned his bridges in the Native artifacts community through illegitimate business practices.

Compl. ¶ 17. Nor did they bother to question his history of drug abuse and alcoholism or his

struggles with his mental health. *Id*. For Gardiner, the opportunity must have appeared to be a

stroke of luck; his paycheck garnered him $7,500 per month and  $224,000 during the entire

operation. Compl. ¶ 27.

Finally, the Defendants failed to acknowledge that the Native artifacts community policed

itself; federal agents outside of Utah were already cooperating with reputable and established

dealers who reported the few illicit traffickers to authorities to maintain the integrity of the marketplace. Compl. ¶ 18.

Despite their knowledge of Gardiner's unsavory past, the Defendants did not question his allegations regarding kingpins trafficking items robbed from federal and tribal lands and that such activity allegedly plagued the Four Corners area of the United States. Compl. ¶¶ 16, 19.

The Defendants trained Gardiner to artificially raise the value he paid for purchases so they could file felonies where misdemeanors or inaction would be required. Compl. ¶¶ 24-25. In particular, the Defendants did not distinguish between articles found on private land – which are legal – and articles found on public land – which are not. Compl. ¶ 25.  Nor did the Defendants distinguish items found prior to the enactment of the Artifact Protection Act, or articles that originated within Native American civilizations that did not exist in Utah. *Id*. Those items were legal to possess as well. *Id*. The Defendants made no effort to educate Gardiner as to any of the legal boundaries governing his conduct or their investigation. *Id*. Dr. Redd became a victim of the Government and Agents' activity when the Defendants manufactured a felony against him when they knew that he had not broken the law. Compl. ¶¶ 41-42.

At 6:55 a.m., on June 10, 2009, Dr. Redd was accosted as he returned home from an early-morning visit to his clinic. Compl. ¶ 31. The Defendants restrained Dr. Redd as he exited his car, shackled him, handcuffed him and sequestered him in his own garage. Compl. ¶ 32. For the next four hours, the Defendants rebuked, terrified and humiliated Dr. Redd. Comp. ¶ 34. They taunted him that he would lose his medical license and called him a liar when he professed his innocence.  Compl. ¶¶ 35-36. Ultimately, they arrested him for a crime he did not commit. Compl. ¶ 1. The day following the raid, Dr. Redd recorded a message to his family. Compl. ¶ 57.

He noted the impact that the raid and the misguided felony charge had upon his life. *Id.*

Thereafter, he went to his vehicle, hooked a hose to the exhaust pipe of the car and asphyxiated

himself. *Id*.

## SUMMARY OF ARGUMENT

The Defendants' Motion urges the Court to apply an unduly narrow reading of the requirement that all defendants must have personal involvement in the deprivation of a plaintiff's constitutional rights in order to gain liability for a constitutional tort. *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009). Supervisors incur liability if an affirmative link exists between their own conduct and the constitutional deprivation. *Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997), as do team members. *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989), as well as participants in a search. *James by James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990). Inaction also incurs liability. *O'Neil v. Krzeminksi*, 839 F.2d 9, 11 (2d Cir. 1988). An officer who witnesses a fellow officer depriving an individual constitutional rights without intervening is subject to liability. *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982).

Within the context of these rules, the Plaintiffs have alleged specific facts that give rise to liability for each Defendant. More troubling is the fact that the Defendants knew through the use of wiretaps and outright fabrication that they were manufacturing charges against Dr. Redd. Such allegations amount to a violation of one or more clearly established constitutional rights, and thus qualified immunity is unavailable to any Defendant.

*Heck v. Humphrey* and the Tucker Act do not mandate dismissal. The purpose of the *Heck* rule is to "prevent litigants from using a [constitutional tort] action, with its more lenient pleading rules, to challenge their conviction or sentence without complying with the more stringent exhaustion requirements for habeas actions." *Butler v. Compton*, 482 F.3d 1277, 1279 (10th Cir. 2007). No court has ever extended the *Heck* rule to cover constitutional tort actions, which would imply the invalidity of a third party's conviction, and no reason exists for doing so.

Finally, because the Plaintiffs bring this action against the Defendants in their individual

capacities, the Tucker Act, 28 U.S.C. § 1491, does not apply.

## ARGUMENT

### I.     Qualified Immunity is Not Available to the Individual Defendants.

When government officials abuse their offices, "action[s] for damages may offer the only

realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S.

800, 814 (1982). Nevertheless, courts generally afford government officials immunity from suit

when performing discretionary functions. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The

immunity, however, is qualified; government officials may claim immunity, despite the clear

existence of a constitutional principle that governs the case, only if a reasonably well-trained

officer would not have known that his or her conduct would violate the plaintiffs' constitutional

rights. *Id*. at 641. The analysis of qualified immunity then, follows two steps: (1) "Taken in the

light most favorable to the party asserting the injury, do the facts alleged show that the officer's

conduct violated a constitutional right?" and (2) Was that constitutional right clearly established

at the time of the defendant's misconduct? *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts are

"permitted to exercise their sound discretion in deciding which of the two prongs of the qualified

immunity analysis should be addressed first, in light of the circumstances of the particular case at

hand." *Pearson v. Callahan*, 55 U.S. 223, 236 (2009).

The assertion that the Defendants acted in good faith has no bearing on whether they are

guilty of constitutional violations. *Harlow*, 457 U.S. at 818 (announcing that the Court departed

from the good faith standard articulated in *Pierson v. Ray*, 386 U.S. 547, 557 (1967)). The advice

of counsel that the dismissal of an employee was justified does not bestow qualified immunity

upon a defendant. *Melton v. Okla. City*, 879 F.2d 706, 731 (10th Cir. 1989) (*modified en banc*, 928 F.2d 920 (1991)). Nor will advice from a judge bar liability through qualified immunity. *Cannon v. City of Denver*, 998 F.2d 867, 874 (10th Cir. 1993).

No qualified immunity can be claimed with respect to unconstitutional conduct that involves an element of culpability that is inconsistent with finding that the defendant acted in a reasonably objective manner. *Beard v. City of Northglenn*, 24 F.3d 110, 114-115 (10th Cir. 1994) (if claimant proves that police deliberately submitted false information to obtain search warrant, no immunity defense); *Snell v. Tunnell*, 920 F.2d 673, 692 (10th Cir. 1990) (false statements in petition to remove children from shelter not protected by qualified immunity).

If the jury finds that the action against the plaintiff was taken based on plaintiff's constitutionally protected conduct (prevailing on previous charge), the jury must find that defendants violated plaintiff's federal constitutional rights. *Wheeler v. Mental Health & Mental Retardation Authority*, 752 F.2d 1063, 1069 (5th Cir. 1985).

Defendants are not entitled to qualified immunity because each of them violated the Plaintiffs' clearly established constitutional rights.

### a. Plaintiffs Have Alleged Facts to Support Claims Against Each Individual Defendant.

It is true that a defendant must have personal involvement in the alleged constitutional violation to be liable for a constitutional tort and that supervisory status alone is not enough. *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996). It is also true that a supervisor may incur liability if an "affirmative link" exists between the constitutional deprivation and either the supervisor's personal participation, the supervisor's exercise of control or direction, or the supervisor's failure to supervise. *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988). *Allen*

*v. Muskogee*, 119 F.3d 837 (10th Cir. 1997) illustrates the circumstances under which a supervisor (in this case, a municipality) acquires liability through its own actions. *Allen* involved an action under 42 U.S.C. § 1983 (2006), the law to which the Supreme Court labeled *Bivens* actions, the "federal analog." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009).

In *Allen*, the Tenth Circuit considered whether the City of Muskogee was liable under § 1983 for failing to train officers who had violated the plaintiff's constitutional rights. *Allen*, 119 F.3d at 841. As a preliminary matter, the Court warned that supervisory liability does not necessarily require a constitutional violation by the individual officers as a prerequisite. *Id*. Instead, municipalities may become liable when "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability." *Id*. at 842.

In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989), the Supreme Court explained when inadequate police training constitutes city policy and thus imposes supervisory liability upon a municipality:

> It may happen that in light of the duties assigned to specific officers or employers, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury…

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that the failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

4

In addition, law enforcement officers may gain liability through inaction as well: "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his or her presence by other officers." *O'Neil v. Krzeminksi*, 839 F.2d 9, 11 (2d Cir. 1988). A police officer has an affirmative legal duty to block any other police officer in his or her presence from violating constitutional rights. *Smith v. Ross*, 482 F.2d 33, 36-37 (6th Cir. 1973). If any police officer witnesses another officer engaging in unconstitutional conduct and does not take steps to prevent such conduct, then the officer who witnesses, but who fails to attempt to prevent such conduct, is liable for the consequences of such conduct. *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982). Nearly half of the circuits place § 1983 liability on a police officer when the officer, whether supervisory or not, fails to intervene when a constitutional violation takes place in his or her presence. *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986); *Bruner*, 684 F.2d at 426, cert. denied, 459 U.S. 1171 (1983); *Putnam v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981); *Harris v. Chanclor*, 537 F.2d 203, 206 (5th Cir. 1976); and *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972).

Law enforcement officers may also incur liability when they form part of a group. No matter whose actions ultimately inflicted the plaintiff's injury, all members off the "team" may be held liable when the deprivation of rights is the result of a "team effort." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989). *Gutierrez* is particularly instructive in the context of this case. The facts reflect the recklessness with which a cadre of special agents, expecting the extraordinary, may confront the mundane. On a date one night, Gutierrez, accompanied by a young lady, sat in his car in a secluded spot above San Juan, Puerto Rico. *Id*. at 557. That same evening, four members of the Carolina Drugs and Narcotics Division of the Police Department

of Puerto Rico patrolled the same area scanning for drug activity. *Id*. The officers, dressed as

civilians, drove an unmarked car. *Id*.  When they spotted Gutierrez, they approached the car,

guns drawn. *Id*. At the site of four unidentified gunmen approaching, Gutierrez hastily started his

car and drove away. *Id*. The officers immediately opened fire. *Id*. Although all four officers were

shooting, only one bullet struck Gutierrez. *Id*. Unfortunately, it hit his spine rendering him a

paraplegic. *Id*. Although only one of the officers had actually injured Gutierrez, the First Circuit

found all four liable explaining:

> It was eminently foreseeable that an encounter with a civilian by four policemen
> with weapons drawn and ready to fire might result in a discharge of the firearms
> and an injury to the civilian. No matter whose bullet ultimately inflicted plaintiff's
> injury, the deprivation of Gutierrez's constitutional rights was the result of a team
> effort. The officers exited their vehicle with guns drawn. As plaintiff pulled away
> a number of shots, "around five or six" according to Gutierrez, were fired. That
> only one bullet found its mark was fortuitous, not exculpatory.

*Id*. at 561. In *James by James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990), the Fifth

Circuit explained when search participants gain liability under § 1983. A backup officer who

stands at the door of the building while a search proceeds is a full, active participant in the

search, not a mere bystander, and thus performs police functions that are integral to the search.

*Id*. An officer who is present until the search is completed and the seized items removed from the

premises incurs liability. *Id*. *quoting Creamer v. Porter*, 754 F.2d 1311, 1316 (5th Cir. 1985)).

Officers who remain armed on the premises throughout an entire search may also be liable. *Id*.

Officers who guard the detainees outside while a search and arrest proceeds may be liable

because their activities are integral to the search and render them participants rather than

bystanders. *Id*. Lastly, those who provide surveillance and backup may be liable. *Id*.

6

As the preceding discussion demonstrates, personal involvement is, indeed, necessary to incur liability for a constitutional tort. *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009). However, liability is not limited to the soldiers on the ground. Supervisors and team members also incur liability if the requisite affirmative link exists to connect them to the tort. *Meade*, 841 F.2d at 1527, (supervisors); *Gutierrez-Rodriguez*, 882 F.2d at 561 (team members).

Construing the facts in the light most favorable to the non-movant, the Plaintiffs have established a sufficient factual basis to withstand a motion to dismiss. The Defendants knew to a moral certainty that they were training Gardiner, the informant, to purchase items that had been illegally obtained. Yet with that objective, the Defendants failed to train Gardiner to recognize which items were legal and which were not. They failed to train him to ask the all-important question that would classify the item as legal or illegal: where and when was the item found? If the item was found on private property, it was legal. If the item was found before the introduction of the Archaeological Resource Protection Act, it was also legal. If Gardiner had asked the Redds those central questions, he would have found that the Defendants had no case against Dr. Redd. This failure to train provides the affirmative link that connects the Defendants to the deprivation of Dr. Redd's constitutional rights.

Further, as members of Operation CERBERUS, each and every Defendant, as well as approximately 66 other agents, descended upon Dr. James Redd's residence in Blanding, Utah, in an unprovoked and unnecessary show of force that ultimately caused Dr. Redd to take his own life. Compl. ¶¶ 1,5,6. Each and every Defendant was a member of Operation CERBERUS, essentially a conspiracy to prohibit the legal collection of artifacts. Compl. ¶ 14. As members of Operation CERBERUS, each and every Defendant ignored Ted Gardiner's shady past and

accepted the veracity of a colorful tale describing "an illicit black market…without any precautionary assessment of veracity." Compl. ¶ 17.  Once Ted Gardiner had gained employment as a confidential informant, each and every Defendant, as a member of Operation CERBERUS, encouraged Gardiner to purchase Indian artifacts at artificial prices from people with no criminal history or disposition and without any propensity to sell such items. Compl. ¶¶ 21, 23. Operation CERBERUS' sole reason for encouraging such inflated purchases was to secure a false, but adequate, basis for a felony charge. Compl. ¶ 25. As members of Operation CERBERUS, each and every Defendant participated in the willful ignorance of law. The member Defendants made no effort to distinguish between legal artifacts acquired on private land and looted artifacts stolen from the public. Compl. ¶25.

Once the Defendant members of Operation CERBERUS decided to conduct a raid, they did so in violation of Dr. Redd's Fourth Amendment right to be free from excessive force, and descending upon the Redd home "armed with a ridiculous and disproportionate number assault rifles, while clothed in flak-jackets," the Defendants accosted Dr. Redd, a man with only a peaceful history, and imprisoned him for hours in his own garage without counsel. Compl. ¶¶ 30-33. Most importantly, the Defendants, as members of Operation CERBERUS, were aware or should have been aware of the psychological effects that their baseless accusations would have on Dr. Redd. Compl. ¶¶ 39. Yet the Defendants continued their unprovoked harassment despite zero evidence that he possessed the item he had been indicted for possessing. Compl. ¶¶ 40-41.

In fact, the Defendants, as members of Operation CERBERUS, manufactured a false value of the artifact at issue in Dr. Redd's indictment. Compl. ¶42. With the false value, the Defendants misrepresented the severity of the alleged crime against Dr. Redd in an unsuccessful attempt to

get him to admit to a crime that the Defendants knew, or should have known, that he did not commit. Compl. ¶ 42. The Defendants had several reasons for their actions, none of them legitimate and at least one of them vindictive. Compl. ¶ 47.

Specifically, the Defendants violated Dr. Redd's constitutional rights by giving deliberate falsehoods or passing information with a reckless disregard for the truth. Compl. ¶ 49. The Defendants used excessive force although nothing ever suggested to them that Dr. Redd was a threat or possessed any kind of weapon. Compl. ¶¶ 50-51. Nor did the Defendants justify the manner of the execution of the warrant. Compl. ¶ 55. The Defendants made an example of Dr. Redd by using a disproportionate number of agents and weapons to arrest him. Compl. ¶ 56. As a result, Dr. Redd killed himself, a result the Defendants, as members of Operation CERBERUS should have expected. Compl. ¶¶ 57, 62. After Dr. Redd's death, the Defendants, as members of Operation CERBERUS, took his property. Compl. ¶ 61. These acts and omissions deprived Dr. Redd of his Fourth, Fifth, and Sixth Amendment rights. Compl. ¶ 65.

That Dr. Redd took his own life as a result of the raid was not fortuitous, but foreseeable, a fact that each and every Defendant knew or should have known. *Gutierrez*, 882 F.2d at 561. Each and every Defendant was also present while agents deprived Dr. Redd of his constitutional rights and either participated in the actual deprivation, or stood by and observed it without performing their affirmative duty to stop the violation. *James*, 909 F.2d at 837. At the very least, they were present, they were armed, and they stood guard: actions sufficient to render them liable for Dr. Redd's death. *Id*. The Court should deny the Defendants' motion and allow the case to proceed.

     **b.  Qualified Immunity does not preclude Plaintiff's Fourth, (Counts 1-9), Fifth (Counts 10-13), Sixth (Count 14), Eighth (Count 15 and 16), and Fourteenth (Count 17) Amendment Claims.**

      **i.  Qualified Immunity does not bar the Plaintiffs' Fourth Amendment Claims (Counts 1-9).**

The Complaint asserts nine separate causes of action under the Fourth Amendment. The First Cause of Action alleges that the Defendants violated the Plaintiffs' right to due process, unlawful detention, freedom from unlawful restraints, freedom from deliberate falsehoods, reckless disregard for the truth, and the denial of life, liberty and pursuit of happiness without due process and equal protection under the law. Compl. ¶¶ 24-25. Plaintiffs concede that these claims fall more appropriately under the Fifth Amendment, which is addressed *infra* at the Argument Section (b)(iv), page 20.

The Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Causes of Action collectively allege claims for unreasonable search and seizure, lack of probable cause, and excessive use of force.

      **ii.  The Defendants are not entitled to qualified immunity because they improperly executed a search warrant in violation of the Plaintiffs' clearly established Fourth Amendment right to be free from unreasonable searches.**

Even assuming the search warrant was valid, the members of Operation CERBERUS still lack qualified immunity because they improperly executed the search warrant of the Redds' residence. The Fourth Amendment's particularity requirement targets the constitutional evil of "general exploratory rummaging in a person's belongings pursuant to a warrant." *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999). In 1927, the Supreme Court established that "the requirement that warrants shall particularly describe the things to be seized makes general

searches under them impossible and prevents the seizure of one thing under a warrant describing

another." *Marron v. United States*, 275 U.S. 192, 196 (1927). The essential inquiry when faced

with challenges under the Fourth Amendment is whether the search or seizure was reasonable.

*O'Rourke v. City of Norman*, 875 F.2d 1465, 1472 (10th Cir. 1989).

When officers overstay a search warrant, they do not act reasonably. In *Peterson v. Jensen*,

371 F.3d 1199 (10th Cir. 2004), The court denied qualified immunity to officers who continued

to search an apartment pursuant to a valid search warrant after the officers verified that the item

they sought was not present. *Id*. at 1203.

The search warrant at issue authorized the members of Operation CERBERUS to confiscate

the following:

> All records relating to violations of 16 U.S.C. 470 ee (b) trafficking in illegally
> obtained artifacts and/or 18 U.S.C. 641, theft/retention of stolen property, 18
> U.S.C. 1163, embezzlement and theft from Indian tribal organizations and/or 18
> U.S.C. 1170, illegal trafficking in sacred objects and or items of cultural
> patrimony...[sic].

> See Affidavit and Application for Search Warrant, attached as Exhibit 1, at Attachment

B, ¶ 1, page 16. In addition, the search warrant authorized the confiscation of:

> any and all artifacts and or items relating to violations of 16 U.S.C. 470 ee(b),
> trafficking in illegally obtained artifacts, 18 U.S.C. 641, theft or retention of
> stolen government property, 18 U.S.C. 1170, illegal trafficking in sacred objects
> and or items of cultural patrimony or 18 U.S.C. 1163, embezzlement and theft
> from Indian tribal organizations.

*Id.* at ¶ 2. It did not authorize the CERBERUS Defendants to "accost Dr. Redd as he

returned to his residence from his early morning visit to his clinic," Compl. ¶ 31. Rather

than question Dr. Redd in an appropriate manner, with his attorney, the Defendants

"manhandled and handcuffed" Dr. Redd, and isolated him in his garage for four hours of

interrogation. Compl. ¶ 32. During the interrogation, the Defendants "rebuked, terrified and humiliated Dr. Redd." Compl. ¶ 34. They accused him of unlawful activity he did not commit. Compl. ¶ 35. They taunted him with the loss of his medical career and called him a liar. Compl. ¶ 36. The Defendants committed these violations of Dr. Redd's Fourth Amendment rights fully "aware of the psychological impact of their assault on Dr. Redd, knowing that his life focused on his family, his religion, his profession, and his community." Compl. ¶ 38.

The search warrant, even if it was supported by probable cause, authorized the agents to search the Redd household for items that may implicate one or more of the Redds for violations of the various laws listed within it. The search warrant did not authorize the Defendants to effectively imprison Dr. Redd within his own household, taunt him, humiliate him, and then arrest him for an offense that they knew Dr. Redd could not possibly have committed. The reasonableness of the search did not include an interrogation of Dr. Redd, and no reasonable officer could have thought that such use of a search warrant amounted to appropriate conduct.

The improper execution of the search warrant satisfies both prongs of the qualified immunity test. It violated Dr. Redd's Fourth Amendment right to be free from an unreasonable search, a right the Supreme Court established with *Marron* in 1927, some 80 years prior to the raid on the Redds' residence. The Court should therefore deny the motion to the extent it is based on qualified immunity for the Operation CERBERUS defendants.

            **iii.   The Defendants are not entitled to qualified immunity because they deceived the magistrate judge into believing that probable cause existed in order to obtain a search warrant of the Redds' residence.**

The U.S. Supreme Court has made it clear that constitutional tort defendants "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If an arrest warrant issues without probable cause, even "a facially valid arrest warrant does not shield otherwise reasonable conduct." *Juriss v. McGowan*, 957 F.2d 345, 351 (7th Cir. 1992). An officer can not reasonably believe that a warrant was properly issued if the magistrate or judge issuing the warrant was misled by information in an affidavit that the affiant knew was false, or would have known was false except for his reckless disregard for the truth. *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). Where an officer knows or has reason to know that he materially misled a magistrate on the basis for a finding of probable cause, the shield of qualified immunity is lost. *Id*. Even if the officer relied on the advice of others, acting pursuant to that advice does not automatically render the officer protection. "Determining whether an officer seeking a warrant is entitled to immunity is not limited to considering whether that officer sought advice from others, such as attorneys, before seeking the warrant or whether a judge ultimately authorized the warrant." *Marks v. Clarke*, 102 F.3d 1012, 1026 n. 31 (9th Cir. 1996). The officer must still use his or her independent judgment. "The officer applying for the warrant is required to minimize the danger of an arrest 'by exercising reasonable professional judgment.'" *Id*. (quoting *Malley*, 475 U.S. at 345).

In the Tenth Circuit, the same rule applies. If a plaintiff proves that police deliberately submitted false information to obtain a search warrant, the police are not entitled to qualified immunity. *Beard*, 24 F.3d at 114-115. In *Beard*, the Court defined clearly established law in 1994: "Clearly established law indicates that an arrest is valid and does not violate the Fourth

Amendment if the warrant underlying it was supported by probable cause at the time of its issuance; this holds true even if later events establish that the target of the warrant should not have been arrested." *Id*. at 114. The relevant question then becomes "whether the warrant issued for [the plaintiff's] arrest was constitutionally sufficient when sought." *Id*. Beard asserted the same infirmities that led to the invalid warrant at issue here:

> He asserts that the affidavit contained false information that, if excised, would have negated probable cause; he argues as well that the document failed to mention material facts in the officers' possession that, if they had been included, would have had the same invalidating effect. To impeach an otherwise valid warrant on the ground that it was issued on specified information that was false and critical to the finding of probable cause requires proof that the affiant seeking the warrant knew that the challenged information was false or that he had a reckless disregard for its truthfulness.

*Id*. "'Allegations of negligence or innocent mistake are insufficient.'" *Id*. (*quoting Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). When officers decide to omit from their warrants information in their possession that is also critical to the showing of probable cause, Courts apply the *Franks* standard. *Id*.

> If, after all, a claimant is able to prove the necessary deliberate falsehood or reckless disregard to impeach a facially valid warrant, the reasonableness inquiry has to be resolved against the defendant since no reasonably competent officer could believe an arrest legal where it was his deliberate or reckless deception that led the magistrate into issuing the warrant.

*Id*. at 115. Under the Fourth Amendment, the inquiry of whether deliberate falsehood or reckless disregard for the truth exists "focuse[s] neither on the existence nor the consequence of [the Defendant]'s error but on the intention behind it." *Id*. at 116. Evidence must exist that the officer "'in fact entertained serious doubts as to the truth of his allegations…and a fact finder may infer reckless disregard from circumstances evincing 'obvious reasons to doubt the veracity of the allegations.'" *Id*. (*quoting U.S. v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984)). If an

officer does, in fact, knowingly or recklessly make a false statement in an affidavit in support of

a search warrant that is material to a finding of probable cause, the officer violates the plaintiff's

Fourth and Fourteenth Amendment rights. *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991).

That rule is clearly established. *Id*. Even if a magistrate authorizes a warrant, qualified immunity

does not shield an officer from constitutional tort liability if the warrant is so lacking in indicia of

probable cause as to render official belief in its existence unreasonable. *Kaul v. Stephan*, 83 F.3d

1208, 1213 (10th Cir. 1996). Lastly, The Fourth Amendment's probable cause standard requires

a showing that there is a fair probability that contraband or evidence of a crime will be found.

*U.S. v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011).

The affidavit in support of the search warrant is patently false in many places and contains a

variety of inconsistencies that the Defendant members of Operation CERBERUS knew or should

have known were present. ¶ 17 of the Application and Affidavit for Search Warrant, attached as

Exhibit 1, which is illustrative of the defects in the entire warrant, states:

> The illegal network is a very close knit entity. Individuals who deal in stolen
> archaeological objects are usually very careful to disguise the site of the origin.
> This is usually done by identifying the site of origin as leased and/or private
> property. Objects typically are sold with a letter of provenance which acts as a
> sort of title document. Letters of provenance usually list the individuals who
> found the item, identify the location where it was found, and include assurances
> that the item was not illegally collected from public lands or Indian lands. For
> most transactions involved in this investigation, the Source provided a blank letter
> of provenance to the seller, who then represented that the artifact came from
> leased and/or private land. In fact, the seller recovered and/or knew the item was
> recovered on public and/or Indian land. The seller then filled out the blank letter
> of provenance with the false information. Further, the seller identified for the
> Source on a topographic land use map, the real public land location from which
> the item was recovered. This was done by the seller who pointed to the location
> on the map from where the item was recovered or circled the location on the map.

¶ 17 fails to allege any facts with specificity that would lead a reasonable officer to believe he had probable cause to search the Redds' residence. The vague assertions that "the illegal network is a very close knit entity," who "are usually very careful to disguise the site of the origin," lack even the most rudimentary factual support. Rather than allege with any specificity reasons that the Redds' various letters of provenance contain false information, the affidavit simply attributes an illegal *modus operandi* to an ill-defined group of people and insinuates that letters of provenance that Operation CERBERUS uncovered during its operation are to be treated as fraudulent even though people like the Redds were assured the item was not illegally obtained.

¶ 20 of the Application and Affidavit for Search Warrant, attached as Exhibit 1, contains false information and/or lacks indicia of probable cause as well:

> The Source then asked [Jeanne] Redd what business she wanted to do that day. Redd and the Source then engaged in a trade, valued at about $600. Redd gave the Source a grouping of miscellaneous artifacts in a frame in exchange for a button. The button purportedly came from Dark Canyon. Redd told the source that she found the two pendants, which were among the items in the frame she provided to him, at Burial Mounds, lower Recapture Canyon, within the last eight years.

The Government conducted zero investigation into its valuations. Instead, it relied on the informant Ted Gardiner – a man in dire financial straits – to value its items. Conveniently, the inflated prices most always alighted on a range above $500, (see ¶ 21) the valuation the Government would need to ensure a felony charge. The inflated pricing underscores the point that the Government knew it did not have adequate evidence to allege a felony, but manufactured information to generate one. Compl. ¶ 15.

¶ 22 of the Application and Affidavit for Search Warrant, attached as Exhibit 1, provides:

> The Source and [Jeanne] Redd then engaged in another trade valued at $1,000 in which the Source provided Redd with an effigy bird pendant in return for one frame of artifacts which were previously discussed. The frame had prices from a

previous transaction written on it. The effigy came from Starvation Canyon above
Blanding. The Source sold two items from this frame.

What ¶ 22 omits, is any allegation that the frame of artifacts allegedly provided by Jeanne
Redd contained contraband or illegal items. It also omits the fact that the Starvation Canyon,
where the effigy bird pendant was allegedly "from" contains both private and public land.

The inconsistencies and fabrications surrounding the effigy bird pendant run much deeper
than its supposed location of origin. To this day, the government is unable to produce the
allegedly illegal bird-effigy pendant that spawned the raid on the Redds' residence[1]. However,
the Application and Affidavit for Search Warrant, attached as Exhibit 1, states, at most, that
James Redd found a white bird pendant in Baby Rocks, Arizona. There is no allegation that the
item was an artifact or that it was valued in excess of $500. The application is unclear whether
Jeanne Redd allegedly traded this item to the informant Gardiner for other items that were also
lawful to possess, but it is clear that neither the Government, the informant or the Redd's have
the item. The Complaint alleges that the bird effigy pendant that is the subject of this litigation
never existed in the first place. Compl. ¶ 41. The pendant, and the subsequent raid that lies at the
heart of this case, arose solely as a result of the government's reliance on its drug and alcohol
impaired informant acting with enormous financial motives. Had the Defendants conducted even
a modicum of investigation prior to Operation CERBERUS, they would have discovered they
had no probable cause to search the Redd residence.

The Application and Affidavit for Search Warrant, attached as Exhibit 1, at ¶¶ 25-27 alleges:

> 25. During the conversation, [Jeanne] Redd showed the Source a mug that she had
> purchased from Vern Crites and stated that he had restored the mug. Redd stated

---

[1] The bird "effigy" pendant is also referred to as a "white bird pendant" in ¶31-32 of the Warrant
Application.

that the mug came from a kiva by Owl Creek, Utah. Redd then described in detail where the mug was found in Owl Creek.

26. Redd asked the Source what the mug would be worth if she decided to sell it. The Source told her that the mug would be worth $700.00 or $800.00. The Source also told her that the mug would be worth more than that if it had not been restored. The Source did not purchase the mug at this time.

27. It was later determined through additional investigation that the Owl Creek site where the the mug was located was on BLM land. According to [redacted] BLM Cadastral Surveyor and Land Record Specialist, the area in Owl Creek where Redd found the mug is entirely on public land.

The most troubling aspect of this section of the affidavit is the inconsistency that attributes criminal activity to Jeanne Redd. First, the affidavit states that Redd purchased the mug from Vern Crites. Later, it asserts that Redd found the mug on public land. The Government knew of this inconsistency because it was allegedly listening in to the conversation. ¶ 24. Equally troubling is the fact that neither statement is true, a certainty the government also knew by way of Gardiner's wire. The Application fails to identify when the mug was found. Regardless of the other circumstances, if the mug was found prior to the enactment of the Archaeological Resource Protection Act (1979) and the Native American Graves Protection and Repatriation Act (1990) the possessor would be immune to prosecution under either act – 16 U.S.C. §§ 470ee(f) (2006); 25 U.S.C. §3002(3)(d)(2006) – an additional exculpatory fact of which the government was aware through Gardiner's wire. Most troubling, however, is the statement that "the source did not purchase the mug at this time." Nor did the source ever purchase the mug. It simply was not for sale, and the government's insertion of the language into the search warrant affidavit reflects its attempt to bias the information presented to the magistrate judge to manufacture probable cause.

In the Application and Affidavit for Search Warrant, attached as Exhibit 1, at ¶¶ 28

and 29, the Government states the following:

> 28. [Jeanne] Redd also showed the source a hafted axe and a gourd which
> contained a shell necklace. Redd told the source that both were found at Floating
> House Ruin/ Chinle Wash. The Source told Redd that he would offer $3,000 to
> $3,500 for the hafted axe. The Source told Redd he would pay $4,000 for the
> necklace. Redd told the source the necklace was on its original string and was
> approximately 13' in length. The source did not purchase any of these artifacts at
> this time.
>
> 29. It was later determined through additional investigation that the Floating
> House Ruin was on Indian lands. According to [redacted] BLM Cadastral
> Surveyor and Land Record Specialist, the area of Floating House/Chinle Wash,
> where Redd found the hafted axe and Gourd necklace, is entirely on Indian lands.

Again, the government equates an offer for purchase on the part of the informant to an

offer for sale on the part of Redd. Through its monitoring of the conversation between Redd and

Gardiner, the Government knew the items were not for sale. Through the same monitoring, the

Defendants also knew that its assertion that Redd found the necklace and gourd were false. They

nevertheless inserted the accusations into the affidavit in order to manufacture probable cause to

search the Redds' residence.

There are many more inconsistencies, omissions and outright fabrications spread throughout

the affidavit that Defendants promulgated solely to manufacture probable cause against the

Redds so that the Defendant members of Operation CERBERUS could obtain a search warrant.

The actions described above violated James Redd's Fourth Amendment right against

unreasonable search, a right that was clearly established, at the very least, in 1994. *Beard*, 24

F.3d at 114, some 15 years prior to the Defendants' raid on the Redd residence. Defendants are

not entitled to qualified immunity on these claims and the Motion should be denied.

### iv. The Defendants are not entitled to qualified immunity because they violated James Redd's clearly established Fourth Amendment Right against the use of excessive force.

The Tenth Circuit considers excessive force claims separately and distinctly from unlawful arrest claims:

> [I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for arrest and the degree of force they used to affect it. If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest. If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

> *Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007).

"Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989). When a citizen alleges that an officer has used excessive force, the Court evaluates the claim in light of the Fourth Amendment's reasonableness standard. *Id*. at 395. In so doing, the Court will balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id*. at 396 (*quoting Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). To weigh the government's interest, the Court evaluates three factors through the lens of the reasonable officer confronted with the scene, rather than with the 20/20 vision afforded hindsight. *Id*. Those factors are the following: "[T]he severity of the crime at issue,

20

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." *Id*.

Furthermore, the Tenth Circuit has noted that "the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property and privacy interests – a person's sense of security and individual dignity." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1196 (10th Cir. 2001) (internal quotation omitted).

In *Cortez*, the Tenth Circuit awarded the defendant officers qualified immunity because the plaintiff was accused of a violent felony – raping a 2-year-old. *Cortez*, 478 F.3d at 1128. Considering the other *Graham* factors, the Tenth Circuit noted that the plaintiff made no effort to resist and, because he showed up at the door in a pair of shorts, he posed no threat to the safety of the officers. *Id*.

The Court characterized the amount of force used against the plaintiff as "small;" the officers grabbed the plaintiff and placed him in the patrol car. *Id*. As a result, the Court concluded that the amount of force used against the plaintiff was appropriate:

> Although the dignity aspects of this arrest are troubling, specifically hauling Rick Cortez (clad only in his shorts) into the patrol car in the middle of the night without any explanation, the police were investigating a serious felony and claimed a need for quick action to separate the accused from any other children that might be in the home.

*Id*. at 1128-29. In contrast, the Tenth Circuit denied qualified immunity to the defendant officers in *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991). There, the police pulled over a husband and wife after the wife's brother threw chairs through several mirrors at a restaurant. *Id*. at 1457-58. Later, after the situation had eased, a police officer pulled over the married couple and,

although both complied with his orders and neither was under arrest, he choked the husband and beat him with a flashlight. *Id*. at 1458.

Considering the *Graham* factors, the Court should deny qualified immunity to the Defendant members of Operation CERBERUS because they violated James Redd's clearly established Fourth Amendment right to be free from the use of excessive force.

### 1. The Nature and Quality of the Intrusion on James Redd's Fourth Amendment Interests.

In the early morning of June 9, 2010, some 80 federal agents, including the 16 Defendant members of Operation CERBERUS, armed in flak jackets and wielding assault rifles, descended upon Redd's home at 6:40 a.m. Compl. ¶ 30. They stayed until 5:45 p.m. that evening. *Id*. Fifteen minutes after the agents' arrival, James Redd arrived home as well after an early morning visit to his medical clinic. Compl. ¶ 31. As James Redd exited his car, he was restrained, manhandled, handcuffed and shuttled off to his own garage for four hours of interrogation. Compl. ¶¶ 31-32. During the interrogation, the Defendants accused James Redd of unlawful activity of which he was not guilty; they repetitively called him a liar, they taunted him that he would lose his medical license. Compl. ¶¶ 35-37. They terrified him and humiliated him. Compl. ¶ 34. And finally, at some point, they arrested him. Compl. ¶ 40. The treatment ultimately caused Dr. Redd to kill himself. Compl. ¶ 1.

### 2. Severity of the Crime at Issue

James Redd was accused of one crime:

> On or about March 27, 2008, in the Central Division of the District of Utah, JEANNE H. REDD and JAMES D. REDD, defendants herein, did receive, and retain property belonging to an Indian tribal organization, with a value of more than $1,000 to wit: an effigy bird pendant, knowing such property to have been

embezzled, stolen, or converted, and did aid and abet therein, all in violation of 18
U.S.C. § 1163 and 2.

Compl. ¶ 40. The *Cortez* Court's decision seemed to turn on the fact that the plaintiff had been accused of a serious, violent felony. *Cortez*, 478 F.3d at 1128. "[T]he police were investigating a serious felony and claimed a need for quick action to separate the accused from any other children that might be home." *Id*. The robbing or embezzling of property belonging to Native American tribes is, indeed, a serious crime, but serious investigation is not synonymous with serious force. The crime of which Dr. Redd stood accused was not a violent one. More troubling are the assaults on personal dignity that the *Cortez* Court deemed relevant. *Id*. James Redd – by all accounts an upstanding member of his community – was rebuked, terrified and humiliated, Compl. ¶ 34, when a simple conversation would have sufficed.

### 3. Dr. Redd Did Not Pose an Immediate Threat to the Safety of the Officers or Others.

After the agents drug James Redd from his car, they handcuffed him and imprisoned him in his own garage. Compl. ¶ 32. The Defendants deem the large number of officers and the use of physical force appropriate because Dr. Redd "blamed the [government] for past distress and anxiety . . . was a high-profile member of a group historically in tension with 'federal powers' . . . had 'a wife and five children' . . . and 'loved hunting.'" Def. Mot to Dismiss, 13. Although all these allegations are true, none of them are relevant to Dr. Redd's proclivity for violence. More importantly, Dr. Redd was a respected member of his community living out his sixth decade with zero criminal record and no history of violence. In this context, the Defendants' force used against him was unreasonable.

### 4. Dr. Redd Did Not Resist Or Attempt to Evade Arrest by Flight.

Nothing suggests that Dr. Redd was a flight risk. In fact, the circumstances suggest the opposite was true. Although Dr. Redd was not home when Operation CERBERUS landed on his front doorstep, he soon returned home. Compl. ¶ 31. Although he undoubtedly witnessed the circus occurring on his driveway, Dr. Redd made no attempt to turn around. In fact, he drove up and exited his car on his own. *Id*. Dr. Redd was not a flight risk.

### 5.  The Totality of the Circumstances.

Dr. Redd was nearly eligible to receive social security. Yet the Defendant members of Operation CERBERUS nevertheless felt it was necessary to use 80 agents, dressed in flak jackets and pointing assault rifles to effect his arrest. Prior to his arrest, the Defendants handcuffed Dr. Redd, manhandled him and sequestered him in his own garage for four hours. Judging by Dr. Redd's demeanor prior to his arrest, nothing suggests that a single agent, knocking on Dr. Redd's door and flashing his badge, would have been unable to secure Dr. Redd's arrest and cooperation. Under the totality of the circumstances, the Defendants brazen show of force was unreasonable and excessive. As a result, the Court should deny the Defendants the protection of qualified immunity.

### v.  The Defendants are not entitled to qualified immunity because they violated Dr. Redd's clearly established Fourth Amendment right to be free from unreasonable seizure.

Even if the Defendant members of Operation CERBERUS did not use excessive force on Dr. Redd, he still has a claim against the Defendants if they effected an arrest without probable cause. *Cortez*, 478 F.3d at 1126. As *Malley* demonstrates, constitutional tort defendants may not hide behind a warrant to gain qualified immunity; such defendants "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a

warrant should issue. *Malley*, 475 U.S. at 341. In *Maryland v. Pringle*, the Supreme Court held

that probable cause is "reasonable ground for belief of guilt . . . particularized with respect to the

person to be searched or seized" 540 U.S. 366, 371 (2003). The Court ruled that officers had

probable cause to arrest Pringle, who was sitting shotgun in a vehicle, even though the officers

found cocaine under a rear armrest. *Id*. at 371-72.

> We think it an entirely reasonable inference from these facts that any or all three
> of the occupants had knowledge of, and exercised dominion and control over, the
> cocaine. Thus, a reasonable officer could conclude that there was probable cause
> to believe Pringle committed the crime of possession of cocaine, either solely or
> jointly.

> *Id*. at 800-01. In *Cortez*, the Tenth Circuit denied Cortez's excessive force claim but

upheld one for unlawful arrest. 478 F.3d at 1122, 1129.

> The only information which arguably implicated Rick Cortez was a statement
> attributed to a barely-verbal two-year old child that her babysitter's "boyfriend"
> had "hurt her pee pee." The statement was relayed by telephone to the officers,
> from the nurse, who heard it from the mother who ostensibly heard it from the
> two-year old. Rather than waiting to receive the results of the medical
> examination of the child, interview the child or her mother to better understand
> the circumstances, or seek to obtain a warrant, the officers responded to the
> statement with an immediate arrest of the babysitter's husband, Rick Cortez.

> *Id*. at 116.

At the time of the raid, it was clearly established that an officer of the law must have

probable cause to arrest an individual. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

> Furthermore, it was [clearly] established law that the probable cause standard of
> the Fourth Amendment requires officers to reasonably interview witnesses readily
> available at the scene, investigate basic evidence, or otherwise inquire if a crime
> had been committed at all before invoking the power of warrantless arrest and
> detention.

> *Lundstrom v. Romero*, 616 F.3d 1108, 1125-26 (10th Cir. 2010), *quoting Cortez*, 478
> F.3d at 1117.

It is true that, at the time of the raid on the Redd residence, a grand jury had indicted James

Redd on a single count of embezzlement and theft from Indian Tribal Organizations, 18 U.S.C.

1163 (2006), Compl. ¶ 40. It is also true that the entire raid rested on the testimony of an

informant whose motivations were impure at best and malevolent at worst. Lastly, it is also true

that the effigy bird pendant that Dr. Redd allegedly traded to the informant has never been

located or identified or otherwise demonstrated to exist. With nothing else to corroborate their

investigation – and with the centerpiece of the crime still unaccounted for – the Defendant

members of Operation CERBERUS nevertheless descended upon James Redd's home and

arrested him. The Defendant members of Operation CERBERUS are not entitled to qualified

immunity because they violated Dr. Redd's clearly established right to be free from unreasonable

seizure.

### vi.   Defendants are not entitled to Qualified Immunity because they violated Dr. Redd's Clearly Established Fifth and Sixth Amendment Rights.

The Tenth, Eleventh, Twelfth, and Fourteenth Causes of Action assert claims pursuant to the

Fifth Amendment. The Thirteenth and Fourteenth Causes of Action assert claims pursuant to the

Sixth Amendment. Defendants are not entitled to qualified immunity on any Fifth or Sixth

Amendment Claim set forth in the Complaint.

### 1.   Defendants are not entitled to qualified immunity because they violated Dr. Redd's right to equal protection under the law.

The Supreme Court has upheld the legitimacy of *Bivens* actions arising under the Due

Process Clause of the Fifth Amendment. *Davis v. Passman*, 442 U.S. 228, 230 (1979). The Due

Process Clause also "forbids the federal government to deny equal protection of the laws." *Id*. at

234.   An equal protection violation occurs when the government treats someone differently than

another who is similarly situated. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). In order to succeed on an equal protection claim, a Plaintiff must prove "the existence of purposeful discrimination," and that the purposeful discrimination had a discriminatory effect on him. *McClesky v. Kamp*, 481 U.S. 279, 292 (1987) (quotations omitted). In addition, the Supreme Court has recognized classes, or classifications, as one type of equal protection analysis, that is presented when a plaintiff alleges intentional differential treatment from others similarly situated with no rational basis for such treatment. *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923).

As mentioned above, James Redd was arrested pursuant to a single count of an indictment: receiving, concealing and retaining property belonging to an Indian tribal organization worth more than $1,000. Compl. ¶ 40. Kevin Shumway was also arrested for the same offense. Plaintiff alleges in the Complaint at ¶47(c) that the Defendants treated him different than others because of a 1995 incident in Utah's state court system. Compl. ¶ 47(c). That year, the Utah Court of Appeals dismissed a state-based charge against Dr. Redd that closely resembled the charge that the Defendants sought to manufacture against Dr. Redd in federal court. *Id*. The Utah Court of Appeals dismissed the state charge for insufficient evidence. *Id*. The Defendants sought to charge James Redd, but not others arrested that day implicated by the investigation regarding the pendant, solely because they wanted to retaliate against Dr. Redd for prevailing in the 1995 state-based charge. Their actions violated Dr. Redd's clearly established constitutional right to enjoy equal protection under the Due Process Clause of the Fifth Amendment. As a result, the Defendants are not entitled to qualified immunity.

    **2.   The Defendants are not entitled to qualified immunity because they violated Dr. Redd's clearly established Fifth Amendment**

**right against the taking of his property without just compensation.**

It is true, as the Defendants assert, that Jeanne Redd stipulated to the forfeiture of certain items in her plea agreement. The Plaintiffs' takings claims do not pertain to these items, but rather to items not mentioned in the plea agreement – some of which the Defendants have since returned, and some of which remain, to this day, in the possession of the Defendants.

The Fifth Amendment bars the taking of "private property for public use without just compensation." U.S. Const. Amend. V. Where the government authorizes a physical occupation of property or actual takes title, the Takings Clause requires compensation. *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 522 (1992). "The rationale for the *per se* rule is that occupation of property obviates an in-depth factual inquiry to determine whether one's economic interests have been sufficiently damaged as to warrant compensation." *Nixon v. U.S.*, 978 F.2d 1269, 1284 (D.C. Cir. 1992). The per se takings doctrine applies to personal as well as real property. *Id*. Even if the taking is just temporary, it is not different in kind from a permanent taking for which the Constitution requires compensation. *First English Evangelical Church of Glendale v. Los Angeles County, Cal.*, 482 U.S. 304, 318 (1987).

The Plaintiffs' takings claim is a simple cause of action. During the raid on the Redds' residence, the Defendant members of Operation CERBERUS seized several items. Jeanne Redd relinquished control of some of those items in her 2009 plea agreement and now has no property interest over them. Other items, however, were returned only after the Plaintiff filed its Complaint. Those items are: three cameras, one phone answering system, various bank statements, photographs from the Redds' hikes near their home, an architectural blue print of the Redds' residence, receipts, several hand-written notes, various credit-card statements, phone

bills, car registration documents, canceled checks, and deposit and debit slips. Those items were only returned to the Redds on Aug. 20[th,] 2011, more than two years after the raid. Compl. ¶ 61.

Other items still remain in the Defendants' possession to date. Among these items are the Redds' passports and, most importantly, Dr. Redd's personal journals. The latter items are of extreme sentimental value to the Redds and no market price could ever accurately gauge their worth to Dr. Redd's family. The Defendant members of Operation CERBERUS denied the Dr. Redd and the rest of his family use of all of the property described above and thus violated their clearly established Fifth Amendment right against uncompensated takings. The Defendants are therefore unprotected by qualified immunity. Compl. ¶ 61.

### vii.   The Plaintiffs' Eighth and Fourteenth Amendment Claims.

The Plaintiffs concede that they do not have a claim pursuant to the Eighth Amendment because James Redd was never convicted. Nor do they have a claim pursuant to the Fourteenth Amendment because it applies to state governments, not the federal officials in a *Bivens* action.

## II.   *Heck v. Humphrey* Does Not Apply to this Case.

This argument appears founded on the assumption that Jeanne Redd is the Plaintiff in this Action. The Plaintiff is the Estate of James D. Redd, who proceeds by and through the personal representative, Jeanne Redd. See Compl. At pages 3-4; docket 2; Civil Cover Sheet, Docket 1, Section I. Because only James Redd (the Estate of James Redd) is the only named Plaintiff in the Caption on the Complaint, under Fed. R. Civ. P. 10(a), he/it, is the only Plaintiff. Because James D. Redd is deceased, he is represented by his personal representative, Jeanne Redd. Jeanne Redd appears only in her official capacity. James D. Redd was never convicted and *Heck v. Humphrey* does not apply.

In *Heck v. Humphrey*, the Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus…

*Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). The Defendants assert that the Supreme Court's holding compels the Court to "reject the Twelfth Cause of Action for an allegedly improper 'taking' as well as any argument that federal agents lacked probable cause to search the Redd home (Count Two) because they represent a collateral attack on Mrs. Redd's criminal conviction and plea agreement." Def. Br. p. 25. The Defendants conclude that the Court "ha[s] no choice but to dismiss any suit where 'judgment in favor of the plaintiff would necessarily imply the invalidity of [a] conviction or sentence' 'unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.' *Id*. at 487." Def. Br. p. 25.

The Defendants' assertion is misleading at best. The actual language from *Heck* is the following: "When a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of *his* conviction or sentence." *Heck*, 512 U.S. at 487 (emphasis added). The Defendants' substitution of an indefinite article for a pronoun renders language favorable to the Defendants but inconsistent with the *Heck* Court's holding. It implies that the Supreme Court has extended *Heck* to cover claims that would imply the invalidity of third parties' sentences. It has not. As the Tenth Circuit explained: "The purpose behind *Heck* is to prevent litigants from using a § 1983 action, with its more lenient pleading rules, to challenge their conviction or sentence without

30

complying with the more stringent exhaustion requirements for habeas actions." *Butler v. Compton*, 482 F.3d 1277, 1279 (10th Cir. 2007). That is not the case here.

This action, therefore, does not imply the invalidity of James Redd's conviction, because no such conviction was entered. A judgment in favor of Plaintiff may imply the invalidity of various convictions of other third parties, including Jeanne Redd, who were prosecuted in the CERBERUS cases, but *Heck* has never been held to apply to convictions other than those entered against the Plaintiff. The Defendants assert that this effect is barred by *Heck*, but in every case that the Defendants cite in their brief, the plaintiff or person bringing the § 1983 challenge was also the convicted prisoner. Such is not the case here and *Heck* is thus irrelevant.

### III.   The Tucker Act does not Preclude a *Bivens* Remedy.

The Tucker Act, reads, in significant part, as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1)(2006). Tortious acts by government personnel, such as the Defendants in this case, are beyond the jurisdiction of the Court of Claims to consider. *Huerta v. U.S.*, 548 F.2d 343, 348 (Ct. Cl. 1977). The Court of claims has no jurisdiction over the claims of a postal patron against the United States seeking damages against the U.S. postal service for negligently causing a torn, ripped, and badly damaged article to be returned to him, causing the loss of a business transaction. *Naskar v. U.S.*, 82 Fed. Cl. 319, 321 (2008). Nor does the Court of Claims possess jurisdiction under the Tucker Act over a federal inmate's claim alleging that the Bureau of Prisons lost his personal property, asserted under the Federal Tort Claims Act. Rather,

such a claim is within the exclusive jurisdiction of the U.S. district court. *Brown v. U.S.*, 74 Fed. Cl. 546, 549 (2006).

The general rule is that constitutional claims for damages may not be brought against the federal government itself, but proceed only against government officials on a *Bivens* theory. *FDIC v. Meyer*, 510 U.S. 471, 484-86 (1994). The Tucker Act presents an exception to the general rule, but only to the extent that it authorizes the Court of Federal Claims to hear Fifth Amendment takings claims against the federal government. 28 U.S.C. § 1491 (2006). For Constitutional tort claims, the Westfall Act makes clear that *Bivens* provides the only right of action. 28 U.S.C. § 2679(a)-(b) (2006).

In short, damages suits complaining about unconstitutional actions by federal law enforcement officials are governed by *Bivens* if the suit is against officers and by the Federal Tort Claims Act if it is against the United States. *Okra v. Callagahan*, 324 F.3d 488, 490 (7th Cir. 2003) (rehearing and rehearing *en banc* denied, certiori denied 539 U.S. 910). When the government loses or destroys property and the government is responsible, the proper remedy is a suit for damages. *Id*.

Although the Supreme Court has not yet recognized a *Bivens* action with respect to takings claims, a court within the Tenth Circuit has inferred that the Court would, in fact, embrace such a cause of action if provided the opportunity to do so. In *Bivens*, the Supreme Court recognized an implied constitutional right of action because of the absence of an "explicit congressional declaration that persons [so] injured . . . may not recover money damages . . . , but must instead be remitted to another remedy, equally effective in the view of Congress," *Bivens*, 403 U.S. at 397, and by the absence of "any special factors counseling hesitation in the absence of

affirmative action by Congress." *Id*. at 396. In *La Compania Ocho, Inc. v. U.S. Forest Serv.*, 874 F.Supp. 1242, 1249, n. 2 (D.N.M. 1995), the district court held that the Administrative Procedure Act preempts *Bivens* actions predicated upon agency action, but not those agency actions that fall outside of the APA. *Id*. at 1249-50. The court noted that its approach "is consistent with the Supreme Court's observation in *Bush* that 'certain actions by supervisors against federal employees, such as wiretapping, warrantless searches, or *uncompensated takings*, would not be defined as 'personnel actions' within the statutory scheme" of the civil service, and therefore would be redressable by *Bivens* claims." *Id*. at 1249 n. 2, *citing Bush v. Lucas*, 462 U.S. 367, 385 n. 28 (1983) (emphasis added).

All causes of action assert claims not against the federal government, which would invoke the Tucker Act, but against each of the Defendant members of Operation CERBERUS in their individual capacities for denying the Plaintiffs their constitutional rights pursuant to the takings clause of the Fifth Amendment. As a result, *Bivens* is the only right of action. 28 U.S.C. § 2679(a)-(b) (2006). Nevertheless, if the Court determines that it lacks jurisdiction to hear the Plaintiffs' takings claims, it should transfer the case to whatever jurisdiction it deems appropriate. 28 U.S.C. § 1631 (2006).

## IV.    Personal Jurisdiction over Defendants Kice and McTighe.

Defendants assert defenses based on Rule 12(b)(2). The Court may consider the affidavits at Exhibit 8 through 11 on a Rule 12(b)(2) motion as well as the additional matters submitted by Plaintiff. *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 800 (9th Cir. 2004). Under Rule 12(i), the Court may defer ruling on such a motion until such time as the Court deems appropriate, and under Rule 12(b)(2), the Court may permit the plaintiff an opportunity to

conduct jurisdictional discovery. *Butcher's Union Local No. 498 v. SDC Inv., Inc.,* 788 F.2d 535, 540 (9th Cir.1986) ("Discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." (internal quotation marks omitted)); *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances,* 723 F.2d 357, 362 (3d Cir.1983) ("Where the plaintiff's claim is not clearly frivolous, the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden." *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351 at 308-312 (3d ed. 2004) ("In particularly complex cases, ... it may be desirable to hold in abeyance a decision on a motion to dismiss for lack of personal jurisdiction. Doing so will enable the parties to employ discovery on the jurisdictional issue, which might lead to a more accurate judgment than one made solely on the basis of affidavits."). "Numerous cases have sustained the right of plaintiffs to conduct discovery before the district court dismisses for lack of personal jurisdiction." *Renner v. Lanard Toys Ltd.,* 33 F.3d 277, 283 (3d Cir.1994).

The court should exercise its discretion in this regard because based on information made public by the FBI and Public Statements by Defendant Kice. The FBI has advised the public that

> Special Agent David Kice…[b]ecause of his prior training as an archeologist, … was able to provide invaluable assistance on a recent major case. Last June [of 2009], agents working in conjunction with the Bureau of Land Management arrested more than 20 people in Utah [and other states] on charges of illegal trading of Native American Antiquities."

> See *Art Crime A Team Approach, Part 2*, Federal Bureau of Investigation (available at http://www.fbi.gov/news/stories/2010/february/artcrime2_020510) (last visited March 1, 2012), attached as Exhibit 2.

> In, David Kice, *FBI Agent David Kice Transcript*, 21 Atada News 23, 23-33 (Spring 2011),

Defendant Kice is quoted describing a case of "ours" out of the Salt Lake Office arising in

Blanding, Utah, involving 2 suicides[2] and in which "we" had a good source who put together a "good" case. See Exhibit 3, at page 13 (page 33 of article), highlighted portions. Last, the Application and Affidavit for Search Warrant at Exhibit 1, ¶ 42, the applicant references unidentified "archeologist and/or cultural experts" as members of the search team. Such persons would include Defendant Kice. Movants suggest that Defendant Kice had nothing to do with the events giving rise to this lawsuit, but according to the FBI, he was "invaluable" to it. "[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, n.13 (1978).

With regard to Defendant McTighe, Plaintiff argues that the Affidavit at Exhibit 9 and 10 to the Defendant's Memorandum and Docket 44, demonstrate that Defendant McTighe was the Special Agent in Charge of the Salt Lake Field Office during the time that the property items that are the subject of the constitutional claims that Movants contend are the governed by the Tucker Act, were retained and withheld from the Estate of James Redd. Again, Plaintiff submits jurisdictional discovery and a deferred ruling and jurisdictional discovery are the appropriate remedies.

**CONCLUSION**

For the reasons set forth above, the Court should deny the Defendants' Motion to Dismiss.

Dated: March 1, 2012

/s/ Shandor S. Badaruddin
Shandor S. Badaruddin, Esq.
**Attorneys for Plaintiff**

---

[2] James D. Redd and the Source both committed suicide.