# EXHIBIT 1

# Affidavit and Application for Search Warrant

# UNITED STATES DISTRICT COURT

## CENTRAL DIVISION District of Utah

## SEALED

*In the Matter of the Search of*
(Name, address or brief description of person or property to be searched)

Jeanne Redd

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case Number: **2:09 . MJ · 718 A**

I, PATRICK G. BROSNAN, being duly sworn depose and say:

I am a Special Agent and have reason to believe that /__/ on the person of or / X / on the premises known as (name, description and/or location)

SEE ATTACHMENT A, attached to this application and incorporated herein by reference

in the District of Utah there is now concealed a certain person or property, namely, (describe the person or property)

SEE ATTACHMENT B, attached to this application and incorporated herein by reference

which is (give alleged grounds for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure)

Believed to be property that constitutes evidence of the commission of a criminal offense and contraband, the fruits of crime or things otherwise criminally possessed.

This application also seeks authorization for executing officers or agents to be accompanied by an archeologist or cultural artifacts expert, for the sole purpose of assisting agents in identifying and authenticating items to be seized, as contemplated in Attachment B of the Application and Warrant, incorporated by reference herein.

Continued on the attached sheet and made a part hereof.   __xx__   Yes   __ __   No

in violation of Title(s) 18 United States Code, Section(s) 16 U.S.C. § 470 ee, 18 U.S.C. § 641, 1163.  The facts to support the issuance of a Search Warrant are as follows:

See attached Affidavit incorporated by reference herein.

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

Special Agent, FBI

_____6/ 0 8/ 09_____   at   SALT LAKE CITY, UTAH
Date                                                              City and State

SAMUEL ALBA, UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, PATRICK G. BROSNAN, being duly sworn, do hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), currently assigned to the Violent Crimes Squad of the Salt Lake City Division, Salt Lake City, Utah.

2. I graduated from John Marshall Law School in Chicago in December, 1996. I served as an Assistant State's Attorney for Cook County, Illinois from 1997 until 2003. During that time, I reviewed numerous search warrants in my capacity as prosecutor in the narcotics and sex crimes bureau. From 2003 to 2007, I was a criminal defense attorney and litigated hundreds of trials/motions dealing with all aspects of criminal law.

3. As a Special Agent with the FBI, I have conducted numerous federal criminal investigations. The information contained in this affidavit is based on my training and experience, my participation in the Joint BLM/ FBI task force investigation, my personal knowledge and observations during the course of this investigation, and information provided to me by other sources as noted herein.

4. Based upon my knowledge, experience and information provided to me by other law enforcement officers, I am aware that in this type of investigation, relating to the theft, trafficking and destruction of cultural resources, it is customary for individuals interested in and/or involved in the collection of artifacts protected under the Archaeological Resource Protection Act (ARPA) 16 U.S.C. 470, and the Native American Graves Protection and Repatriation Act (NAGPRA) 25 U.S.C. 3001, to maintain records, documents (written and electronic), inventories, receipts, letters, field

notes, electronic mail, sketches, ledgers, photographs, and video tapes of artifacts that they found, collected, traded or sold, in addition to hand-drawn diagrams, topographic, official land status or other maps pertaining to the searching, selling, collecting, and excavation of said artifacts.  This documentation may also include bank records which may show large, unusual or unexplained deposits of money as a result of the sale of these artifacts.

5.  Based upon my knowledge, experience and information provided to me by other law enforcement officers, I am also aware that computer hardware, computer software, and electronic files may be important to criminal investigations concerning cultural resource crimes.  These items are considered objects which are used as storage devices for contraband, evidence, and instrumentalities or fruits of a crime in the form of electronic data.  In this case, the warrant application requests permission to search and seize records and information, as they relate to cultural resource violations, including those records and information that may be stored on a computer.  This affidavit also requests permission to seize the computer hardware that may contain the records and information if it becomes necessary for reasons of practicality to remove the hardware and conduct a search off-site.  In this case, I believe that the computer hardware is a container for evidence and an instrumentality of the crimes under investigation.

6.  For purposes of this affidavit, unless otherwise specifically indicated, the term "computer" refers to the box that houses the central processing unit (CPU), along with any storage devices (such as internal hard drives) and internal communications devices (such as internal modems capable of sending/receiving electronic mail or FAX cards) along with any other hardware stored or housed internally.  Thus, "computer" refers to

2

hardware, software and data contained in the main unit. Printers, external modems (attached by cable to the main unit), monitors, and other external attachments will be referred to collectively as peripherals and discussed individually when appropriate. When the computer and all peripherals are referred to as one package, the term computer system includes both software applications and data.

7. The term "computer hardware" as used in this affidavit refers to all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but is not limited to, any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices; peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices; as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

8. The term "computer software" as used in this affidavit refers to digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (such as word processing, graphics or spreadsheet programs), utilities, compilers, interpreters, and communication programs.

9.  In addition to my training and experience as a federal law enforcement officer, I have been involved in obtaining search and arrest warrants, and have directed, coordinated and assisted other law enforcement officers in executing numerous warrants.

10.  Except where otherwise stated, the information set forth herein is based upon my personal knowledge and observations, and your affiant reasonably relies upon the information identified in this affidavit and application. This information is of the quality and quantity routinely and properly relied on by law enforcement personnel in conducting investigations and analyzing the existence of probable cause to believe crimes, such as those being investigated in this matter, are being or have been committed.

11.  Therefore, based on my experience, education, and training as a law enforcement officer and in consultation with other federal officers who are experienced in these types of investigations and the aforementioned facts set forth herein, I reasonably believe that there is probable cause to believe a crime has been committed, to wit:  16 U.S.C. § 470ee (b) illegal trafficking in archeological artifacts; 18 U. S. C. § 641, the theft/retention of government property; 18 U.S.C. § 1163, the theft of property belonging to an Indian tribal organization; and that the property to be seized as set forth in Attachment B is contraband, evidence, and fruits of a crime. I further reasonably believe that there is probable cause to believe that the property to be searched for will be found within the premises as described in Attachment A for reasons including the following:

12.  Based upon my knowledge, experience and information provided to me by other law enforcement officers, I am aware that individuals often conspire with others in the illegal removal and subsequent sale and disposal of this property without appropriate legal documentation and/or approval from the federal government, specifically artifacts

4

taken from public lands illegally.  Based upon my knowledge, experience and

information provided to me by other law enforcement officers, I am also aware that

individuals who have stolen artifacts from public lands often maintain for years artifact

collections at their homes and other secure locations, including storage facilities, safes

etc.  I am also aware through training and investigative experience that these same

individuals often maintain for years the following types of records associated with these

activities: maps, photos, video recordings, sketches, records of site locations,

artifact/historical research documents, sales records, logs, ledgers, etc.  I also have

knowledge, through training and investigative experience, that these individuals use and

often maintain for years specific tools to excavate and collect artifacts, including trowels,

brushes, flipping boards, shovels, etc.

13.  In October, 2006, the FBI and the Bureau of Land Management (BLM)

developed a significant Confidential Human Source (CHS) (identified hereafter as the

Source who shall be referred to throughout this affidavit in the masculine gender

regardless of true gender).  The Source has been a major dealer of archaeological artifacts

over the past ten years and is in a position to testify.  The Source has an extensive

number of contacts who actively deal in archaeological material to include excavators,

dealers, and collectors of stolen and illegally obtained artifacts.

14.  On November 30, 2006, the FBI and BLM jointly initiated an investigation,

via an application for undercover authority, based largely on the development of the

Source and the chronic problem of ARPA and NAGPRA violations in the Intermountain

West/Four Corners area (intersection of Utah, Colorado, New Mexico, and Arizona) of

the United States.  ARPA was enacted in 1979 to preserve archaeological resources

located on public and Indian Lands, and to prevent the loss of such irreplaceable items which are part of this nation's heritage and increasingly endangered due to their commercial attractiveness.  NAGPRA is corresponding legislation enacted in 1990 which provides direction for the proper return of skeletons, funerary items and cultural property to the proper lineal descendents.

15.  In March of 2007, the Source entered into a service agreement with the FBI. From approximately March 2007 until November 2008, the Source, acting at the direction of the FBI and BLM, purchased approximately 256 archeological artifacts totaling $335,685.00.  In most cases, the Source obtained audio and or video evidence of the illegal transaction(s), via an audio/video recording device worn by the Source. These transactions were also monitored by case agents, via a real time transmitter, worn by the Source.  Therefore, the Source's information was  corroborated by consensually obtained audio and video recordings and through the real time surveillance monitored by Special Agents of the FBI and BLM.  The Source has also provided reliable information including, but not limited to addresses, telephone information, and subject identification which have been corroborated through independent means such as property records, websites and law enforcement records.

16.  The FBI and BLM also developed information that there is a large network ("illegal network") of individuals who regularly pillage archaeological sites, many unknown to the scientific community and many which involve funerary (burial) sites, on public land in the four corners area.  Besides these excavators or "diggers", other individuals in the illegal network are dealers who buy, sell, and transport this material and collectors who are end users.

17.  The illegal network is a very close knit entity.  Individuals who deal in stolen archaeological objects are usually very careful to disguise the site of origin.  This is usually done by identifying the site of origin as leased and/or private property.  Objects typically are sold with a letter of provenance which acts as a sort of title document. Letters of provenance usually list the individual who found the item, identify the location where it was found, and include assurances that the item was not illegally collected from public or Indian lands.  For most transactions involved in this investigation, the Source provided a blank letter of provenance to the seller, who then represented that the artifact came from leased and/or private land.  In fact, the seller recovered or knew the item was recovered on public and/or Indian land.  The seller then filled out the blank letter of provenance with the false information.  Further, the seller identified for the Source on a topographic land use map, the real public land location from which the item was recovered.  This was done by the seller who pointed to the location on the map from where the item was recovered or circled the location on the map.

18.  On August 30, 2007, a consensually monitored conversation occurred between the Source and Jeanne Redd at Redd's residence in Blanding, Utah.  The residence, owned by Redd and her husband James Redd, is located at the _____ ___ __ __

7

19. Redd took the Source on a tour of her collection of artifacts located in the residence. Specifically, the Source was shown two glass cases which contained numerous Native American artifacts. The glass cases were located in an office on the main floor of the residence. Redd then took the Source into a bedroom on the main floor. Under the bed, were drawers which were filled with frames of archaeological artifacts.

20. The Source then asked Redd what business she wanted to do that day. Redd and the Source then engaged in a trade, valued at about $600. Redd gave the Source a grouping of miscellaneous artifacts in a frame in exchange for a button. The button purportedly came from Dark Canyon. Redd told the Source that she found the two pendants, which were among the items in the frame she provided to him, at Burial Mounds, lower Recapture Canyon, within the last eight years.

21. Redd and the Source then made another trade valued at $600 in which Redd provided another grouping of artifacts in a frame in exchange for a button purportedly from Dark Canyon. The Source traded for the smaller frame of artifacts which were previously discussed between Redd and the Source. The Source added the bone awl to this frame. The two trades were for two buttons the Source provided Redd.

22. The Source and Redd then engaged in another trade valued at $1,000 in which the Source provided Redd with an effigy bird pendant in return for one frame of artifacts which were previously discussed. The frame had prices from a previous transaction written on it. The effigy came from Starvation Canyon above Blanding. The Source sold two items from this frame.

23. While in Redd's residence, the Source asked to take a photo of her collection. Redd stated she would mail him a photo she had already taken of her collection. Redd

8

told the Source that she had promised her husband she would not let anyone take photographs of the collection. Much of her collection is in a glass case which Redd acquired from Vern Crites, a prolific dealer in Native American artifacts.

24. On September 19, 2007, a consensually monitored conversation occurred between Jeanne Redd and the Source at Redd's residence. This meeting was monitored by the case agents in real time, via a transmitter, worn by the Source.

25. During the conversation, Redd showed the Source a mug that she had purchased form Vern Crites and stated that he had restored the mug. Redd stated that the mug came from a kiva by Owl Creek, Utah. Redd then described in detail where the mug was found in Owl Creek.

26. Redd asked the Source what the mug would be worth if she decided to sell it. The Source told her that the mug would be worth $700.00 or $800.00. The Source also told her that the mug would be worth more than that if it had not been restored. The Source did not purchase the mug at this time.

27. It was later determined through additional investigation that the Owl Creek site where the mug was located was on BLM land. According to          ., BLM Cadastral Surveyor and Land Record Specialist, the area in Owl Creek where Redd found the mug, is entirely on public land.

28. Redd also showed the Source a hafted axe and a Gourd which contained a shell necklace. Redd told the Source that both were found at Floating House Ruin/Chinle Wash. The Source told Redd that he would offer $3,000 to $3,500 for the hafted axe. The Source told Redd he would pay $4,000 for the necklace. Redd told the Source that

9

the necklace was on its original string and that it was approximately 13' in length. The Source did not purchase any of these the artifacts at this time.

29.  It was later determined through additional investigation that the Floating House Ruin was on Indian Lands.  According to                     , BLM Cadastral Surveyor and Land Record Specialist, the area of Floating House Ruin/Chinle Wash, where Redd found the hafted axe and gourd necklace, is entirely on Indian lands.

30.  On March 27, 2008, a consensually monitored conversation occurred between Jeanne Redd and the Source at Redd's residence.  This meeting was monitored by the case agents in real time, via a transmitter, worn by the Source.  James Redd, Jeanne Redd's husband, also participated in the conversation.

31.  Jeanne Redd told the Source that "we" (Jeanne and her husband James) went down to Baby Rocks, Arizona where James Redd found a white bird pendant.  James Redd then detailed exactly where he found the pendant to the Source.  The Source did not purchase the artifact at this time.

32.  According to                     , BLM Cadastral Surveyor and Land Record Specialist, the area where James Redd found the white pendant, Baby Rocks, Arizona, is entirely on Navajo Reservation Land.

33.  On October 6, 2008, a consensually monitored conversation occurred between Jeanne Redd and the Source at Redd's residence.  This meeting was monitored by the case agents in real time, via a transmitter, worn by Source.  James Redd, Jeanne's husband, was also present for parts of the conversation.

34.  Jeanne told the Source that she had four sandals for sale that came from Allen Canyon.  The Source then showed Jeanne a map and she marked on the map the location

10

from where the sandals were removed.  The location which she marked on the map is on public lands administered by the United States Forest Service.

35.  The Source told Redd that the Source would pay $500.00, $600.00, $800.00, and $1000.00, for the sandals.  Redd asked if the Source would be willing to pay $3000.00, total for the sandals.  The Source agreed to the price.

36.  The common practice in these transactions is to generate a false letter of provenance or title stating that these items came from private land.

37.  The Source then gave Redd a blank letter of provenance, and asked her to fill it out.  Redd asked the Source if she should say it came from Bayles Ranch as private property.  Redd then filled it out and put down that she found it on Bayles Ranch, a private land area near Allen Canyon.  Redd then signed the false letter of provenance and the Source gave $3,000.00 to Redd for the four sandals.

38.  BLM archeologist                        , and Utah State archeologi: examined the four sandals bought by the Source from Redd on October 6, 2008.  Based on their education, experience, and professional judgment, each of these items were at least 100 years of age and represent authentic Prehistoric Native American artifacts.

39.  On May 14, 2009, BLM SA Brent Range, Source, and I drove by                        .  This is the listed address for Jeanne Redd, and the residence that case agents observed the Source enter during undercover operations involving Jeanne Redd.  The Source confirmed in my presence that the single family residence as previously described  is the residence of Jeanne Redd.

40. On May 30, 2009, the Source informed case agents that while in the residence of Jeanne Redd, during undercover operations, he observed a personal computer. The Source stated that Jeanne Redd has sent the Source emails in the past discussing artifacts, and Redd has told the Source she would email the Source photos of artifacts. Case agents do not have copies of the emails at this time; however, the Source's information has been deemed reliable throughout this investigation.

41. In this affidavit and application, affiant seeks authority for executing agents to photograph and catalog archeological artifacts located during the execution of the search warrant in order to leave those items in the care and custody of the target of the search. Affiant anticipates that an arrest warrant will be served concurrently with the search warrant, and that the United States will seek, as a condition of release, that the target will be ordered to maintain and protect these items pending a final resolution of his/her case in court.

42. In this affidavit and application, affiant seeks authority to include an archeologist and/or cultural experts as a member of the search team. The role of the archeologist or cultural expert will not be to assist in the search itself, but to identify and authenticate artifacts located by agents executing the search warrant. This is necessary to appropriately narrow the scope of the search and seizure, as searching agents will not have the training and experience necessary to make an on-site determination as to which items may be covered by the warrant. Agents and the accompanying archeologist will be instructed that the archeologist or cultural expert is not to engage in any independent effort to uncover evidence, and that the archeologist's or cultural expert's role will be

limited to examining and authenticating artifacts uncovered by agents executing the warrant.

43.   Therefore, based on your affiant's training and experience, and upon the facts and circumstances set forth herein, your affiant respectfully requests this honorable court to find there is probable cause to search the residence and any other outbuildings and vehicles located at the residence of Jeanne Redd

Patrick G. Brosnan
Special Agent
Federal Bureau of Investigation


SUBSCRIBED AND SWORN BEFORE ME THIS , 8th June 2009.

Hon. Samuel Alba
United States Magistrate Judge


13

# Attachment B

1. All records relating to violations of 16 U.S.C 470 ee (b), trafficking in illegally obtained artifacts and/or18 U.S.C. 641, theft/retention of stolen property, 18 U.S.C. 1163, Embezzlement and theft from Indian tribal organizations.  and/or 18 U.S.C. 1170, illegal trafficking in sacred objects and or items of cultural patrimony. Such records to include lists of customers and related identifying information; types, amounts, and prices of artifacts trafficked as well as dates, places, and amounts of specific transactions; any information related to the provenience of artifacts; any information related to sources of illegally trafficked or obtained artifacts (including names, addresses, phone numbers, or any other identifying information); any and all travel records; any and all bank records, checks, credit card bills, account information and other financial records.

   The term "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic or magnetic form ( such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMSs, optical discs, backup tapes, printer buffers, smart cards, flash/thumb drives, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting): any mechanical form (such as printing or typing); and any photographic form ( such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, and photocopies).

2. Any and all artifacts and or items relating to violations of 16 US.C. 470 ee (b), trafficking in illegally obtained artifacts, 18 U.S.C. 641, theft or retention of stolen government property, 18 U.S.C. 1170, illegal trafficking in sacred objects and or items of cultural patrimony or 18 U.S.C. 1163, Embezzlement and theft from Indian tribal organizations.

3. Item # 6: Frame of Artifacts, including a bird effigy pendant and two buttons traded to JEANNE REDD 8/30/07 (see photo).



4. Item #62: On 3/27/08 a turquoise pendant originally purchased by SOURCE on 12/12/07 from DARYL SEARCY was traded to JEANNE REDD (see photo).



5.  Item: Black-on-White Mug (JEANNE REDD)



6.   Item 257: 3/27/08 White Bird Pendant from Baby Rock, Arizona (JIM REDD)



7.  Item 258: Gourd containing a Necklace and a Hafted Axe from Floating House Ruin. See following screen shots:









