# EXHIBIT 3

David Kice, *FBI Agent David Kice Transcript*, 21 Atada News 23, 23-37 (Spring 2011)

# ATADA NEWS

A PUBLICATION OF THE ANTIQUE TRIBAL ART DEALERS ASSOCIATION

SPRING 11

Vol. 21 No. 2
$10.00



Member Close-Up: Jackson Clark II

Another Battle at Little Big Horn

Collector's Corner: David Irving



Authenticity-Integrity

Dedicated to the Highest Standards of Dealing and Collecting Antique Tribal Art

Photo Courtesy: David Irving

# FBI Agent David Kice Transcript

As part of "Legal and Business Perspectives in the World of Contemporary Art," a symposium held on October 21 and 22, 2010 at the Zane Bennett Gallery in Santa Fe, New Mexico, David Kice, Special Agent, FBI Santa Fe, presented "Theft, Fraud, Forgery: Cultural Property Crime in the U.S. and the FBI Art Theft Program." The two-day symposium, organized by the New Mexico Lawyers for the Arts, was intended for artists, dealers, nonprofits, collectors, and visual arts organizations.

*This talk was recorded by a video recorder at the back of the hall. We obtained a copy of the DVD from the New Mexico Lawyers for the Arts and, with their permission, had a transcript of the talk made. This transcript is presented here in its entirety.*

***************************

OPENING REMARKS:  … and we're still a young organization but we intend in the next year to see the referral numbers for [inaudible] and have events like this in the future.  So if you have a comments on lectures that you would like to see we have a conference table downstairs just write it down and let me know and thank you so much for coming.
[The gallery owner welcomes the audience.]
AGENT DAVID KICE:  We have a pretty small group here so I encourage questions.  It will be more interesting if there is an engagement between all of us rather than me just standing up and going on.  So I think that we're a small enough group so if you have questions feel free to raise your hand and ask as I'm going along or write it down and save it for the [inaudible] an open question and answer period at the end.  Anything you want to ask about the FBI, about art crimes, whatever I'm happy to answer whatever I can.

As Polly said, I'm an FBI agent.  I've been at the FBI for 15 years.  I was in Los Angeles for about a year and I've been in Santa Fe for over four now.  I requested to come to Santa Fe.  I wanted to live here.  I am one of ten agents assigned to the Santa Fe resident agency of the FBI.  Resident agency means a small [inaudible] we're a sub office of the Albuquerque field office which covers the whole state of New Mexico.  The FBI has offices in Albuquerque, Santa Fe, Farmington, Gallup, Las Cruces and Roswell to cover the whole state.  There's about 135 agents in the whole state. The ten agents here in Santa Fe, our number is kind of disproportionate for a city the size of Santa Fe; a city of 65,000, 70,000 people.  That's because we cover both Los Alamos National Lab in terms of national security concerns and the Eight Northern Pueblos in terms of crime on Indian country.  That's why are numbers are larger than they would otherwise be for a town of this size.

I have been on the FBI Art Crime Team since spring of 2009, so I'm fairly new to this field of endeavor. Art crime investigation is what we call collateral duty in the FBI.  It's one of the hats I wear, one of the things I do in addition to my full-time investigative job which is investigating about crime in northern New Mexico.

I have come to the FBI Art Crime Team because I have a background in anthropology and archaeology.  As you heard, I have a BA from Colorado College in anthropology.  A Master's degree from the University of Chicago in physical anthropology and archaeology and I almost finished my PhD before I knew I didn't want to be a college professor that I wanted to do something else with my life.  My field studies, my archaeological studies focused on the American Southwest, although I focused more on human skeletal biology the excavation and analysis of human skeletal remains more than architectural remains, more than antiquities per se.  But I did study those and learn about those.  So that was sort of my entree into the FBI [inaudible] because we have a variety of responsibilities in cultural properties law and a big one is the investigation of antiquities.

Today I'm going to focus more on the FBI Art Crime Team and on fine art crime, a little bit of the Thomas Crown Affair, the sort of stuff that makes the big news.  Although, that's just a portion of my work in the FBI Art Crime Team.  Because of where I am, here in Santa Fe, I focus both on the fine art crime and antiquity crime. And if you've got questions at the end focus more on antiquities because I know there's a number of  [inaudible] members here in the audience I would be happy to answer questions about that at the end and I'll touch on that later in the talk.

Let's see if I can make the technology work.  The FBI Art Crime program consists of the Art Crime Team which is 13 special agents nationwide and the national stolen art file.  That's a database that the FBI maintains of works of art stolen in the United States.  We are basically the sole national depository of law enforcement branch regarding stolen works of art.  The Art Crime Team was created in 2004.  It came about as a result of the lootings of the Iraqi National Museum in Baghdad after basically Baghdad entered into chaos as the US forces were entering the city in the current Iraq War the museum was essentially looted.  The worldwide archaeological community, the US State Department realized what a problem that was – how many priceless artifacts had disappeared, although early estimates were way higher than it turned out to be the case.  But a team of FBI agents who had some expertise in art crime were sent to Iraq to investigate this single crime.  Out of that grew to 13 special agents nation wide, set up to investigate art crimes in their region and be a resource of expertise for other agents handling those types of cases and be available to be salvoed out to a crisis scene [inaudible] as a team to being investigated.

The 13 special agents were responsible for coordination of art crimes in various regions of the US.  There are three special trial attorneys, nominally, assigned by the Department of Justice to assist.  Right now I don't think there are actually any attorneys at DOJ headquarters -- they've all moved out of DOJ headquarters and to the fields/office around the country.  But we do have attorneys at the DOJ who are experts in the field available to us for consultation.

The regional thing – I am the regional representative for the Southwest which means I have responsibility for Texas, New Mexico, Colorado, Arizona, Utah, Wyoming, Montana and Idaho.  So, basically, all the Rocky Mountain states plus Texas, so it's a pretty large area.  I'm not jumping on a plane and flying to Dallas every week or flying to Missoula to investigate cases.  Agents in those offices are assigned as the case agent when there's a case and they've all [inaudible] expertise assistance [inaudible] so I'm sort of a regional resource.  Although I do have my fair share of art crimes to handle here in Santa Fe alone.  I'm probably preaching to the choir but Santa Fe is, the number we always quote, is Santa Fe has the third largest number of art galleries in the country after New York and Los Angeles for a town of about 65,000 people.  So there's a fair amount of work here for me at home.

The Art Crime Team works domestically in cooperation with local law enforcement agencies and other federal agencies and internationally we work in cooperation with FBI legal attaches. We have I believe the number is 28 legal attaché offices around the world and those offices have responsibility for the worldwide region.  So essentially there is an FBI agent responsible for every square inch of the globe.  So if I have something going on and it relates to art crimes in any part of the world I can do what we call "set a led" send a communication or an email to the agent who has responsibility for that region and they'll work with the authorities there, local and national to get the job done.

Top Ten Art Crimes, this is an old screen shot from the FBI internet web page.  They actually updated it last week and completely changed and updated the FBI web page so it looks different than this now but there is a section on there about art crimes.  It's got some fairly interesting stuff and you're welcome to go through it.  Anybody can go to this FBI public website.  If you do a google search for FBI art crime though it'll link you directly to this page and if you right into the FBI web page you have to go through what we investigate and then crime to art crime.  But it has a lot of interesting stuff in there about art crime among it is a listing of the top ten art crimes that the FBI is currently investigating.  Some of them are within the US and some of them are international.

Q:  Can I ask; is that database when something is stolen is there public access to that link at all times.

AGENT KICE:  No, it's not. It has to go through law enforcement.  But now that you brought it up, there is another database that is run by a private entity, gallery owners, private owners, insurance companies, anyone who is a victim of art crime has access to it although there is a set fee to enter it.  It's called the "Art Loss Register." And it is a very comprehensive database also about missing/stolen works of art.  And we actually, anything that we enter into the national [inaudible] we also enter into the Art Loss Register where we search through them and they don't charge us luckily to do searches.  Sometimes things will appear in that that have not necessarily been reported to law enforcement or it has been reported to local law enforcement and not reported to the FBI – not the government art database.

Q:  The problem with the Art Loss Register is that it's a couple of hundred dollars to do a search and it's not

> **Art crime investigation is what we call collateral duty in the FBI.  It's one of the hats I wear, one of the things I do in addition to my full-time investigative job which is investigating about crime in northern New Mexico.**

"Mapuche women's costume, ca. 1880-1920." From exhibition "Nehuen: Mapuche Power" at the Museo de las Americas, Denver, CO, 2005.

an open database. You submit a painting and you ask if they might have it in the record. So it's a difficult mechanism for people who simply want to do due diligence for articles that are often worth very little.

AGENT KICE: -- use it for a million dollar piece that's going to auction but for a stolen piece that is worth $1,000 it might not be worth the investment. If you are purchasing a piece and you think it might be stolen, call me and I'll check on it. Well, if it's a hundred piece, don't call me, but if it's several thousands of dollars and you really believe it might be stolen or something ask me to check on it.

Q: It seems to me they'd set up a scam by reporting stolen objects that haven't actually been stolen.

AGENT KICE: I'll get to that later.
Among the top ten art crimes is – and I think one of the most interesting ones, is the robbery of the Isabella Stewart Gardner Museum in Boston in 1990. That remains the largest unsolved art crime in the world and the largest unsolved property crime in human history. Estimates range from a loss of $300 million to $500 million. Isabella Stewart Gardner Museum is a privately endowed museum in Boston. Isabella Stewart Gardner was a wealthy woman who died in the early 20th century. Her family had acquired money in the 19th Century and she collected a large collection of art: mostly Mediterranean renaissance pieces along with a lot of other stuff. And she had a renaissance villa built in Boston to house her collection. She took care of the collection herself [inaudible] and in her will gave it as public museum with the caveat that nothing would ever be added to the collection, nothing would ever be removed from the collection and nothing could ever be changed in the collection. Everything had to be left exactly the way she designed it.

In 1990 there were a couple of rather amateurish college students type guards on duty, two people dressed as Boston police officers, knock on the door so they had gotten a call of a crime and were mistakenly admitted to the museum, tied up the two guards in the basement and proceeded to go through the museum and steal a lot of their stuff.

Nobody could really figure out why they stole what they did. Although what they stole was very valuable, they left some more valuable things on the wall, stole some weird items. Among the things they stole were a Rembrandt, The Storm on the Sea of Galilee so if anyone ever comes across that would be – they also stole one of the 34 Vermeers that were still in existence and a lot of Degas drawings and – anyway, that crime remains completely unsolved. None of those works have been recovered. Nobody has any idea of who did it now 20 years later.

Q: Do you think it was handpicked by someone?

A: That was a theory and that might explain some of the inconsistent of what they picked out of what rooms. They might also just have been stupid and they might have been in a hurry. They went into one room and they heard the noise and just grabbed a couple and – there was discussion at one point that it was a faction of the IRA, buddies with Whitey Bulger and they stole the stuff to sell on the clandestine world market to the IRA – that theory is bolstered by the fact that there was a robbery in Ireland that the IRA did do that was very similar but today it is unsolved. When we find Whitey Bulger maybe we'll be able to get some answers to questions. But until then it's a big deal in archives. That is the Thomas Crown Affair the sexy kind of stuff that you get on the news.
All the other top ten art crimes as far as the FBI is concerned are listed on our website.
Art crime team recoveries: between conception and 2008 which is the last data I have, we have recovered $140 million worth of art, 2,600 items of cultural properties were recovered and FBI has confiscated. What is a cultural property? It is art work, antiques, antiquities, rare books and manuscripts, also to be added to this weapons are on there, antique scientific instruments like telescopes and thermometers and that sorts of thing, anything old or valuable in addition to what we typically think of as works of art.
Art crime worldwide is a multimillion-dollar industry. Interpole in the FBI have proverbially quoted a figure of $6 billion annually. That's an estimate based on a lot of different factors considered by law enforcement to be the third largest category in terms of dollars of transnational crime after drug smuggling and illegal weapon smuggling. Whether it's really third or not it's a big issue. It's done by [inaudible] specialized in art crime or cultural property theft. These are international gangs of criminals that are committing kidnapping, murder, extortion, drugs, murder all of that sort of stuff and art crime is one of the things they dabble in.

Q: So would the theft of fine art or whatever be collateral to the main crime – is it specialized in buying, stealing and reselling?

AGENT KICE: Not so much. They tend to be crimes of opportunity whether it [inaudible] a drug organization will turn up someone who happens to work in a museum and he's an insider and they'll do a theft or they become aware of [inaudible] and they have a guy or … whatever. But these tend to be crimes of opportunity. And that can be organizations doing these the final crime they don't operate in the United States, it's more of a European problem. The other thing is that in terms of dollar amounts and in terms of being a worldwide problem we include both organized and small scale looting of archaeological sites worldwide and part of that is part of that problem. We have an enormous problem in Native America and in the Middle East particularly that part of the Middle East that is developing more fast in recent years.
MR. ELMORE: Can I ask you a question? This is in the book called Priceless written by Robert Wittman, an FBI agent and he founded the Art Crime Team.
AGENT KICE: No, that's not –
MR. ELMORE: -- well, he was one of the first Art Crime Team members. But he says on his chapter Befriend and Betray, he says "The sale of counterfeit Indian art is a $1 billion a

year problem but it's dwarfed by the illegal trade of Native American religious objects particularly those featuring eagle feathers."

AGENT KICE:  Yes.  So your question is?

MR. ELMORE:  That the FBI thinks that there is a billion dollar counterfeit Indian art market going on in our country.

AGENT KICE:  Yeah, probably.

MR. ELMORE: Where is there any evidence that it is $1 billion –

AGENT KICE:  Well I don't know that –

MR. ELMORE:  -- excuse me, in size and that it is dwarfed by the illegal trade of eagle feathers or religious objects of over $1 billion a year are being sold.

AGENT KICE:  First of all Mr. Wittman is retired FBI.  He is currently pursuing [inaudible] with both the FBI and the Department of Justice.  So I don't know where he was getting his figures.

MR. ELMORE:  That's all I'm asking for; where did those figures come from and why is this a billion dollar Indian art market  -- where is this evidence of a billion dollars?

AGENT KICE:  I didn't write the book and I don't know.

MR. ELMORE:  Excuse me; multi-billion dollar industry up there is a power point presentation, sir.

AGENT KICE:  Yes, art crime nationwide – worldwide, excuse me.  Not counterfeit Indian ramifications; Indian art in the United States but art crime worldwide is a multi-billion dollar industry.  I don't know where he got the figures for counterfeit Indian art.  It is a problem. It's addressed by federal criminal legislation.  There is a whole organization of the Department of the Interior, the Indian Arts & Crafts Board; they are the experts in counterfeit Indian art.  They're the ones to ask about the dollar amounts they keep track of how much counterfeiting in art is being sold in the United States.  I don't know about the billion-dollar number and I don't know about the number of artifacts, excuse, objects with eagle feathers being sold and traded in the United States.  I don't know the dollar amount of numbers. I know it happens a lot but I don't know the numbers.

MR. ELMORE:  Okay, thank you.

AGENT KICE:  Yes.

MALE:  It seems to me that if you make off with a nice Vermeer painting that some institution would pay $50 million or $100 million for it, that's really cool but where do you sell it?  Is there some kind of a black market for this stuff?

AGENT KICE:  Yes, that is to my knowledge is one of the more unknown aspects of this industry.  We believe that there are wealthy private collectors who buy and sell this – excuse me, buy the stuff and it is a completely underground market because the stuff like the Vermeer will disappear and never show up again in the legitimate market.  So we assume that there's an underground market.  We haven't penetrated that yet.

It also might be that people steal the stuff to try and find buyers for it.  They realize it's too high profile and they can't sell it.  It's in storage someplace, it's been destroyed, it's buried; who knows.  Stuff from the Gardner Museum could be private collection.  It could still be in the storage locker that somebody put it in 1990 when things got too hot and they've never gone back.  We just don't know.

So it's an unknown.  But [inaudible].  The people committing art crime do tend to travel internationally particularly in Europe.

International art thief, United States is a consumer country for cultural properties stolen worldwide.  People with money buy art.  People with money buy illegally acquired art.  People in the United States have most of the world's money so we are a consumer nation.  You don't see a lot of thefts of art in the United States that we know or aware of getting sold overseas but we do get items illegally acquired overseas coming to the United States.

Jurisdiction, what's the FBI's jurisdiction in art crimes.  Our first jurisdiction is interstate transportation of stolen properties.  That National Stolen Property Act, for those of you who don't know this is legal shorthand for Title 18, United States Code, Section 23-14 and 23-15.  They'll be a few more slides with that shorthand.  So 18 USC is most of the criminal laws that United States passed by the United States Congress.  So this basically makes it illegal to transport items work $5,000 or more across state lines if they have been acquired illegally.  That's everything from stolen art to somebody who hijacked a tractor-trailer full of cigarettes or whatever, shoes.

Thief of major art work:  There's a special statute that gives federal jurisdiction and particularly FBI jurisdiction in thefts from museums if it – it also prohibits the sale, possession and transfer of such objects.  It does not put [inaudible] movement of a stolen property across state lines to make it a federal offense unlike most federal criminal statutes.  And there 's a 20 year statute of limitation whereas there is a five year statute of limitations ITSP, interstate transportation.

The museum in that statute is defined by an institution which admits members of the public which has a substantially educational mission.  So I don't know, somebody who has got a few items and wanted to open a curio shop outside of a national park and called it a museum, that' s not going to qualify under the statute and they charge people $2 to go in and look at reflection, that's not going to qualify as a museum.  But institutions that essentially have a mission of educating the public they qualify as museums.  Items stolen from there if they are worth $2,000 or more or worth $200 or more and more than 100 years old can be FBI jurisdiction.

Mail frauds and swindles: any kind of swindle or fraud scheme if it involves the use of interstate mail or interstate wire communications, i.e. phone calls and nowadays emails, becomes federal jurisdiction.  So any body that engages in a scheme to defraud somebody, cheat them out of money and uses interstate communication can become

an FBI matter.

What's the role of the cultural property community; you all.  First of all, it's information.  You're the ones that tell us about crimes that have been committed.  You're the ones that tell us about people that you think are committing crimes and that's where the information comes to us from.  Unlike many people believe and sometimes it would make my job easier, the FBI is not Big Brother.  We are not listening to everyone's telephone conversation and we are not spying on everyone by satellite 24/7.  The way we find out about crimes being committed is by people reporting them to us and then we begin to investigate.

We also go the cultural property community for expertise in the authenticity of items, in the value both cultural and monetary objects and to testify as expert witnesses in court.  For the most part, people who have to testify as experts are experts in art.

Some other big, besides the Gardner Museum case there are some other big cases in recent history.  The theft from the Swedish National Museum, that was very much like the movies.  Armed robbers broke into the Swedish National Museum and stole a few Renoirs and Rembrandts most of, they held the guards at bay with an automatic weapon and as they were getting ready to escape the museum they set off bombs on two opposite ends of the city so all the city police officers rushed to where those explosions occurred.  They put devices on the street around the museum to flatten the tires of any car coming toward the museum and created gridlock in the streets and then they hopped on a speed boat because the museum is on the waterfront and took off in a speed boat.  The stuff that movies are made about.  I think that eight subjects were arrested within a number of months by the Swedish authorities but none of the pieces stolen were recovered.  The main people for whom they were working got away at the time and still have the pieces outstanding.

The Renoir was recovered I think by European law enforcement officers.  They did an undercover buy from the bad guys, arrested the bad guys and recovered it .  The Rembrandt was recovered through an undercover operation run largely by the FBI in Denmark and was recovered actually by one of my squad mates in Los Angeles.  There's a picture taken when they were doing the exchange, money for the painting, they took a photo then and they arrested the guy handing off the painting.  That shows the back of it to authenticate that it was in fact the one taken from the Swedish museum.

Another example of a big case we've been involved in, in 2006 Art Crime team members recovered a large cache of illegal antiquities smuggled out of Ecuador.   We got a tip from the Ecuadorian authorities, worked in cooperation with them and developed suspects in Miami and did a search and seizure and seized 169 artifacts valued at $2 million and then 600



Mapuche silver stirrups

more artifacts were recovered by the Ecuadorian police at the same time from related subjects who had not yet sold them or transported them out of the country. Another example of another type of our case.

Art theft in the United States: most thefts are residential burglaries. In those burglaries there are volumes of lesser value are stolen. They sell through [inaudible] people don't regularly break into places with automatic weapons, hold people at gun point, tie them up and steal stuff.  Like I talked about in the Gardner Museum and the Swedish National Museum.  It's not really organized theft.  It's a theft

> **AGENT KICE:  Yes.  So your question is?**
> **MR. ELMORE:  That the FBI thinks that there is a billion dollar counterfeit Indian art market going on in our country.**
> **AGENT KICE:  Yeah, probably.**

of opportunity.  Burglars who live in the United States, not universally, but tend to be people who need money for drugs.  They do a residential burglary and they target a house that looks like it belongs to somebody of means, somebody with money, they come across works of art that they probably don't

know what they are and what they're worth and they steal them along with the TV and stereo and the camera and the computer and the jewelry and then try to find a place to sell them.

As an example, we had a case here in Santa Fe last year where burglars broke into a private residence stole a number of works of art and tapes that the owner had. Including paintings that the owner himself had painted worth tens of thousands of dollars, he was an artist of success himself, but among the items they stole was a drawing by Vincent Van Gogh which was hung in the man's walk-in closet, it wasn't even out in public display in his home. That was later recovered by the Santa Fe police department with some assistance from me at a resale shop in Raton, New Mexico on sale for $250. If you think you can't get a bargain at resale shops –

The piece has not been authenticated and has not been appraised yet to my knowledge but its estimated value is between $250 thousand and $1 million. There is some debate whether it really is a Van Gogh because it does not appear in the catalogue raisonne of Van Gogh's works. The man that owned it, his understanding – I don't want to say claims because I don't necessarily want to refute him, this is kind of up in the air right now – but his belief is it was acquired by his grandfather who was the ambassador from the Netherlands to France in the late 19th Century when the painting – the painting was painted in 1888, the painting for which the drawing was a study. It's called Night Café, it's one of Van Gogh's more famous paintings but no drawn study of it was known although there is a letter from Van Gogh to his brother Theo mentioning he had done a charcoal study of this. Anyway, it is believed that this item was acquired by this man's family in the late 19th Century and it has never been for sale publicly and it's has never been exhibited publicly that's why it doesn't appear in the catalogue raisonne. So when the time comes to try this guy and actually develop a suspect Santa Fe police and New Mexico state police developed a suspect, they located him in Vermont recently so we'll see. I don't think he has been extradited back here yet, but when the time comes for trial there's going to have to be some authentication if they're going to charge with the theft of a $1 million painting. So we'll see what the experts say when the time comes.

FEMALE:  And if he had it in his closet, isn't that a little bit suspicious? I mean I understand that you protect a work of art but I mean where did he get it? That's the point.

AGENT KICE:  There doesn't appear to be any debate that he got his father who got it from his grandfather. But –

FEMALE:  In the case of the work that was stolen that was done by the owner, the artist/ owner, is that valued at the cost of materials like $400 for the cost of the canvas?

AGENT KICE:  The value we put on it at the time that we opened the case was based on his claim of its value. When it comes time for trial to charge somebody with the crime of stealing those paintings, we'll basically look at what that guy's work has sold for in the past, similar works of similar size and then we'll come up with an algorithm to determine the average cost of a painting of his of X size.

The way we found where the Van Gogh was that some of his paintings were also at this resale shop in Raton. Some lady got in from Texas and stopped and said these look nice, I'll buy these for $150/$200 took them home and looked at his signature block, went to a website, found out who he was, called him and said how much are these paintings worth; and where did you buy them, oh someplace down in Raton. He called me and I called [inaudible] and he rushed up there and got not all of his stuff that was stolen but a lot of his stuff that was stolen back. Also, we found stuff that had been stolen from the home of a fairly famous country singer in Taos, also sold by the same guy to the same resale shop.

FEMALE:  For an update on these sort of open cases can we find even small ones like Raton on that website?

AGENT KICE:  No, they only cover the real big ones. For updates on the smaller cases stay tuned to the New Mexican, it's been covering this case. But there probably won't be anything much that shows up in the paper until this guy gets extradited back from Vermont and faces charges.

Expensive works of art, viable works of art in the United States tend to leave the hands of their rightful owner and end up in the stolen art market because they're burglarized from peoples' homes and they are not necessarily the $ million Van Gogh being sold to a retail shop for some number less than $250 because that was what it was ultimately on sale for. That guy or guys obviously didn't know it was a Van Gogh; right. It probably saw a pretty gilt frame and thought the frame was worth more than – anyway, so in the United States these works tend not to be stolen by people who know what they're going after.

In the United States, unlike the Swedish National Museum and the Gardner Museum is an example to the contrary, about 80 percent of US museum theft cases that go into the National Stolen Art File are committed by staff members are those in a position of trust. Stuff from museums, things get stolen by people who work there. People don't break in and steal stuff from museums typically. They do in Europe but less often in the United States. And the thefts are most often from collection storage areas not exhibition space. People don't steal stuff from off the walls they go into the storage, the back storage and steal stuff out of their collections in large part because as museum staff members they know where that stuff is and they know it's not checked on regularly and it can disappear for awhile before somebody knows it is gone.

The next few slides are aimed largely at museum security community, that's who this power point presentation was made for. Are you all interested in how to protect works of art at museums and galleries or shall I speed through this? Yes you are interested – all right, yes.

Basically, know what's there and have good records of it.  Have it insured.  If you individually own valuable items of art and we're talking a few thousand dollars, don't assume your homeowner's policy will cover it because they won't.  You need to have a rider specifically for the value of specific items.  You need to have good images of those items recorded.  That's photographs, digital photographs, videotape of the items of all sides.  If it's a three-dimensional work of art, images from all sides help recover it.  The stolen Van Gogh we didn't have a photograph of it to put in the National Stolen Archive luckily we recovered it pretty quickly but there was not photograph.

MALE:  do you have to have good appraisals also for insurance purposes?

AGENT KICE:  If you're going to get a rider for an item your insurance company is going to say okay we've got to figure out how much this thing is worth.  Yeah, if they're going to insure it for X amount they're going to want to know it's worth that much, so they'll require you to do so, yes.

And control access to spaces.  A catalogue of valued items should include all this stuff.  That stuff we need to put into databases to get the help of people recovering it.  And that's all on the handout to you guys so I don't have to belabor it.  And, again, all this stuff is in your handout.

MALE:  And while you're doing that, just a question for you.  The previous speaker mentioned that this stuff of like 400 to 500 items from the Wisconsin Historical Society which was done by a staff number and they didn't know about it for a long time and only 35 or so of those items have been found partly because the museum didn't have photographs.  Is that often true for museum?  I assume that individuals don't have.  But frankly I'm surprised that museums don't have it.  Is that often for museums to be laxed in that area?

AGENT KICE:  Smaller scale museums if they are underfunded, have a small staff, maybe a largely volunteer staff like Wisconsin Historical Society, yeah, that's probably the case. And obviously theft occurs and I can't emphasize this enough, don't disturb the scene.  Don't touch anything. Don't go in there.  Don't even walk near it, stay out.

If the objects fulfill the criteria for the Theft of Major Art Statute public museum over 100 years old and 5000 or 10,000 – wait I had the numbers too low, over 100 years and $5,000 or over $10,000 or $100,000 [sic] call the FBI.  Be happy to talk.

Determine the last time the object was seen for objects back in storage, behind the scenes in museum and galleries, that can become difficult to figure out the last time you've seen.  Call the insurance company with an incident report.  Even if there is no FBI jurisdiction, so if it hasn't crossed state lines and it's not from a museum and so forth, I can assist in getting items entered into the national and international databases whereas the Santa Fe police department and Santa Fe County sheriff's department doesn't have access with us.  So if you have the [inaudible] call the police and mention to them they can contacted me.  Although the main investigation for the Santa Fe police department, Detective Pecorelli has a lot of experience in art crime and he knows and he can call me and get it in the database.  That's a role we can play even if there is no other federal jurisdiction.  That's how I got involved in the Van Gogh thing at all, I was just helping the police out.

> **Stuff from museums, things get stolen by people who work there. People don't break in and steal stuff from museums typically.**

Art Fraud:  So switching gears here from theft to fraud which is way more common in the United States.  Art fraud can range from the simple to the complex.  The most common scheme is a simple insurance fraud and it happens all the time as you mentioned, people claim stuff lost, stolen, damaged, when it's not been to the insurance claim.  I get reports from complaints from insurance companies all the time of stuff that happens here in Santa Fe about what they believe to be fraud in an insurance claim.  I can't handle all of them but if they are a large enough dollar amount and there's actually good evidence that the fraud has been committed we can open a federal – and if there's some evidence that interstate communication has taken place with say an insurance adjuster or the insurance company or someone else we can open a federal fraud case and I've got a bunch of them open right now.  So it happens all the time.  Whether people claim items are stolen when they've actually been sold or they claim items are damaged when they have been damaged intentionally and they make a claim. So it goes from simple stuff like that all the way up to very complex investment fraud schemes involving art as investment or collateral.  Last year at the annual Art Crime Team training we heard about this elaborate scheme in Texas where these wealthy – wealthy oil millionaires were investing in gold and then that person got them involved and there was going to be some big investment scheme and they invested in a company and buy share in a company or loan and the collateral was going to be this catalogue of invaluable works of art that were purchased in Europe and they showed them the pictures of the art and showed them the bank records for the purchases and stuff.  Essentially, they had bought a bunch of original works of art in Europe and a bunch of fakes and a bunch of copies and then set their value at $50,000 when their value was more $5,000 and put those up as collateral for loans, they defaulted on the loans and people went to repossess the collateral and it had much lesser value than claimed.

That's an example of the kind of investment schemes that can revolve around art.  Also, people that can afford to buy expensive art are wealthy people.  Maybe they're looking

to diversify their investment portfolio and they think art might be kind of interesting and they like art and [inaudible] people who are buying it and they're open to being taken by shysters, by people trying to hook them out of their money. I guess the bottom line is if it sounds too good to be true, it is. I have to tell people that on the phone everyday who call in who have been swindled in an internet fraud scheme. If it sounds too good to be true, it probably is.

Then we have straight forgery. People just simply faking works of art and selling them and the FBI has jurisdiction on all of this stuff as I said if there is interstate communication by wire or mail.

FEMALE: Does that last point include internet websites as well?

**AGENT KICE: And it seems like about 30 percent of all fine art sold in the world was not created by the person the seller said**
**MR. ELMORE: Who are the experts that came up with that 30 percent figure?**
**AGENT KICE: That's not to say that every gallery you walk into that three out of ten pieces on the wall are fake, no. That's the total commerce in fine art in the world or attempted commerce.**

AGENT KICE: Yes, any wire communication. We get questions if somebody in New Mexico sends an email to somebody else in New Mexico to engage in a scheme to defraud but almost always the email servers are outside of the state of New Mexico so the emails have gone outside the state of New Mexico and come back in and that's interstate – so if it involves the internet it's probably interstate.

And if people are talking on cell phones, all the cell phone carriers operate across state lines so we can actually sometimes use that, as we say, a hook to hang our hat on, to have an interstate nexus as we say is the case. Interstate communication is not necessarily picking up your telephone and talking to somebody who is in another state on a hard line.

Forgery, the intentional or unintentional sale of fraudulent fine art is extremely common. The annual FBI art crime training took place in New York last year and it was basically on forgery and authentication. We had many panel discussions of very prominent gallery owners, appraisers, authenticators in the fine art world from New York City to come talk to us and we basically asked them all what their feeling was about the percentage of pieces coming through that they see they're fake. And it seems like about 30 percent of all fine art sold in the world was not created by the person the seller said -- again, let the buyer beware. You're buying an expensive work of art there is a 30 percent chance it's not done by who the seller says it is done by. And that then involves a lot of different – you can arrive at the fakeness of that work by, one is straight delivery of fake. Somebody who hires an artist, contemporary artist to do a copy of a famous work of art or even not a very famous but a work that has some value and sell it as the original. It happens a lot.

MR. ELMORE: Who are the experts that came up with that 30 percent figure? Because frankly you're saying that, you're implying that 30 percent of the art that is being sold here in Santa Fe is forged. I think that is an outrageous claim, sir. Who are these experts?

AGENT KICE: They're the people who work in the galleries in New York and see the art coming through their galleries and authenticate and trace the provenance.

MR. ELMORE: -- they're telling you that 30 percent of the art that they're selling is fake.

AGENT KICE: Thirty percent of the art that they're asked to sell or handle, yes, is not what it purports to be.

Now if you're going to a gallery that represents a specific Santa Fe artists and that gallery knows where there stuff comes from the chances of it being fake are not very high.

MR. ELMORE: It's just the wording really that I'm objecting to because it makes it seem that 30 percent of all of the fine art – if somebody buys something, a fake, at a flea market and brings it into my shop and says, hey, Steve, is this a great whatever it is? I say no.

AGENT KICE: That's what we're talking about.

MR. ELMORE: Okay, but that's not 30 percent of all the real fine art being sold.

AGENT KICE: That's not to say that every gallery you walk into that three out of ten pieces on the wall are fake, no. That's the total commerce in fine art in the world or attempted commerce.

[inaudible] female comments]

AGENT KICE: But they believe that 30 percent of the pieces bought and sold on the world market are not what they purport to be.

MR. ELMORE: I think these experts should state who they are and where they're getting this information because I don't –

AGENT KICE: This is an opinion that I believe in talking to four panelists –

MR. ELMORE: Do you think that's true in Santa Fe?

AGENT KICE: I don't know. Again, if they are works being sold by galleries that represent a living Santa Fe artists, you know who is representing their art in this gallery, no, the chances of it being fake are pretty slim unless that gallery owner is –

MR. ELMORE: But we're talking about –

AGENT KICE: If you look at a piece in a gallery that was sold to that person by someone who had it sold to them, who had it sold to them from an artist that created it 50 years ago and if you don't have a really solid

paper trail from start A to point X all the way back to the artist, there's 30 percent change it's not what it purports to be.

MR. ELMORE:  I see it as you're casting grave aspersions upon the art market by saying this.

AGENT KICE:  Well, I'll get to the point here, but a lot of it is based on mistaken identify.  It doesn't necessarily mean that people are doing it deliberately.

MR. ELMORE:  I think you should go after those people and get them.

FEMALE:  I was going to say that that statistic is more believable when you consider historic, not the market for contemporary artwork, when you consider the market for historic pieces by 19th Century to Old Master --

AGENT KICE:  Or even early 20th Century pieces.

FEMALE:  Who is – and it is not necessarily deliberate forgery but misattribution.  There aren't raisonnes in the world enough to identify every single art work by every artist.  And the documentation isn't available and people/experts make mistakes all the time.

MALE:  And it's probably through the internet.  If you look at the internet at this stuff – it's amazing stuff.

AGENT KICE:  For instance, even works created in the 20th Century then, at the time of creation were created by probably amateur that have since become – there's become a market for them, an interest in them.  Works for early 20th Century African American artists who were unrecognized at the time has become a big market in New York in recent years.  So those items when they are made and when they're given away the first time and given away the second time and acquired the third time aren't – there's not necessarily good provenance, good records tracing them back to their origin.  And somebody may look at a piece and say this looks just like it was made by this artist who I know their pieces are selling for $5,000 now and sell it as such.  Whether it be wishful thinking or whatever.  The moral of this story is provenance, provenance, provenance, provenance. Trace the piece back to the artist if you can't, you're taking a risk in purchasing it.

FEMALE:  A lot of that stuff too is just unsigned and people tend to –

AGENT KICE:  Absolutely, absolutely.  And [inaudible] I'll show you a few pieces of those later, mistaken identify, misattribution, reproduction of something original.  If you got a lot of gullible buyers come across something an Andy Warhol, it happens all the time, it's a silk screen, it's got a frame, it's cloth, it must be an original –  "I found a lost Warhol."  But it's a print and it's an intentional copy but they think they've got an original and try to sell it for such.

Misattributions, there's a lot of artists who again maybe didn't sign their work in the early part of their careers and their work has become valuable and sought after later.  But they were working as part of a school or a movement in a particular place in a particular time, many members of whom were doing similar media, similar appearance, similar themes and somebody comes across an item, a piece made by another artist working in that school of someone who has become famous and they think oh, this was done in this time period and this city and it looks kind of like so-and-so and they attribute it to the famous artist not their colleague who may be deceased or a sales clerk at Kmart.  But it's attributed to that artist because it looks similar and sold as such. That's what we're talking about in terms of the total number of – and as I said, 30 percent were not created by the artist who it was attributed to. [inaudible]

You mentioned that internet, but there was one of those home shopping networks  on a TV channel that had a show that was selling fine art and they were selling prints of Picasso, Degas, Renoir and Van Gogh and famous artists, they were selling prints as originals.  And they did a big volume business.  An agent in Los Angeles, a friend of mine, got a report of this and was investigating it and decided just to stop by, stop by and was sitting there at the front desk of this store front operation and somebody comes  in from the back carrying I don't know I'm going to say a Picasso print, I don't know what it was but walks up and the woman – so he's waiting to talk to the receptionist that is on the phone and while she is still on the phone waiting for him she puts the phone to her ear, takes and signs Pablo Picasso and hands it to that person and ships it out to the person on Home Shopping.  So the big art market goes all the way to that stuff.  It's simple they take advantage of customers who are that gullible.   And by the way she signed Pablo Picasso and I think he signed Picasso.

So authentication, you're asking how we authenticate and determine whether it's fake or not and this is done in a lot of ways.  It is done by art historians.  And it's based on qualitative analysis, people who have spent years studying the artistic qualities of the use of light, the use of color, the use of form/shape and other given artists who become expert on that artist and will look at that's work and determine whether or not it is consistent with the work of the artist.

Dealers and curators, and we're talking about more modern stuff that is not so well known by museum curators, it's art dealer stuff, 20th Century stuff.  But there are art dealers who become experts  in a particular genre/particular school of art and again, understand the qualitative nature of works by particular artist and can give some sense of whether they're legitimate or not.

There's scientific analysis. There are firms, one in particular, that are material analysis experts.  They'll look at a work of art and they can take samplings of the paint and do x-ray or fraction analysis to determine the exact chemical composition of the paint and figure out when it was made.  They can examine the canvas.  They can examine smoke and dust and dirt and smog on the surface of the painting.  They can examine the wood, the frame, the stitches – all of the things that go into that work of art and determine whether or not they're consistent usually with the time period that the work is supposed to have been created but also the place.

Whether that type of paint was available in the place where the artist was actually working and where this work was purported to have been done.

Finally, provenance which is the main thing that the buyer and the dealer can rely on.  Make sure that there are good records going back to where the thing was supposedly originally came from.

MR. ELMORE:  Let's talk about that a minute. I  mean, there is stuff all over the world and nobody keeps a record.

AGENT KICE:  And you want to make absolutely sure that the thing you're selling is what it purports to be, provenance is a way to do that.  If you're dealing in a type of art that doesn't have those kinds of records, then you don't have that to rely on.  Then you have to fall back on qualitative sort of analysis or material [inaudible]. You have to fall back on some other method to figure out whether it really is what it is suppose to be.  But if it is the type of work where you expect there to be written records and there aren't, that should be a dead giveaway right off the bat.  Particularly, bill of sale from the person who's selling it to you and trace that back.

But if you're talking about Native American art made in the early 20th Century or something, yeah, there's probably not going to be written records and you're going to have to rely on your knowledge of what those pieces look like or get some materials analysis done by an expert to determine whether the  stuff that goes into that work either comes from the time period you think it came from or the place or whatever.

Deliberate fakes.  This is an image and I think it is probably a screen shoot from the internet but the real image from the catalogue raisonne of Picasso of Woman in a Blue Hat, a drawing – 1901.  This is one sold in 2006 by a woman who owned a West Hollywood antique store in Los Angeles, outside Los Angeles, sold for $2 million.  It's a pretty good copy. This art dealer/antique dealer went to a local artist and said can you draw me this Picasso in the same colors, materials and same size and the artist did a pretty good job.  Just from looking at these images and actually they're bigger now then when I was looking at them on my computer screen.  The only thing I can see is that the way his bun doesn't look quite right to me but everything else looks pretty good because they are hiring good modern artists to fake this stuff.  When she did the sale she said this has come on the market because of a dispute in the family or a divorce – nasty and ugly and hush-hush, so we don't want to talk about this too much and I can let it go to you for the low, low price of $2 million.  So she didn't have provenance, she didn't have explanation, good explanation of how this came on the market, where she got and so on and so on.  The person bought it.  Spent $2 million for something she probably paid, what do you pay a starving artists to draw this, $5,000?

FEMALE:  So how did she discover it?

AGENT KICE:  You know I don't know the history of this case.  I resume the buyer then went to a museum and then saw the real one on the wall.  Actually, the real one was sold by Sotheby's in 1990 to a private collector so I don't know if they went back into Sotheby's website or that they tried to sell it to Sotheby and said we sold that just a few years ago and it wasn't to you.  So I don't know.

Okay, Andy Warhol, this case came out of Zagreb, Yugoslavia – here's the real Any Warhol, Great Marilyn, also sometimes called Lavender Marilyn it's one of his series of Marilyn Monroe, done in 1962, done as much as any work was by Andy Warhol himself because I think he actually had people physically doing the hands on work.  This is a fake sold to somebody for a lot of money, seized in Zagreb. They were able to determine it was a fake – well, first of all I don't know – that little doohickey there which doesn't appear in the original and I'm not sure if the centering of the piece was exactly the way the original was or if there's  too much space over here but they examined the marks, the silk screen marks, the screen marks on this one and they didn't match up with the paint.  So in other words, they had taken a print of the Great Marilyn that had been printed not be silk screen I don't know how the computer [inaudible] so that it showed the actual silk screen marks in the paint and then they put a screen over it to put screen marks on it that didn't match up to the original screen marks so it was kind of obvious when someone looked at it with a magnifying –

FEMALE:  What if somebody actually gets their hands on the actual print – some of the screen from the original, the real deal and starts running off more.

AGENT KICE:  That would be easier to do. But the paint probably wouldn't be the same; the ink probably won't be the same as it was originally. The paper probably wouldn't be the same et cetera, et cetera.  There would be ways to tell the difference if you took the time to delve that deep into the question.

Antiquities crimes: in the southwest antiquities crime is as a significant problem or a more significant problem for the FBI.  The FBI and the Fine Art Thefts [inaudible] particularly here in Santa Fe because this town has a big market for antique Native American art and antique world art/tribal art. So the Federal jurisdiction and antiquities matters included the Archaeological Resources Protection Act and as the predecessor the Antiquities Act of 1906, the Native American Grave Protection Repatriation Act, theft of government property and theft of tribal property, interstate

**MR. ELMORE: I would like you to comment on that 'I'd like the trade to dry up.'  And first of all, do you know which federal agent said that?
AGENT KICE:  Yeah, me.**

transportation of stolen property and potentially other federal statutes. This has got a lot of press since June of 2009, there was a big case out at the Four Corners region out of Blanding in Utah and out of our Salt Lake City office. There were four search warrants that were served here in Santa Fe and it's an ongoing case. There are 25 people indicted, two of them committed suicide. The source that was really the impetus for the case, he also committed suicide. The cases are ongoing. I think it's up to 17 plea bargains out of Utah now I believe and there are still four ongoing cases here in New Mexico. In the cases of those who pled guilty in Utah, they've all gotten probation. None of them got any jail time but all of the people who plead so far have agreed to turn over their collections. So there's been about $7 million of I think collections turned over up to this point.

And that's just an example of the kind of cases that are ongoing by a number of federal law enforcement agencies all over the southwest. This case was larger than most because they developed a source who cooperated with law enforcement who had access to a lot of players in this world, this industry if you will, and that's why this case grew to the proportions that it did. There are always smaller scale cases of this nature going on in the Four Corner states by the FBI, the BLM, Forest Service, Park Service, BIA, the agencies who have responsibility for the public lands from which these items are often looted. So, at any rate, there has been much talk in the media of there being a sea change in federal response to antiquities crime. I'd like to think that was the case. I'd like to think antiquities crimes were getting more attention from US Department of Justice and the FBI. I don't think that's necessarily the case. I think we had a good source and put together a good case and it got a big media splash and there will be spin offs from those 25 indictees. We'll find information from additional players that deal in the antiquities market and there will be additional search warrants and arrests eventually. We would like to keep it going and put a crimp in the illegal antiquities market. Yes, you had a question.

MR. ELMORE: In the August 20th issue of the Pasatiempo they interview a US Federal agent and he says very clearly that he would like the trade in antiquities to dry up.

AGENT KICE: Um-hum.

MR. ELMORE: And I'd like you to comment on that because we have a healthy antique Indian art market here in Santa Fe. It is legal to sell and buy southwestern antiques. It's in the Archaeological Resources Protection Act, the pieces before 1979 are grandfathered in and they are acknowledged as existing and the government passes a law that says the government and the collectors and the archaeologists should cooperate and work together on this. So what I would like to know, I would like you to comment on that "I'd like the trade to dry up." And first of all, do you know which federal agent said that?

AGENT KICE: Yeah, me.

MR. ELMORE: Okay. Why would you like the trade to dry up, sir?

AGENT KICE: Because – and you're absolutely right there is a legal trade in antiquities. The problem is that that legal trade creates an enormous loophole that allows people —that facilitates the illegal trade. So because there continues to be a legal trade in items legally acquired from private lands it creates a trade which gives people the incentive to continue to loot sites on public land. And sites continue to get looted on public land and invaluable, priceless archaeological resources are destroyed illegally because there is a legal market. So that's why I would like the legal market to go away. It would end that facilitation of the illegal market.

MR. ELMORE: But there's no authority in the Archaeological Resource Protection Act for you to destroy a perfectly legal American business which has been going on before this country was ever even a country and you're now saying that rather than you're going to arrest the looters the quickest way is to destroy the market.

AGENT KICE: No, that's not what I said.

MR. ELMORE: "I'd like the trade to dry up," what does that mean?

AGENT KICE: I personally, David Kice, not speaking for the US Department of Justice, the US Congress, the FBI, I would like to see the trade dry up in order to protect archaeological resources on public lands –

MR. ELMORE: Why don't you go out there and protect the sites rather than attack the people who have legal antiquities?

AGENT KICE: Wait – we're not attacking people who have legal antiquities.

MR. ELMORE: Yes, you are. You're saying you want the trade to dry up. You're going to –

AGENT KICE: Did I say anything about attacking?

MR. ELMORE: Well, I think swat teams on four Santa Fe dealers is attacking the trade, sir.

AGENT KICE: There were no swat teams.

MR. ELMORE: Okay. There were no swat teams in the four searches, correct.

MAN: What could we prevent to [inaudible] his from start this from being actually rewarding because the punishment for them seems to be so light.

AGENT KICE: It is and that's another problem. You can see that as a failure on the part of the crafting of the legislation or you can see it as reflecting the intent of Congress for them to be illegal but not really illegal.

MR. ELMORE: So you're going to interpret the law and congress in the way that you wish to and attempt to dry up catch the looters.

AGENT KICE: I'm going to enforce the law as it is written, that's my job.

MR. ELMORE: Well, where does the law say that it is your duty to dry up the trade? The law says for you to –

AGENT KICE: I didn't say that that was my

duty. I said that was my personal opinion that I would like to see the trade dry up.

MALE: But, sir, to me it seems like when you say that all of us agree that child molestation is terrible; right?

AGENT KICE: Yes.

MALE: Well, you're saying there's a way to prevent child molestation: we'll kill all the kids. It's the same thing.

AGENT KICE: No. To extend the child analogy. Let's say it was legal to sell pictures of your own children naked but you couldn't sell pictures of other kids naked. That's the analogy that we're talking about here. Private versus public; right? So in order to stop the trade in selling pictures of your own kids naked we would stop the trade in all selling of naked pictures of kids and it would accomplish that; correct?

THREE VOICES: No.

MR. ELMORE: What does it mean, you saying you would like the trade to dry up because there's no provenance so therefore every piece that does not have provenance should now be a illegal – but you're saying you want the trade to dry up, sir? What authority do you have --

AGENT KICE: I would like you personally to stop selling antiquities because it would stop people from looting sites. If you're not willing to do that, then fine.

MR. ELMORE: I'm not buying from looters. I've never bought a piece from a looter in my life.

AGENT KICE: Right but because you and those like you continue to sell stuff legally acquired –

MR. ELMORE: It's legal by the law, sir. The federal government –

AGENT KICE: You sell stuff legally acquired. There is a market for stuff illegally acquired.

MR. ELMORE: Yes, it comes off of private land, it came off before 1979 – you're attacking that trade and I want to know, really, what has got you into this bad thinking position where you kill off an American business because there are looters. Your job by both laws is to catch the looters –

AGENT KICE: Which is what I do.

MR. ELMORE: There are 13 of those 26 cases were looters. The other 13 were not looters.

AGENT KICE: Who, contrary to the law, bought sold or traded illegally acquired items. Which is what the law prohibits.

MALE: Can I ask a question?

AGENT KICE: Yeah.

MALE: Even assuming I agree with you, why do you think that because there is no commerce that would start looting. I grew up in Ohio near Pt. Ridge and there are people on weekends –

AGENT KICE: Step outside of their property –

MALE: It won't stop the looting, you know.

AGENT KICE: It will diminish it to a large degree. It will diminish the systematic large scale looting if there's no market for it.

MR. ELMORE: Where is the systematic large scale looting?

AGENT KICE: Let other people have a turn, sir. There are enormous loopholes in NAGRA and ARPA. The loop hole in ARPA is that only items on public lands as you say are covered but if people buy, trade and sell items without revealing where they came from or lying about –

MR. ELMORE: Or not knowing.

AGENT KICE: -- or not knowing then that allows for those items to be bought, sold and traded that come illegally from public lands. Right?

MR. ELMORE: It's possible, yes.

AGENT KICE: I don't know, what percentage do you think, not you, of all the people buying, selling and trading antique Native American art in the United States, of all those items that are currently out there for sale today, what percentage do you think came from public lands versus private lands honestly?

MR. ELMORE: Before 1979.

AGENT KICE: The Antiquities Act was –

MR. ELMORE: -- I know that from Dr. Stephen LaBlanc's book from Harvard when he investigated Hopi pottery 83 percent of the Hopi pots that were prehistoric are already in public museums and institutions. And 17 percent of the Hopi prehistoric pottery that he researched for 20 years was in private hands. So this tells me that 83 percent of material that is out of the ground is already in public institutions and that 17 percent is in private collections. These private collections are perfectly legal under ARPA.

AGENT KICE: Yeah, but you didn't answer my question.

MR. ELMORE: You're saying that you want to dry up the trade.

AGENT KICE: You didn't answer my question.

MR. ELMORE: What is the question?

AGENT KICE: Of all the stuff all that prehistoric Native American antiquities or historic Native American antiquities that are out there – what percentage, and not your shop, not your collection – but out there as a whole, what percentage do you think came off public lands versus private land?

MR. ELMORE: Again, I don't have an actual

**MR. ELMORE: Why don't you go out there and protect the sites rather than attack the people who have legal antiquities?**
**AGENT KICE: Wait – we're not attacking people who have legal antiquities.**

figure for you but I know that it is part of the history of this part of the West that thousands and thousands of early settlers went onto the land and every Sunday afternoon had a picnic where they collected Indian antiquities.  Those pieces were legal. They have been passed down through the family.  They are heirlooms.  They are pieces of value.  They are cherished by them, people are bonded to them and they have a right to own it.  There's nothing illegal about them having them, sir.  And, yet, you're saying you want to kill the business.

        FEMALE:  I think maybe a more useful question is what percentage of all materials circulating are of an unknown provenance.  I think to the utility of the stated purpose in ARPA the desirability of exchange of information, of preservation and faith was – it is my intuitive response that a proposal that items should be considered as illegal would have several results. One would be that we would essentially stop the ability for researchers to do their job.  You would frighten people into destroying information and the federal judge in Albuquerque clearly pointed out that you would essentially be criminalizing the innocent actions of the thousands and thousands of Americans who have purchased such items in the past.  I think of my mother who did so before 1979 bought stuff in the galleries and if you have no means in determining the origin of a piece given the resources that we have in terms of increased ability to document thanks to new technology and the increased ability to share information through the internet then the resources that are being devoted to what I have to think of as really publicly showcasing of actions that those resources would be better devoted and more effectively devoted in terms of curtailing archaeological degradation by educational work and by sharing the information and by establishing the value of preserving and documenting these materials.

        To my mind it's really the matter what's the most efficient way to achieve a goal you have in mind and looking at the question of how many pieces are there that you know anything about is a more relevant question in terms of developing social policy.

        AGENT KICE:  Those are all avenues of curtailing the looting of archaeological sites but they're not the ones I'm charged with engaging.

        FEMALE:  May I ask question which is what did this investigation cost in terms of manpower or dollars because you say the art crime section only came to be in 2004; what is its budget?

        AGENT KICE:  I have no idea.  Less than a million, I know.

        FEMALE:  Really.

        MR. ELMORE:  Really.

        AGENT KICE:  But the cases out of Utah those weren't funded by the Art Crime Team.  Those were funded by the Salt Lake City Field Office of the BIA, Utah BLM, Salt Lake – Phoenix Field of the FBI, Arizona BLM, New Mexico BLM, New Mexico FBI.  So investigations of art crimes or whatever they're called are funded out of the field office where that investigation takes place.

        MR. ELMORE:  You are putting yourself above the law.

        AUDIENCE:  Come on.

> MALE:  Even assuming I agree with you, why do you think that because there is no commerce that would start looting.  I grew up in Ohio near Pt. Ridge and there are people on weekends –
> AGENT KICE:  Step outside of their property –
> MALE:  It won't stop the looting, you know.
> AGENT KICE:  It will diminish it to a large degree.  It will diminish the systematic large scale looting if there's no market for it.

        AGENT KICE:  Just a minute.  You don't like me –

        MR. ELMORE:  No, it's not personal David.  I assure you --

        AGENT KICE:  You don't like me because of what I do impacts potentially your living; correct?

        MR. ELMORE:  And my collection and my hobby and my passion in life, yes.

        AGENT KICE:  Your passion.

        MR. ELMORE:  That's right.

        AGENT KICE:  And I don't like that passion in life because it makes it harder for me to do my job and protect things.

        MR. ELMORE:  I'm sorry if you have a hard job, sir.  I will assist you in that job but not if you're trying to destroy my business.

        MALE:  Let's let the other people in the audience participate.  Is that reasonable?

        MR. ELMORE:  Sure.

        MALE:  This isn't about you.

        MR. ELMORE:  No, it isn't.

        MALE :  Okay, we can agree on that.

        ATTORNEY:  First of all I think your position is contrary to ARPA and the reason I say that is that if you look at the purpose of ARPA it is to foster cooperation between the federal agencies and collectors.

        AGENT KICE:  One of the purpose, yeah.

        ATTORNEY:  That's the main – the purpose section, that's the main one.

        AGENT KICE:  You're right.  It's not the purpose of the criminal provisions of ARPA.

        ATTORNEY:  No, I didn't say criminal.  I said the purpose of ARPA which includes the criminal.  And ARPA also says that anything that was in the marketplace prior to 1979 is grandfathered in to help foster this cooperation between federal agencies and also says archaeologists and collectors.  Now if that's the stated purpose of the act then it

seems to be that your position is actually contrary to that and I think that's why Steve's getting a little upset.

But to me as an attorney, you're doing something that is against the statute that you want to enforce to bring actions against people.

AGENT KICE:  I'm charged in enforcing the criminal provisions.

ATTORNEY:  Sure, and that's part of ARPA.

AGENT KICE:  Investigating, prosecuting people for the trade of items illegally acquired in contradiction to ARPA.  As I said, me, the fact that I would like to see the trade dried up does not attack on you personally.  I don't dislike you.  But the fact, and as I said before, it's my personal opinion that the existence of the legal trade creates a market for the illegal items.  So my job would be easy, there would be no market, no commercial market for illegal looted antiquities if there did not exist a legal one.  So my job would be easier if that legal market dried up.  Also, never mind, anyway that's the reason I would like to see that dry up.

MR. ELMORE:  Does the tip of the tail wag the whole dog?

AGENT KICE:  Nobody knows what percentage of the market is illegal versus legal.

MR. ELMORE:  It's nothing like a billion dollars a year, sir.  The entire art market for Santa Fe, for the entire art market is $1 billion.  New York is $14 billion and now you're telling me there's over a billion in eagle feathers; where is this stuff?

AGENT KICE:  No, I'm telling you that.

MR. ELMORE:  Well, Mr. Wittman does. He was the guy who's work you've been showing up here.

AGENT KICE:  No.

MR. ELMORE:  Oh really, he wasn't involved in the Swedish Museum case?

AGENT KICE:  No.

MR. ELMORE:  No wonder this person was no gratis.

FEMALE:  In your defense, I think if what Mr. Kice is saying is if it dry up – and you can say that about the entire art world, you know, if nobody created art then we wouldn't have a problem with art crimes.  But the whole point is that these antiquities cannot be replaced.  This is a cultural property that is irreplaceable and if there isn't a ban trading them the focus would be on preservation and study.  And, so I understand why you said it.  It's not going to happen, but I understand the point And it's the same in Egypt.

AGENT KICE: Many, many other countries regard all items of antiquity that come out of the ground that have come out of the ground to be a national resource and to belong to the nation as a whole and cannot be bought sold or trade.

MR. ELMORE:  There is a fourth amendment that addresses personal property rights, sir, in this country.

FEMALE:  But in contrast –

AGENT KICE:  Which is why ARPA makes the distinction between public and private land. But again, we've gone around and around and –

MR. ELMORE:  I want you to think this through a little better [inaudible] I would just ask that of you sir as I have asked that of myself.

AGENT KICE:  Any other questions on any other topic other than antiquities.

FEMALE:  One of the difficulties and issues for our [inaudible] for accessing information about items that was reported as stolen and as both international and domestic cultural property matters this open access is a real issue.  I mention this that it's just expensive and a little bit [inaudible] Art on Register – I know that Interpol has recently opened his database for people who want to formally sign up and get a log in and information and access. Is there any thoughts –

AGENT KICE:  Well, now that you mention it.  The public FBI internet site, if you go to the art crime section and I didn't mean that that was it – I was pulling out fake Picasso for this presentation and didn't look further. But I think there is actually a search block right there on the FBI site.

MALE:  It is on there.  I tried it once and –

FEMALE:  Because I'm signed up for the Interpol guide and it's 90 percent [inaudible] and there were

AGENT KICE: Probably lots of seals from the



Mapuche silver knife

     FEMALE:  And there were 16 were Native American art eight of which were obvious fakes, even on a thumbnail that big and all of which when I looked at other sites came from [inaudible] conference LAPD website [ tremendous background noise] and I just wanted to say how helpful it would be and –
     AGENT KICE:  And for the national stolen ARPA items can only be submitted by law enforcement agencies through the FBI.  So the private individual can't enter them and so that closed the screen for authenticity and so forth before they go in our database and there's a form that I give the police to fill out and then I send it our program manager in [inaudible] and I don't enter the database, she is more of an expert in art crime than I am.  We like to have images too.
[inaudible]
     WOMAN:  Thank you very much.
     AGENT KICE:  Oh, one last think, Indian Arts and Crafts another aspect of art crime it makes it illegal to sell as made by a Native American which is not made by a Native American. Congress just passed a [inaudible] law and makes it – allows any federal law enforcement agency to investigate this, Indian Arts and Crafts Board in Washington DC, Department of Interior would like to see a lot more [inaudible] for this.  It's got more teeth than ARPA and NAGPRA with a five-year felony fine and you all have a hand out on this.  Thank you all.


     *****************************


After this talk, we set up a meeting between ATADA members Jim Owens, Kate Fitz Gibbon and Robert Gallegos and FBI Special Agent David Kice on Tuesday, November 9, 2010 at the FBI Building on Rodeo Park East, Santa Fe, NM. Although the circumstances were difficult, Special Agent Kice listened patiently to all that was presented and all participants were pleased to have dispelled a few misconceptions on each side. The discussion ended with a suggestion of possible joint participation in a plan for protection of Southwest Archaeological resources brought up by Jim Owens. (We are still interested in this protection plan but need to work within an existing federal crime-reporting structure. As enforcement is primarily locally-based we are unsure how best to coordiate and as yet this plan is not developed.) The ATADA participants all thanked Agent Kice for participating in the discussion and all felt that an important communication channel had been opened.
Special agent Kice gave a second talk on the same subject at St. John's Methodist Church, Santa Fe, New Mexico, November 11, 2010. At this talk, he did not engage in a discussion of the black market in American Indian Art and other points that created controversy at the October lecture.