IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF JAMES D. REDD, M.D., et. al,<br><br>Plaintiffs,<br><br><br>vs.<br><br><br>DANIEL LOVE, et. al,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER ON MOTION TO DISMISS<br><br><br><br><br><br>Case No. 2:11-CV-478 TS |

This matter is before the Court on Defendants' Consolidated Motion to Dismiss.

I. BACKGROUND

In 2006, the FBI and Bureau of Land Management (BLM) began a joint investigation into the looting of Native American artifacts on public land. The operation, dubbed "Cerberus," culminated in the arrest of 24 alleged traffickers in stolen artifacts, including Dr. James Redd and his wife. The following allegations are taken from Plaintiffs' Complaint.

Federal agents had obtained arrest warrants for the Redds after a grand jury issued an indictment. The warrant was based on information provided by Ted Gardiner, a Native American artifacts dealer and collector, who was working as an undercover informant. Mr. Gardiner told FBI and BLM agents that major "kingpins" of artifact trafficking were operating in

1

Southern Utah, and that he had experience dealing with the individuals. Mr. Gardiner was then employed by the federal agencies to transact with suspected traffickers.

On several occasions, Mr. Gardiner met with Mrs. Jeanne Redd, Dr. Redd's wife, to trade with Mrs. Redd for artifacts that she had in her possession. Dr. Redd was also present for some of the transactions. During such trades, Mr. Gardiner would ask Mrs. Redd to identify where she had found her artifacts by pointing out the area on a map. Audio and/or video recordings were made of the transactions. Relying on statements from Mrs. Redd confirming that various artifacts were taken by her and her husband from public or Indian lands, federal agents sought a warrant for the arrest of Dr. and Mrs. Redd and the search of the Redds' property. A federal grand jury indicted the Redds on felony charges of trafficking in stolen artifacts, theft of government property, and theft of tribal property.

Agents arrived at Dr. Redd's home in Blanding, Utah around 6:40 am on June 10, 2009. Though the exact number of officers present during Dr. Redd's arrest is not specified, 80 plus officers were present in Blanding to execute arrest warrants against various residents of the town. The officers involved in Dr. Redd's arrest were wearing flak jackets, and an unspecified number were bearing assault rifles. Dr. Redd returned home from an early morning visit to his clinic soon after the FBI agents arrived. As Dr. Redd exited his car, he was restrained, "manhandled and handcuffed" and interrogated in his garage for four hours.[1]

The day after Dr. Redd was arrested, he committed suicide. Dr. Redd's estate and his heirs brought *Bivens* claims against the federal agents involved in Cerberus, alleging violations

---

[1] Document No. 2, at 13.

of various of Dr. Redd's constitutional rights.  Defendants move the Court to dismiss all causes of action for failure to state a claim under the standards governing a *Bivens* action.  Defendants have also argued that the Court does not have personal jurisdiction over two of the named Defendants—Kice and McTighe—and therefore all claims against them should be dismissed.

## II.  PERSONAL JURISDICTION

"Article III generally requires a federal court to satisfy itself of its subject-matter jurisdiction before it considers the merits of a case."[2]  The Court must therefore resolve whether it has personal jurisdiction over Defendants McTighe and Kice.

> The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts ties, or relations.  Therefore, a court may exercise personal jurisdiction over a nonresident defendant only so long as there exist minimum contacts between the defendant and the forum state. . . .
> The minimum contacts standard may be met in two ways.  First, a court may, consistent with due process, assert specific jurisdiction over a nonresident defendant if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.  Where a court's exercise of jurisdiction does not directly arise from a defendant's forum-related activities, the court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's general business contacts with the forum state.  However, because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts.[3]

From December 30, 2009, until May 31, 2011, Special Agent McTighe was the Special Agent in Charge of the Federal Bureau of Investigation's Salt Lake City Field Office.  He has

---

[2]*Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 575 (1999).

[3]*OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1090-91 (10th Cir. 1998) (internal quotation marks and citations omitted).

since retired and has submitted an affidavit asserting that his sole residence is now in Virginia. Because McTighe is retired and is no longer in Utah or the special agent in charge of Utah, the Court cannot find general jurisdiction.

As to specific jurisdiction, McTighe has averred that he did not "plan or carry out any of the Utah arrests or searches conducted as part of Operation Cerberus" and that he never had "any involvement, in [his] work or otherwise, with the Redd family."[4] McTighe became the special agent in charge of Utah after the raid on the Redds took place. Plaintiffs argue, however, that McTighe would have been the Special Agent in charge of the Salt Lake City office during the time in which the Redds' property was held unconstitutionally. As a government agent in charge of the forum state for the FBI's affairs, McTighe clearly "directed his activities at residents of the forum" either personally or by managing the agents there residing. The alleged injury here—an unconstitutional taking—arises from or relates to FBI activity in Utah, over which McTighe had control. Accordingly, the Court finds that it has personal jurisdiction over McTighe as to that claim. As to any other claims against McTighe, Plaintiffs have presented no evidence that he was present during the raid on the Redds.

Because, accepting Plaintiffs' facts as true, McTighe's only alleged contact with the forum state occurred after the events giving rise to all claims except the takings claim, the Court finds its jurisdiction over McTighe is limited to the takings claim. All other claims are therefore dimissed for lack of personal jurisdiction.

---

[4]Docket No. 44 Ex. 11, at 1.

Special Agent Kice has averred that he lives in New Mexico and that he, like McTighe, did not "plan or carry out any of the Utah arrests or searches conducted as part of Operation Cerberus" and never had "any involvement, in [his] work or otherwise, with the Redd family."[5] Plaintiffs contend this is not the case, and have offered statements made by the FBI and Kice himself suggesting some level of involvement in Operation Cerberus. On an FBI web page providing information about the team of agents working art crime cases, the following statement about Kice is found:

> Because of his prior training as an archeologist, he was able to provide invaluable assistance on a recent major case. Last June [of 2009], agents working in conjunction with the Bureau of Land Management arrested more than 20 people in Utah, Arizona, Colorado, and New Mexico on charges of illegal trading of Native American Antiquities.[6]

The Court would note that this statement does not confirm that Kice had any actual involvement with the Utah element of the operation. At best the statement provides grounds for speculation.

The other statement offered by Plaintiffs was made by Kice during a presentation on art crime. During the presentation, he referenced the FBI's operations in Blanding, Utah. Plaintiffs find significant his use of the pronouns "we" and "our"—"a big case out of Blanding in Utah and out of our Salt lake City office"; "I think we had a good source and put together a good case."[7]

---

[5]Docket No. 44 Ex. 10, at 1.

[6]Docket No. 47 Ex. 3, at 1.

[7]*Id.* Ex. 4, at 13.

Again, these statements are far from definitive. Kice could just as well be using the institutional "we" ("we at the FBI") as the personal ("myself and other agents").

When determining personal jurisdiction, the Court will take as true only "plausible, non-conclusory, and non-speculative" facts.[8] The statements Plaintiffs offer do not meet this standard. This is especially true in light of Kice's averment that he was not involved in the planning or carrying out of Operation Cerberus. "[E]ven well-pleaded jurisdictional allegations are not accepted as true once they are controverted by affidavit."[9] Thus, "absent an opposing showing by [Plaintiffs], through specific averments, verified allegations, or other evidence sufficient to create a genuine issue of fact, [Kice's] affidavits carry the issue."[10] The Court therefore finds that it does not have personal jurisdiction over Kice and he will be dismissed.

### III. CONSTITUTIONAL CLAIMS

The Supreme Court has firmly established that a plaintiff in a *Bivens* action "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[11] In the context of § 1983 claims, to which *Bivens* actions are the federal analogue,[12] the Tenth Circuit has stated

> In § 1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities. Therefore it is particularly

---

[8]*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).

[9]*Shrader v. Biddinger*, 633 F.3d 1235, 1248 (10th Cir. 2011).

[10]*Id.*

[11]*Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

[12]*Id.* at 675.

> important in such circumstances that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.[13]

Accordingly, the first requirement for Plaintiffs is to plead with specificity the alleged constitutional violations against each individual Defendant from which they seek damages. To the extent that Plaintiffs seek damages for a violation but do not specify how an individual Defendant's conduct created the violation, the claim must be dismissed.

If Plaintiffs have passed this threshold step as to any of their constitutional claims, the qualified immunity analysis then asks two questions: (1) do the facts Plaintiffs have alleged make out a violation of a constitutional right and (2) was the right clearly established at the time?[14] A district court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[15]

With these rules in mind, the Court will consider each of Plaintiffs' constitutional claims.

A.  UNREASONABLE SEIZURE

Plaintiffs claim that Defendants unreasonably seized Dr. Redd and that Dr. Redd's right to "be secure from unreasonable search and seizure by reason of the false allegation of Defendants' [sic] commission of a crime"[16] was violated. The Court takes this to mean that

---

[13] *Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008).

[14] *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

[15] *Id.* at 236.

[16] Docket No. 2, at 25.

Plaintiffs allege that the warrants in this matter were issued based on fraudulent information, and Defendants were therefore operating without probable cause. This argument appears to be based on Plaintiffs' contention that federal agents instructed Mr. Gardiner to inflate the value of the artifacts in question above $500 so that there would be a basis for felony charges against people such as the Redds.

However, even if such behavior could invalidate a warrant, Plaintiffs have failed to identify which Defendants were involved in the plot. Without identifying which Defendants knew, and how they knew, that the alleged scheme was afoot, the Court is unable to determine which Defendants, if any, would have committed a constitutional violation by securing and/or executing the warrants.[17] Accordingly, the Court will dismiss this claim.

B.      UNREASONABLE SEARCH

Plaintiffs claim that Defendants' execution of the search warrant was unreasonable. To the extent that any of Plaintiffs' claims allege that the search was unreasonable because it relied on a faulty warrant, the same reasoning applies here as above. Without specificity as to the participants in the sham process, the Court cannot proceed.

Plaintiffs also argue that Defendants exceeded the bounds of the search warrant. Under the warrant, Defendants were authorized to search for and confiscate certain items relating to the crimes for which Dr. Redd was indicted. Plaintiffs argue that Defendants exceeded the bounds of

---

[17] The Court will not countenance a claim that every named Defendant, as an individual, engaged in all the wrongful conduct alleged by Plaintiffs. Clearly, not every FBI and BLM Defendant individually contacted Gardiner and told him to fabricate information.

this authorization by: (1) accosting Dr. Redd when he returned home from his clinic; (2) manhandling and handcuffing Dr. Redd; (3) interrogating Dr. Redd for four hours in his garage; and (4) rebuking, terrifying, and humiliating Dr. Redd during the course of the interrogation.

Plaintiffs have failed to identify which of the Defendants did any of those things. The Court will therefore dismiss the claim on that ground, without opining on whether Defendants' actions would have exceeded the scope of the search warrant.

C.   EXCESSIVE FORCE

Plaintiffs have similarly failed to plead excessive force against the Defendants individually. Plaintiffs' claim is based on several aspects of the morning raid: (1) the presence of too many officers at the scene, bearing assault rifles and wearing flak jackets; (2) that Dr. Redd was "manhandled" when pulled from his car; (3) the use of handcuffs; (4) that Dr. Redd was interrogated in his garage for four hours; and (5) that the interrogators threatened Dr. Redd with the loss of his medical license, called him a liar, and otherwise bullied him.

As to the first basis, even if the presence of too many officers, wearing flak jackets and bearing guns, could equate to excessive force, Plaintiffs have not identified which Defendant made the decision to use that amount of force. Certainly no individual officer could be said to have used that "collective" excessive force, as an individual, against the deceased merely because the officer was present at the Redds' arrest.

As to the rest, even if the force used was "excessive," Plaintiffs have not identified which of the Defendants employed the force. Because Plaintiffs must show that the targeted Defendant

personally acted in violation of constitutional rights, Plaintiffs' allegation that "the Defendant(s)" used excessive force against Dr. Redd is self defeating.

D.  OTHER FOURTH AMENDMENT CLAIMS

Plaintiffs have also alleged that the following rights were violated, all of which they purport are guaranteed to Dr. Redd by the Fourth Amendment: (1) due process; (2) freedom from unlawful detention; (3) freedom from unlawful restraints; (4) freedom from deliberate falsehoods, and reckless disregard for the truth; (5) life, liberty and the pursuit of happiness; (6) freedom from unreasonable treatment and human disrespect; and (7) freedom from gross and unreasonable treatment resulting in intentional disregard of a human being and reckless disregard for a human and the denial of life, liberty and the pursuit of happiness without due process and equal protection under the law.

Plaintiffs have identified nothing to support the proposition that these rights are recognized as protected by the Fourth Amendment, and the Court will therefore dismiss the claims predicated upon them.

E.  FIFTH AMENDMENT CLAIMS

Plaintiffs allege that Defendants violated Dr. Redd's Fifth Amendment rights by (1) denying him due process and equal protection; (2) violating his right against self incrimination; and (3) taking his property without just compensation. Defendants challenge the validity of all three arguments.

Plaintiffs allege that Dr. Redd was denied equal protection of the law because agents did not treat other similarly situated traffickers in the same way. Once again, Plaintiffs have failed to

identify which specific Defendants took the necessary actions with the requisite state of mind to commit the alleged violation.

Though the Tenth Circuit has recognized that supervisor liability can apply in the context of an equal protection claim, Plaintiffs would still be required to identify which specific supervisor "creat[ed], promulgat[ed], implement[ed] or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which" violated the equal protection clause.[18] Instead, Plaintiffs have merely argued that "Defendants treated [Dr. Redd] different than others because of a 1995 incident in Utah's state court system."[19]  Accordingly, the Court must dismiss the claim.

As to the self incrimination claims, the Court first notes that Plaintiffs, in their opposition brief, do not respond to any of the arguments made by Defendants in their memorandum in support.  Plaintiffs therefore appear to have abandoned the claim.  Regardless, Plaintiffs have failed to plead the claim against individual Defendants.

Finally, Plaintiffs allege that the agent's confiscation of the Redd's property was a taking, and therefore Dr. Redd's rights were violated by the government's failure to pay just compensation.  On this claim, Plaintiffs have made some allegations against Defendant Love individually.  However, Defendants contend that a *Bivens* action based on an alleged taking is not proper.

---

[18]*Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

[19]Docket No. 47, at 27.

*Bivens* held that "a victim of a Fourth Amendment violation by federal officers may bring suit for money damages against the officers in federal court."[20]  Since then, the Court has also recognized an implied damages remedy under the Due Process Clause of the Fifth Amendment and the Cruel and Unusual Punishments Clause of the Eight Amendment.[21]  Attempts to go beyond those boundaries have been uniformly repulsed:

> In 30 years of *Bivens* jurisprudence we have extended its holding only twice, to provide an otherwise nonexistent cause of action against individual officers alleged to have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked any alternative remedy for harms caused by an individual officer's unconstitutional conduct.  Where such circumstances are not present, we have consistently rejected invitations to extend *Bivens*.[22]

More recently, the Court has directed lower courts to undergo two steps in deciding whether to recognize a *Bivens* remedy:

> In the first place, there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.  But even in the absence of an alternative, a *Bivens* remedy is a subject of judgment: "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation."[23]

Applying these principles, the Court cannot provide a *Bivens* remedy for a takings claim. "The Tucker Act, 28 U.S.C. § 1491, provides a statutorily defined mechanism for asserting claims

---

[20]*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).

[21]*Id.* at 67.

[22]*Id.* at 70.

[23]*Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (quoting *Bush v. Lucas*, 462 U.S. 367, 378 (1983)).

against the United States for just compensation for public takings," and such claims are required to be filed in the Court of Federal Claims.[24]  Accordingly, "[n]umerous cases have recognized that a plaintiff does not have an implied cause of action under *Bivens* for a Fifth Amendment takings claim because there is an express cause of action for such a claim under the Tucker Act."[25]  Persuaded by this reasoning, the Court will dismiss Plaintiffs' takings claim on the same grounds, without prejudice to the refiling of a Tucker Act claim in the Court of Federal Claims.

F.      SIXTH AMENDMENT CLAIMS

Plaintiffs allege that Defendants denied Dr. Redd his Sixth Amendment right by denying Dr. Redd counsel during the interrogation in the garage.  Even if these facts could provide the basis for a Sixth Amendment claim, because the Complaint does not specify which specific Defendant(s) acted to deny the right to counsel, the Court must dismiss the claim.

IV.  CONCLUSION

In light of the foregoing, the Court will dismiss all claims against the Defendants. However, the Court will grant Plaintiffs leave to file an amended complaint that conforms to the law as stated in this Order.  It is therefore

ORDERED that Defendants' Consolidated Motions to Dismiss (Docket No. 43) are GRANTED and Plaintiffs' Complaint is dismissed without prejudice.  Plaintiffs may file an amended complaint that complies with this Order within twenty-one (21) days.  It is further

---

[24]*Anoushiravani v. Fishel*, 2004 WL 1630240, at *9 (D. Or. July 19, 2004) (citing *E. Enter. v. Aphel*, 524 U.S. 498, 520 (1998)).

[25]*Reunion, Inc. v. F.A.A.*, 719 F. Supp. 2d 700, 710 (S.D. Miss. 2010).

ORDERED that the hearing in this matter currently set for June 14, 2012 at 3:30 pm is STRICKEN.

DATED   June 11, 2012.

BY THE COURT:

_____
TED STEWART
United States District Judge