EDWARD P. MORIARITY (5622)
BRADLEY L. BOOKE (9984)
SHANDOR S. BADARUDDIN (9999)
MORIARITY, BADARUDDIN & BOOKE
736 South Third Street West
Missoula, Montana 59801
Telephone: (406) 728- 6868
Facsimile:  (406) 728-7722
Email: brad@mbblawfirm.com
       ed@mbblawfirm.com
       shandor@mbblawfirm.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| The Estate of James D. Redd, M.D, by and through Jeanne H. Redd, the personal representative for and on behalf of, Plaintiffs Decedent James D. Redd, as an individual in a survivorship action; The Estate of James D. Redd, M.D. by and through his personal representative Jeanne H. Redd and his heirs, and Plaintiffs Decedent James D. Redd in a wrongful death action | Case No. 2:11-CV-00478-TS |
| **Plaintiffs,** | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| vs. | Hon. Ted Stewart |
| Daniel Love, Bureau of Land Management Special Agent, in his individual capacity; Dan Barnes, Bureau of Land Management Special Agent, in his individual capacity; and 21 or more unknown federal agents, | |
| **Defendants.** | |

COMES NOW the Plaintiffs, The Estate of James D. Redd, M.D, by and through

Jeanne H. Redd, the personal representative for and on behalf of Plaintiffs' Decedent

1

James D. Redd, as an individual in a survivorship action; and The Estate of James D. Redd, M.D. by and through his personal representative Jeanne H. Redd and his heirs, and Plaintiffs' Decedent James D. Redd in a wrongful death action; by and through their attorneys, and herein make a Complaint against Defendants as recognized and authorized in the manner of *Bivens* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971), for violation of Plaintiffs' Constitutional rights under the Fourth and Fifth Amendments as follows:

1)      On June 10, 2009, approximately 80 federal agents, mostly armed with automatic weapons, carried out "Operation Cerberus Action," raiding the Mormon enclave of Blanding, Utah, a small town of 3,000 located in the Four Corners region of the Southwest United States. Of the 24 arrests made that day, 16 were in Blanding. "Cerberus" was based on two and a half years of undercover operations costing millions of dollars. Decedent, Dr. James D. Redd, was one of the persons arrested. The next day, June 11, 2009, reflecting on the excessive, overreaching and abusive treatment he had been subjected to, after making a recording based upon his tragic experience, Dr. Redd took his own life. His final words connected his death to the Defendants' egregious actions. This Bivens cause of action, requesting survival action damages and wrongful death damages for Dr. Redd, is the direct and proximate result of the wrongful acts and omissions of the Defendants as set forth below.

## IDENTIFICATION OF PARTIES

**PLAINTIFFS:**

2)      Decedent Dr. James D. Redd had been a community physician in Blanding, Utah, for over 30 years, serving as the sole doctor during a significant portion of this time. He had been, and was at the time of his death, a resident of the State Of Utah.  Everyone in the community knew him: he had birthed their babies, performed their surgeries and saved their grandchildren. On Sundays, Dr. Redd often taught gospel doctrine, delivered lessons and presented his testimony, all of which helped inspire religious life in Blanding, in a manner akin to his oath as a physician to help physical life in the Community and surrounding area.  In fact, the Sunday before June 10, 2009, at temple, Dr. Redd gave his testimony on the sanctity of life and how good it was to be alive. Dr. Redd was a very devoted person, a pillar of his community and had much to be thankful for. He was the father of five children with a happy marriage and successful medical practice. He loved baseball, hunting and was an active member of his Mormon community. He was well-liked in the local Native American community too. Often, his office could be found composed entirely of Native American patients and, in the months leading to his untimely death, Dr. Redd helped the Navajo Nation draft legislation to improve American Indian health. Beyond the community, he enjoyed being outdoors, often taking family walks. On one such walk with some of his family members in Pinon, Arizona, he picked up a ¼ inch long, by ⅛ inch wide, and 1/16 inch thick shell that appeared to be a bird effigy.

3)      The Estate of Dr. James Redd has been established pursuant to Utah law. Jeanne Redd, the widow of Dr. Redd, is the personal representative of the Estate of James Redd, deceased. The Estate of Dr. James Redd has the duty and responsibility to bring all claims, including survival actions, Dr. Redd could have filed had he lived. The Estate also has the duty and responsibility to bring all claims for his wrongful death. Both claims include, but are not limited to, claims for violations of Dr. Redd's constitutional rights. The present lawsuit is brought by and through the Estate of Dr. James Redd to recover all such damages for the above actions and any and all resulting damages Dr. Redd, individually, as Plaintiffs' decedent, and to which his Estate is entitled as more particularly described below.

**DEFENDANTS:**

4)      The following individuals (hereinafter referred to as "Defendants") are sued in their individual capacity: Daniel Love, Bureau of Land Management Special Agent, in his individual capacity; and Dan Barnes, Bureau of Land Management Special Agent, in his individual capacity.

6)      There were many other unknown federal agents and other agents who, at times relevant hereto, acted with a federal cloak of authority, whose identities will be revealed by discovery in the course of this action, acting in their individual capacities. The allegations against the Defendant Unknown Federal Agents are the same as set forth above and as included in this Complaint. Each unknown federal agent has an identity of interest with the named Defendants, and each claim against them arises out of the same transaction and occurrence that gives rise to this action.

**JURISDICTION**

7)      This Court has jurisdiction in this case, because it is a federal matter and pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, it is an action arising under the Constitution of the laws of the Untied States, against Defendants, including an unknown number of law enforcement officers and agents of the Bureau of Land Management, the Federal Bureau of Investigation, the Department of Justice, and others unknown are all officers and agents of the Federal Government acting under color of law. These individual agents, in their individual capacity, are liable for the individual acts and omissions in which they participated and which they carried out in the Cerberus Action, including the constitutional rights of Dr. James D. Redd and the damages that flowed from these violation.  See: *Bivens*, *supra*.

8)      Further, jurisdiction is conferred by 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States, and 28 U.S.C. § 1343 in that this is a civil action commenced by a person to recover damages as a result of a deprivation of right.

9)      Any claim of immunity from this action is wholly without merit. The federal government of the United States employs all those persons engaged in the enforcement of the laws of the United States. The acts alleged amount to a blatant violation of the Constitution and the rights guaranteed therein. Since the Defendants have acted outside their constitutional limitations, they have lost their umbrella of immunity in this case and are ripe for suit.

## FACTS COMMON TO ALL CAUSES OF ACTION

### The Incident at Bluff

10)   On October 29, 1995, Walter Hajduk and Bill Davis were riding horses near an area of Cottonwood Wash, north of Bluff, Utah, when they discovered an excavation site. Two days later, they reported the incident to BLM agent Jim Ragsdale.

11)   On November 2, 1995, Ragsdale discovered the site. He met with a witness, Richard Perkowski, who told Ragsdale that sometime the month before, Perkowski had been walking his dogs in the canyon when he saw three men with a large green van digging in the Cottonwood Wash. When Ragsdale investigated the site, he found that material had been screened and human bones littered the west side of a large trench.

12)   Cottonwood Wash was public land, but locals referred to the land as "Guymon's Land," in reference to the Guymon family. The Guymon family owned a large swath of private property about 200 feet away from the excavation site and according to Bureau of Land Management maps, the excavation site sat on the Guymon family's land. Unknown to the public, the Bureau of Land Management maps were inaccurate.

13)   Sometime in December of 2005, Dr. James Redd, his wife, Jeanne Redd, and their children, Jay, Jerrica and Jamaica Redd, asked Erv Guymon for permission to screen for small artifacts – beads and pottery shards – on Guymon's land. Guymon granted the Redds' request.

14)   On January 6, 1996, the Redd family visited the excavation site where

BLM agent Ragsdale had been investigating two months prior.

15)      For much of the morning, the Redds screened dirt for small artifacts but they never touched human bones or disinterred human remains. The Redd's believed they were on Guymon family land, which they had permission to access, because they were using a BLM map, but in fact, the Redds were on public land.

16)      That day, two hikers standing on a bluff west of Cottonwood Wash saw the Redds digging. One of the hikers was Mike Pearson, of Bluff. Pearson called Deputy Ben Naranjo of the San Juan County Sheriff's office and reported the incident.

17)      When Naranjo arrived at the site to confront the Redds, the Redds told Naranjo that they had permission to be on the land, and that it was private.

18)      The following day, Jim Ragsdale surveyed the site to try to determine whether it was public or private. It was only after he performed a professional survey that he realized the land was public, and the BLM map was inaccurate.

19)      Sometime after the incident, the Hopi Nation learned that gravediggers had desecrated the Cottonwood Wash site by disinterring remains. Concluding that the Redds were responsible, Hopi Tribal Chairman Ferrell Secakuku wrote an open letter to Bill Benge, the Grand County Attorney, urging Benge to file charges against the Redds. The letter was published in the Canyon Echo, the local newspaper, on July 11, 1996.

20)      During September of 1996, several articles appeared in various newspapers throughout Southern Utah urging the county attorney to file charges against the Redds.

21)      Finally on March 5, 1997, the Redds were arrested and booked into the San Juan County jail. They were charged with desecration of a human body, a third-

degree felony, as well as trespassing. The state also filed civil charges against the Redds asking the Court to compel the Redds to pay $250,000.00 to renovate the Cottonwood Wash site.

22)     On March 20, 1997, Judge Lyle Anderson held a preliminary hearing. He dismissed the charges against the Reeds. Judge Anderson noted that probable cause existed that the Redds disinterred remains – although they did not – but he nevertheless dropped all charges against the Redds because the State of Utah had not shown that the bodies had been buried under the intent that they remain in a permanent state of repose. Judge Anderson noted further that archaeologists estimate that 25,000 burial sites lie in San Juan County and that "remains are scattered all over this part of the country."

23)     Media coverage was largely critical of Judge Anderson's ruling, and the State appealed.

24)     In January of 1998, the Utah Court of Appeals heard the state's appeal and backed Judge Anderson's ruling. The state filed a petition for rehearing, which was denied.

25)     In June of 1998, the State refiled charges against the Redds.

26)     Although he felt "serious reservations" about the merits of the State's case, Judge Anderson reluctantly decided to bind over the Redds for trial, but he dropped trespassing charges against the Redds, allowing only the third-degree felony charge, desecration of a human body, to go forward.

27)     Once again, the State appealed Judge Anderson's ruling. The case went up to the Utah Supreme Court, and was remanded. The Redds' filed a motion to dismiss and Judge Anderson recused himself, noting that Dr. Redd had treated various members of

his family and delivered his child. Judge Mary Manley took over.

28)     On June 9, 2000 Judge Manley again dismissed all charged against the Redds. Again, newspaper coverage was largely critical of the ruling.

29)     The State filed charges against the Redds a third time. In November of 2002, Jeanne Redd entered an Alford Plea in which she admitted no criminal action, and agreed to pay $10,000.00 to settle the $250,000.00 civil suit. All charges against James Redd were dropped.

30)     James Redds' family remember that both parents were devastated by the incident and their treatment by the State as well as the Bureau of Land Management during the preceding seven years.

## The Shumway Bird's Background

31)     Prior to 1979, Kasey Shumway found an effigy bird pendent in Starvation Canyon north of Blanding, Utah. This bird pendent is famous in Blanding, and is known locally as, "the Shumway Bird." Because it was found prior to 1979, it does not fall under the authority of any of the laws that the Redds were later accused of violating.

32)     Jeanne Redd had coveted the Shumway bird for 30 years.

33)     At some point, Kasey Shumway gave the Shumway bird to Shane Shumway, a family member. Many times, Jeanne Redd had requested that Shane Shumway sell the bird to her, but Shane Shumway had always declined.

34)     Eventually, Shane Shumway gave the Shumway bird to another family member, Kevin Shumway. Thereafter, Kevin Shumway sold the Shumway bird to the government's informant, Ted Gardiner, who, at the time, was an informant for Operation Cerberus.

**Operation Cerberus**

35)     In October of 2006, the BLM, as well as the FBI, began Operation Cerberus, the "largest investigation ever into the looting of Native American artifacts on public lands."

36)     The planning of "Operation Cerberus Action" was in essence the brainchild of Defendant Love, who decided to put together a taxpayer financed operation intended to stop a tradition of groups living in the Four Corners Area of the United States who went out and collected artifacts. The collection of these artifacts was not against the law if the collection occurred on private property or occurred prior to 1979.

37)     Ted Gardiner was a Native American artifacts collector and dealer, and had been so for the past 10 years, who engaged in the collection and sale of artifacts for a profit. When he was under investigation by Federal authorities, Defendant Love turned him into a confidential informant and undercover agent. Mr. Gardiner had a history of drug and alcohol abuse problems and had struggled with mental health issues.

38)     In 2006, when Operation Cerberus began, Gardiner approached Defendant Love, the head of Operation Cerberus. Gardiner offered to trade his knowledge for money and immunity. He indicated to Love that through his "significant" sales and transaction experience in the artifacts marketplace, there were supposedly major "kingpins" trafficking items illegally obtained from federal or tribal lands. He represented his "Black Book" contained valuable information the agents could pay him to disclose.

39)     Despite Defendant Love's knowledge of Gardiner's struggles with substance abuse and mental health, Defendant Love took Gardiner's story at face value. Unfortunately, the story lacked authenticity. Gardiner was down and out on his luck,

having burned most of his bridges in the Native artifacts marketplace by overcharging, disrespecting and simply ripping clients off. But, Gardiner realized he had something valuable in his "little black book," which had been his customer list. He spun a story to Defendant Love of an illicit black market that the Defendant Love was all too willing to accept, without any precautionary assessment of veracity.

40)     By comparison, in contrast to Defendant Love's actions, federal agents outside Utah were already cooperating with reputable and established dealers in the artifacts business, who reported the few illicit traffickers to authorities in order to maintain the integrity of the marketplace. The concept of "kingpins" and a large illicit market just did not exist in the artifacts trade, yet it was a sham that Defendants willingly bought into.

41)     Defendant Love willingly bought into Gardiner's story not because of naivety, but as a result of Defendant Love's wish to prosecute Dr. Redd. Defendant Love thought that Dr. Redd had escaped a certain felony conviction in 1996 and wished to see Dr. Redd behind bars. It did not matter whether Dr. Redd had actually committed the felony of which he was accused. Defendant Love coveted the press and public acclaim that would certainly result if he were to place a man behind bars who had allegedly dug up Native American burials sites. To Defendant Love, the ends justified the means.

42)     From March of 2007 until November of 2008, Ted Gardiner, acting at the direction of Defendant Love, purchased over $300,000 worth of artifacts, some legal and some illegal, all while being paid $7,500.00 per month by the Defendant Love and his superiors as an informant.

43)     Defendant Love utilized Ted Gardiner as an undercover informant to make friends with various individuals in Blanding, Utah, and elsewhere, and to encourage them to have, or to continue to have, an interest in artifacts, and then to obtain secret audio and video recordings of these individuals allegedly swapping, selling or offering to sell Indian artifacts to Mr. Gardiner, mostly at inflated prices so the "Operation Cerberus Action" would look good.

44)     Ted Gardiner held himself out as a Native American artifacts collector and dealer, but in reality Ted Gardiner was working for Defendant Love and his superiors. In this capacity, Gardiner attempted to entrap the individuals into allegedly selling or offering to sell or swap Indian artifacts to him while he wore a wire so Defendant Love could listen and tape the transactions.

45)     Defendant Love armed Ted Gardiner with a bottomless supply of taxpayer funds so he could entice unsuspecting individuals, often average citizens with no history or propensity to sell an artifact, to convey to him artifacts at exorbitant prices.

46)     Defendant Love trained, directed and encouraged Ted Gardiner to raise the value he paid for the undercover purchases so he could use his undercover sales, swaps and purchases to entrap the customers and to artificially raise the alleged market value of the artifacts. With this training, Gardiner befriended Jeanne Redd.

47)     Defendant Love targeted the Redds because, in the words of Utah Director of Indian Affairs Forrest Cuch, many federal and state authorities felt that the Redds had been "slapped on the wrist" for the Bluff incident in 1996, "and many of us weren't happy with that."

48)    On August 30, 2007, Jeanne Redd gave Ted Gardiner a tour of her Native artifact collection. During the tour, Gardiner wore a wire whereby Defendant Love could listen to his conversation with Mrs. Redd. The Defendants learned, via the wire, that Mrs. Redd preferred small objects – beads and pottery shards – over more valuable artifacts normally coveted by artifact collectors.

49)    That day, Defendant Love sent Gardiner to the Redds' household armed with the Shumway bird that Gardiner had purchased from Kevin Shumway.

50)    Artifacts collecting experts such as Dace Hyatt, who has been recognized by the Peabody Museum and the Harvard School of Archaeology for his expertise, valued the Shumway bird at $1,000.00

51)    Mrs. Redd immediately recognized the bird as she had coveted it for the preceding 30 years. She explained the bird's history to Gardiner and asked if she could trade something for it. Gardiner agreed and exchanged the bird for two plastic bags of nominally priced artifacts. Almost eight months later, on April 17, 2008, BLM Agent Wilson Gibson found the bags in Defendant Love's vehicle.

52)    On March 27, 2008, Gardiner, under the direction of Defendant Love, returned to the Redd household in an attempt to buy more artifacts from Jeanne Redd. During the visit, James Redd happened by. He recognized Gardiner from previous visits to the Redd household and offered to show Gardiner the small bird pendent shell that he had found on the ground in Pinon, Arizona. Although Dr. Redd had found the shell in Pinon, Arizona, he told Gardiner he had found the shell in Baby Rocks, Arizona. Dr. Redd mislead Gardiner because artifacts collectors hide favorite sites in the same way

that fishermen protect trout holes, hunters guard elk wallows and skiers hide powder stashes.

53)   According to Dace Hyatt, the shell that Dr. Redd found is worth $75.00 to $100.00. Gardiner was aware of the true price because he had dealt in the artifacts trade during the past decade and had recently purchased several similar shells from Mr. Hyatt. Mr. Hyatt retains the receipts from these transactions.

54)   Gardiner's handler, Defendant Love, also knew the true value of the shell that Dr. Redd had picked up from the ground, but he instructed Gardiner to artificially raise the value of the artifact by conflating the value of Dr. Redd's shell pendent with the Shumway Bird effigy pendent. First, Defendant Love artificially increased the value to $500.00, the felony threshold. Later, Defendant Love artificially increased the value of the shell to $1000.00 – the same value as the Shumway bird.

55)   Raising the artificially enhanced value of the artifacts could result in a more serious criminal charge, the potential charges could be enhanced from misdemeanors to felonies, so that "Operation Cerberus Action" could make more headlines and justify its existence to the taxpayers. Defendant Love made no effort to inform or educate Gardiner or himself regarding the limits of the criminal laws. In particular, Defendant Love did not distinguish between articles found on private land, or articles obtained prior to the Artifact Protection Act, or articles that were from Native American civilizations that did not exist in Utah.

56)   Cumulatively, Defendant Love, through Ted Gardiner, paid $335,685 for 256 alleged relics during Cerberus.

14

57)      Meanwhile, Defendant Love's monthly $7,500 payments to Gardiner, cost taxpayers $224,000 for Gardiner's undercover services during the course of Cerberus.

58)      As a result of "Operation Cerberus Action," 16 of the entire 24 Cerberus arrests made June 10, 2009, were in Blanding, Utah, with 19 of the 24 arrests being Utah residents.

59)      The costs involved in "Operation Cerberus Action" demanded that there be as many arrests as possible, as many convictions as possible, and as much publicity as possible, so law enforcement agencies could justify their expenditures on an alleged criminal activity that did not endanger physical health and did not harm anyone.

**The Raid**

60)      A reported 80 or more federal agents, including, but not limited to, the named Defendants, armed with assault rifles, and clothed in flak-jackets, raided and searched "Operation Cerberus Action" targets in Blanding, Utah, including Dr. Redd's home. Defendants were present at the Redd residence from 6:40 A.M. on June 10, 2009, until 5:45 P.M. that evening.

61)      At 6:55 A.M. on June 10, 2009, Dr. Redd was accosted, as he returned to his residence from an early-morning visit to his clinic. As Dr. Redd exited his car, unidentified agent #1 restrained Dr. Redd, subjected him to excessive force and arrested him.

62)      Dr. Redd was manhandled and handcuffed. Defendant Barnes sequestered Dr. Redd in his garage and interrogated him during the next four hours.

63)      Defendant Barnes rebuked, terrified and humiliated Dr. Redd.

64)     Defendant Barnes accused Dr. Redd of unlawful activity of which he was not guilty.

65)     Defendant Barnes repetitively called Dr. Redd a liar while taunting him that a felony offense meant revocation of his medical license.

66)     Defendant Barnes wrongfully harassed Dr. Redd and taunted him that he would never practice medicine again. Defendant Barnes used other improper means and made other improper remarks and accusations that were intended to distress and did distress Dr. Redd.

67)     Defendant Barnes pointed to Dr. Redd's gardening tools and asked him, which shovel do you like to dig bodies with?"

68)     At one point, Dr. Redd needed to use the restroom. Unidentified agents # 2 and 3 accompanied Dr. Redd to the restroom. Although the room is large, each agent stood just six inches off Dr. Redd's knees as he defecated. When Dr. Redd was finished, the agents would not remove Dr. Redd's handcuffs so he could properly clean himself.

69)     Although all three Redds were sequestered in corners of their home and law enforcement had taken full control of the situation, Defendant Love spoke to other agents several times on his cell phone throughout the day. In every conversation, he urged more and more agents to come to the Redd household. Defendant Love revealed to Jerrica Redd that some 140 agents had trampled through the Redd home at some point during the day.

70)     Defendants Barnes and Love were aware of the physical and psychological impact of their assault on Dr. Redd, knowing that his life focused on his family, his religion, his profession and his community. They knew the toll that the Bluff

incident had taken on Dr. Redd and his family and they exploited Dr. Redd's anguish over the incident during their interrogation. They intended to use his goals to try to get him to admit to a crime he did not commit.

71)     The Defendants did convey, and intended to convey, the physical and psychological impact caused by their acts and omissions for the purpose of harming Dr. Redd, causing him physical and psychological injuries, and depriving him of his Fourth and Fifth Amendment rights, under the Constitution of the United States of America and the similar provisions under the Constitution of the State of Utah.

72)     Dr. Redd was arrested on June 10, 2009, based upon an Indictment that was issued on May 29, 2009 and placed under seal. The indictment only had one count against Dr. James D. Redd, COUNT 4, which reads:

> On or about **March 27, 2008**, in the Central Division of the District of Utah, JEANNE H. REDD and JAMES D. REDD, defendants herein, did receive, conceal, and retain property belonging to an Indian tribal organization, with a value of more than $1,000 to wit: an effigy bird pendant, knowing such property to have been embezzled, stolen, or converted, and did aid and abet therein, all in violation of 18 U.S.C. § 1163 and 2.

73)     Jeanne Redd's presentence report reads as follows:

> On March 27, 2008, the CS met with the Defendant at her residence. The Defendant's husband was also present. The Defendant told the CS that they had gone down to Baby

Rocks, Arizona, where her husband found a white bird
pendant. Baby Rocks, Arizona was determined to be
entirely on Navajo Reservation Land. The CS did not
purchase the pendant. The pendent had an estimated value
of a minimum of $500.

74)     There was no evidence that the item was worth in excess of $1,000.00 or
$500.00. The best, most favorable evidence available to the Defendants could only prove
a value of $125.00. Nevertheless, Defendant Love artificially enhanced the value of the
shell in the indictment in order to justify a felony charge against Dr. Redd.

75)     The representation of the false value in the indictment was a deliberate,
reckless misrepresentation of value provided under oath by Defendant Love. This false
value was manufactured by the Defendants, with the aid and assistance of the paid
informant Ted Gardiner, for the deliberate, reckless and untruthful purpose of having
Count 4 of the May 29, 2009 indictment allege a felony. Defendant Love then willfully
and wantonly, with intent to do harm, misrepresented the severity of the alleged crime
against Dr. Redd and physically and mentally harassed him in an attempt to get an
admission to a crime he knew, or should have known, Dr. Redd did not commit.
Defendant Love continued these acts and omissions in an attempt to justify his intentional
denial of the constitutional rights of Dr. Redd as set forth in this Complaint.

76)     There were seven Counts in the May 29, 2009, indictment, and it is
acknowledged that the seven counts, including Count 4, were alleged against Jeanne H.
Redd. It is further acknowledged that this Complaint and BIVENS action is not brought
on behalf of said Jeanne H. Redd as an individual nor are the charges brought against her

18

relevant and admissible in this case.

77)     The Defendants spent a great deal of their eleven hour search time trying to locate the item they alleged was illegally obtained by Dr. Redd, but did not even have a proper identification of said item. It was impossible for them to have an honest, true value to present to the grand jury.

78)     Dr. Redd was the primary subject of the Defendants in this case due to his status in the community, his profession which was utilized and respected by all members of the community and surrounding area, including but not limited to, the Native Americans of Blanding, Utah and the surrounding area.

79)     Additional reasons why the Defendants were out to get Dr. Redd as a suspect will be proved at trial but include, and are not limited to, the following;

      a.     Defendants' intent for "Operation Cerberus Action" was to change a culture of many individuals who collected with pride, and respected with honor, the artifacts they collected;

      b.     Defendants' intent was for "Operation Cerberus Action" to provide them with some excitement and something out of the ordinary to do other than their normal mundane everyday tasks;

      c.     To retaliate against Dr. Redd for what the Defendants considered getting away with a similar incident in 1996: In 1996 the Defendants assisted in bringing a similar state based charge against Dr. Redd – the Bluff incident. The charge was dismissed by the Utah Court of Appeals for insufficient evidence, and on re-prosecution, the charges against Dr. Redd were dismissed and Jeanne Redd opted to pay a fine. Defendants were aware of

the distress and anxiety this prior baseless charge had caused Dr. Redd;

d.    The Defendants made a display of arresting Dr. Redd on June 10, 2009, by waiting until he drove up to his house and exited his vehicle after returning from his medical clinic. At that time, the Defendants, armed with assault rifles and wearing flak jackets with conspicuous law enforcement decals, pulled Dr. Redd out of his vehicle, handcuffed him and isolated him in his garage for interrogation. This kind of treatment violated Dr. Redd's constitutional rights, was not justified in any way (he was not and never had been a threat and there was absolutely no reason for the Defendants to fear for their safety, especially when they had already cleared his residence), and the above was undertaken and completed in order to embarrass, intimidate and humiliate Dr. Redd, and to try to make an example of him to community members, not for any legitimate purpose but for the reasons set forth in this Complaint;

e.    The Defendants knew that their acts and omissions constituted a discrimination so unjustified as to be a violation of due process, as well as a class base violation of Due Process under the Fifth Amendment, and that they wanted to make as much of the situation that they could prior to the charges being reduced or dismissed;

f.    To prove the Defendants could use excessive and unreasonable force;

g.    The Defendants knew that they really did not have a felony case against Dr. Redd and that it would be reduced or dismissed.

80)    Dr. Redd was arrested on the above Count 4 of the May 29, 2009 charges

and the Indictment on its face proves that Dr. Redd was not guilty:

      a.     Defendants' valuation cannot be proven, and it is a deliberate, reckless misrepresentation of the value, which is a material element in the crime being charged;

      b.     At the time the artifact was discussed by the informant, its value by him was not more than $500.00. Experts estimate the pendent was actually worth between $75.00 and $100.00.

81)     Defendants gave deliberate falsehoods or had a reckless disregard for the truth in making any statements of value for the artifact alleged to be the property of Dr. Redd.

82)     Defendants used excessive and unreasonable force set forth in this Complaint.

83)     Nowhere in the investigation or in the Cerberus Action was there any evidence as to Dr. Redd, or anyone connected with him, ever having any weapons or being a threat in any way to the Defendants. The use of the excessive force was not and cannot be justified in any way.

84)     Defendants used deliberate falsehoods and/or reckless disregard for the truth in reference to the interrogations of Dr. Redd and the Redd family on June 10, 2009, made with the purpose of deception and violating the constitutional rights of Dr. Redd.

85)     The Defendants' acts and omissions intended to deprive Dr. Redd of his constitutional rights, shock the conscience of reasonable people, constitute threats, were intended to destroy Dr. Redd's rights to life, liberty, and pursuit of happiness, and exhibit the Defendants' deliberate indifference to the life of Dr. Redd, his right to equal

protection of laws, his right to be free from unlawful detention and his right to be free from unlawful arrest.

86)     The Defendants violated Dr. Redd's Fifth Amendment right which prohibits discrimination and the unjustifiable violation of due process as set forth in *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

87)     The Defendants' manner of execution of the warrants was unreasonable. The arrest warrant did not justify the manner of execution and the search warrant as it pertained to Dr. Redd did not justify the manner of execution. The manner of execution of the warrants as they pertained to Dr. Redd was a violation of Dr. Redd's constitutional rights as set forth in this Complaint. The manner of execution resulted in the unconstitutional use of excessive force under the circumstances including the use of physical force, the use of handcuffs, the use of shackles, the unnecessary restraints, the isolation in the garage, the hostile interrogation, the disrespectful human treatment and the overall inhuman treatment.

88)     Defendant Love's plan was to make an example of the arrest of Dr. Redd, so he utilized an excessive number of agents, an excessive number of governmental vehicles, excessive numbers of weapons and excessively brandished weapons, utilized false allegations and deliberate and reckless disregard of the truth, and overall mistreatment as set forth in this Complaint, which was unreasonable under the circumstances.

89)     The following day, on June 11, 2009, shaken to the core and overwhelmed by the Defendants' overpowering and egregious behavior, Dr. Redd discussed the raid with his family. He noted the overwhelming trauma that the State of Utah and the BLM

had inflicted upon him during the years between 1996 and 2002 over the incident at Bluff. Now that the FBI was involved, Dr. Redd knew that he would never be free of the Bluff incident – that the government would never leave him alone. He also noted how Defendant Barnes had exploited the Bluff incident during his interrogation and how Defendants Barnes and Love seemed to hold a vendetta against him with regard to the Bluff incident. He noted all of this and felt incredible despair. Thereafter, with his livelihood and standing in the community unjustly assaulted, Dr. Redd walked out on the patio of his home. He looked towards Colorado and recorded his thoughts to his wife and five children, telling them how much he loved them. He paused to reflect on the attributes that made each of them unique and positive individuals. He also recalled his life growing up in Blanding. Thereafter, he went to his vehicle, hooked a hose to the exhaust pipe of the car, and asphyxiated himself.

**The Aftermath**

90)     Over a thousand people attended Dr. Redd's funeral. He was a linchpin in the Blanding community. Sadly, but not surprisingly, Dr. Redd's suicide was only one of four triggered by roughshod, inhumane and unjust acts by the Defendants that day. On June 19, 2009, a week and a half after the initial arrests, Steven Shrader of Santa Fe, New Mexico, also accused of "looting artifacts," died of two self-inflicted gunshot wounds. Most tellingly, on March 1, 2010, Ted Gardiner, the sole federal informant in Operation Cerberus, realizing that he had played a key role in "killing two people," as noted by one of his Alcoholics Anonymous friends, took his own life with a handgun. Mr. Gardiner had a history of substance abuse and mental health problems. Not only did he feel responsible for both Dr. Redd's and Mr. Shrader's deaths, he also felt federal authorities

had "thrown him to the curb." Just recently, yet another victim of Operation Cerberus committed suicide.

91)     The Defendants' acts and omissions were so egregious and against public policy, not only just at the Redd's residence but throughout Blanding, that statewide outrage ensued. The conduct of the Defendants was condemned by local and statewide law enforcement as contrary to law enforcement standards and policy. Some law enforcement agencies considered bringing state charges against the Defendants. The Utah legislature actually took action, passing House Bill 146, which sought to restrict federal law enforcement by land management agencies. Both of Utah's United States Senators personally wrote United States Attorney Eric Holder, requesting an investigation into the excessive use of force that day, and as of the date of this Complaint, no investigation has been conducted. The resulting allegation is the following: the acts and omissions on June 10, 2009, and the actions thereafter, were against public policy, were overkill and defied rationale law enforcement standards and practices. The failure of Defendants to even investigate the incident illustrates their lack of control and demands that the remedy for the unacceptable behavior be this *Bivins* action.

92)     Utah's Senior United States Senator, Orin Hatch, praised Dr. Redd "as an outstanding and critical member of his community, a decent and honorable man, whom given the unnecessary and brutal actions by federal agents was overwhelmed and overwrought thus taking his life despite being strong person."  Senator Hatch pointed out the Department of Justice and Department of Interior's fanfare press conference announcing the glowing success of Operation Cerberus was the biggest "dog and pony show" Senator Hatch had seen in his 33 years as a Senator.

93)     In June 2010, Defendant Dan Love, the primary BLM detective behind operation Cerberus, attended a meeting of the Dixie Archeology Society in St. George, Utah. Despite the fact that prosecutions of numerous defendants in the case were still pending, Defendant Love gave a formal presentation on "Operation Cerberus." In the middle of the presentation, Defendant Love postulated that "stealing artifacts" was a way of life for the people involved, and was a family affair in one case, showing a picture of the Redd family outdoors (taken during the ransacking of the family home) claiming they were out "pot hunting." Not only is this behavior contrary to the professional standards of law enforcement, the disregard for the Redd family's privacy, the untruth that was presented, and the fundamental unchecked power of Defendant Love to do or say whatever he pleases, would understandably drive a non-empowered citizen to consider suicide when faced by such blatant, unchecked and relentless abuse of power and denial of constitutional rights. Defendant Love has also had the audacity to tell the Redd family that James (Dr. Redd) "took one for the team." Defendant Love's lack of caring, disrespect, lack of respect for the Constitution and malfeasance continues today.

94)     Defendant Love's lack of the respect for the Constitution and proper law enforcement procedures was illustrated when, in April of 2008, 48 artifacts alleged to have been traded in August 2007 by informant Ted Gardiner with Jeanne Redd failed to appear in the case evidence file, and were instead discovered by FBI agent Gibson M. Wilson in Defendant Love's vehicle.  These 48 items of evidence had been kept over nine months by Defendant Love, and were not recorded as evidence until Defendant Love was written up by Defendant Gibson.

95)     At her sentencing hearing, Jeanne Redd contested the value of the bird

effigy pendent that she and her husband had been charged with possessing. She stated

that the bird was not worth $1000.00, but her attorney advised her to plead guilty

anyway. Although her plea was accepted, media outlets covering the sentencing noted

Mrs. Redd's contention.

96)     After everything was over, Jerrica Redd arranged a meeting with

Defendant Love to get some of her father's personal mementos returned such as journals

and photographs. Defendant Love did not return those items, but he did admit to Jerrica

Redd that, "I'm responsible for your father's death."

### First Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the

Defendant(s) violated Plaintiffs' rights under the Fourth Amendment of the Constitution

to be free from unreasonable seizure through unlawful execution of a warrant. Although

Defendant Love knew via the knowledge of his informant that the small shell that James

Redd had picked up in Pinon, Arizona was worth just $75.00 to $100.00, Defendant Love

valued the pendant at $500, then $1000 in subsequent documentation by conflating James

Redd's shell with the Shumway bird. Defendant Love inflated the value of the shell

because he felt that Dr. Redd had escaped from a more serious charge for the Bluff

incident and he wanted to hold Dr. Redd accountable.

### Second Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the

Defendant(s) violated Plaintiffs' rights under the Fourth Amendment of the Constitution

of the United States by violating Plaintiff James D. Redd's right to be secure from

unreasonable search of his residence. Because Defendant Love artificially inflated the

value of Dr. Redd's shell to manufacture a felony charge against him, the search of the Redds' residence pursuant to the search warrant was unlawful and violated Dr. Redd's Fourth Amendment right to be free from unlawful search.

### Third Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiff James D. Redd's rights under the Fourth Amendment of the Constitution of the United States by violating Plaintiffs' right to be secure from excessive force. Although the Redds were secured and the situation was under control, Defendant Love insisted that agents continue to pour into the Redd residence. The only purpose of the extra agents was to embarrass and humiliate Dr. Redd and his family.

During Dr. Redd's interrogation, Defendant Barnes humiliated Dr. Redd by accusing him of crimes that he knew Dr. Redd did not commit. He also denied Dr. Redd the ability to use the restroom with a shred of dignity although Dr. Redd presented no threat of harm and no threat of escape. Rather, he ordered unidentified agents #2 and 3 to stand over Dr. Redd while he used the restroom solely to embarrass and humiliate Dr. Redd.

### Fourth Cause of Action:

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiff James D. Redd's rights under the Fifth Amendment of the Constitution of the United States by violating Plaintiffs' right to equal protection of the laws. Defendant Love, in his role as a supervisor of Operation Cerberus, ordered agents to report to the Redd household throughout the day as they finished other raids in the Blanding area. Although the Redds presented no elevated physical threat or threat of

escape, Defendant Love nevertheless packed the Redd residence with agents solely to embarrass and humiliate the Redds. Defendant Love treated the Redds differently than other alleged traffickers arrested as a part of Operation Cerberus because Defendant Love felt that Dr. Redd had escaped a felony conviction related to the Bluff incident.

**Fifth Cause of Action:**

Plaintiffs assert and re-allege each of the facts set forth above and assert the Defendant(s) violated Plaintiff James D. Redd's rights under the Fifth Amendment of the Constitution of the United States by violating Plaintiffs' right to due process.

WHEREFORE, Plaintiffs, each of them, pray for judgment against the Defendants, jointly and severally as follows:

1) That Defendants be determined to have violated the Fourth and Fifth Amendments to the Constitution as to the Plaintiff James D. Redd.

2) That Defendants be determined to have injured the Plaintiff James D. Redd in an amount to be determined at trial.

3) That Plaintiff James D. Redd and the Estate of James D. Redd be awarded their damages against the Defendants for his survivorship cause of action and his wrongful death cause of action.

4) That Plaintiffs be awarded damages for actual, emotional, intentionally inflicted emotional damages and any consequential damages as determined at trial to be in the interests of justice.

5) That Plaintiff James D. Redd be awarded punitive damages against the Defendants as may be reasonable and justified by the facts herein.

6) That Plaintiffs be awarded their costs and fees herein, including all costs of

trial, reasonable attorney fees in bringing this action and any other costs the Court deems

just and proper.

Respectfully submitted this 2nd day July 2012.

/s/ Shandor S. Badaruddin
Shandor S. Badaruddin, Esq.
**Attorneys for Plaintiff**

MORIARITY, BADARUDDIN & BOOKE, LLC
736 South Third Street West
Missoula, Montana 59801
Telephone:    406-728-6868
Facsimile:    406-728-7722
Email:        Shandor@mbblawfirm.com;
              Ed@mbblawfirm.com;
              Brad@mbblawfirm.com

29

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, the Plaintiffs demand that a jury try all of the

above issues and allegations.

DATED this 2nd day of July, 2012.

/s/ Shandor S. Badaruddin
Shandor S. Badaruddin, Esq.
**Attorneys for Plaintiff**

MORIARITY, BADARUDDIN & BOOKE, LLC
736 South Third Street West
Missoula, Montana 59801
Telephone:     406-728-6868
Facsimile:     406-728-7722
Email:          Shandor@mbblawfirm.com;
                Ed@mbblawfirm.com;
                Brad@mbblawfirm.com