Edward P. Moriarity Bar #5622
Shandor S. Badaruddin Bar #9999
Bradley L. Booke Bar #9984
Moriarity Badaruddin & Booke, LLC
736 South Third Street West
Missoula, Montana 59801
Telephone:    406-728-6868
Facsimile:    406-728-7722
Email: shandor@mbblawfirm.com
              ed@mbblawfirm.com
              brad@mbblawfirm.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF JAMES D. REDD, M.D., et al., <br><br> Plaintiff, <br><br> v. <br><br> DANIEL LOVE, et al., <br><br> Defendants. | Case No. 2:11-CV-00478-RJS <br><br> **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO FEDERAL DEFENDANTS' CONSOLIDATED MOTIONS TO DISMISS** <br><br> Hon. Robert J. Shelby |

## INTRODUCTION

This case is brought pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, (1971). The Plaintiff is the estate of Dr. James Redd, a well-known doctor and Mormon leader in Blanding, Utah, who took his own life after succumbing to an unchecked and unwarranted governmental intrusion into his life. The Defendants are two agents of the Bureau of Land Management. After Dr. Redd allegedly committed a crime that amounted to a misdemeanor, the agents manufactured evidence against Dr. Redd to charge him with a felony.

1

They marshaled an unprecedented raid upon his home, utilizing some 140 agents to arrest a man with a clean criminal record and no propensity to commit, or history of, violence. One day afterwards, overwhelmed with despair, Dr. Redd took his own life. The Defendants now seek to hide behind qualified immunity. The Court should deny them this protection for two reasons: First, Jeanne Redd's statement in advance of her guilty plea does not invalidate her husband's claim. Second, qualified immunity guards the delicate balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It does not protect the Defendants' cavalier conduct towards Dr. Redd, or their disregard for his innocence. The Defendants' characterization of qualified immunity would, in effect, force the Plaintiff to conduct discovery before filing its claim. The Court has never recognized such a duty, and should refrain from doing so now. For these reasons, the Defendants' Motion should be denied.

## STATEMENT OF ISSUES

1. Whether Jeanne Redd's statement in advance of her guilty plea invalidates her husband's claim.

2. Whether the Defendants' Conduct Caused Them To Forfeit The Protection Of Qualified Immunity.

## STATEMENT OF THE FACTS

The facts surrounding Operation Cerberus and James Redd's resulting death are set forth in the First Amended Complaint (FAC) (Dkt. 56). However, the facts relevant to the Defendant's Motion to Dismiss are included herein.

**The Incident at Bluff**

Blanding, Utah is the most populous city in San Juan County, a 7,725 square-mile area containing some 25,000 burial sites of Native American remains. FAC ¶ 22. October 29, 1995, two men were riding horses near an area of Cottonwood Wash, north of Bluff, Utah – also in San Juan County – when they discovered an excavation site. FAC ¶ 10. After they reported the incident to Bureau of Land Management (BLM) Agent Jim Ragsdale, Mr. Ragsdale found human bones littering the west end of a large trench near the site. FAC ¶ 11. Much of Cottonwood Wash is public land, but locals referred to it as "Guymon's Land." The Guymon family owns parts of the wash and according to BLM maps, the excavation site sat on the Guymon family's land. FAC ¶ 12. Unknown to the public, the BLM maps were inaccurate. FAC ¶ 12.

Sometime in December of that year,[1] Dr. Redd, his wife, and three of their children asked Erv Guymon for permission to screen for small artifacts – beads and pottery shards – on his land. Mr. Guymon granted the Redds' request. FAC ¶ 13. A month later, on January 6, 1996, the Redd family visited Cottonwood Wash where Mr. Ragsdale had located human bones two months prior. FAC ¶ 14. For much of the morning, the Redds screened dirt for small artifacts but they never touched human bones or disinterred human remains. The Redds believed they were on Guymon family land, because they were using the BLM map. In fact, the Redds were on public land. FAC ¶ 15. Later that day, two hikers, standing on a Bluff west of the wash, saw the Redds at work. They called Ben Naranjo of the San Juan County Sheriff's office and reported the incident. FAC ¶ 16.

---

[1] The First Amended Complaint erroneously states "2005." That date is a typographical error. It should state "1995."

When Naranjo arrived at Cottonwood wash to confront the Redds, they told him that they had permission to be on the land, and that it was private. FAC ¶ 17. Only after Ragsdale performed a professional survey of the site did he realize that the land was public and that the BLM map was inaccurate. FAC ¶ 18.

Sometime after the incident, the Hopi Nation learned that gravediggers had desecrated the Cottonwood Wash site by disinterring remains. Concluding that the Redds were responsible, Hopi Tribal Chairman Ferrell Secakuku wrote an open letter to Bill Benge, the Grand County Attorney, urging Benge to file charges against the Redds. The letter was published in the Canyon Echo, the local newspaper, on July 11, 1996. (See Exhibit 10, p. REDD-000653).

During September of 1996, several articles appeared in various newspapers throughout Southern Utah urging the county attorney to file charges against the Redds. (*See*, for example, Exhibit 10, p. REDD-000655).

On March 5, 1997, the Redds were arrested and booked into the San Juan County jail. They were charged with desecration of a human body, a third-degree felony, as well as trespassing. FAC ¶ 21. The state also filed civil charges against the Redds asking the Court to compel the Redds to pay $250,000 to renovate the Cottonwood Wash site. FAC ¶ 21. Approximately two weeks later, Judge Lyle Anderson dismissed the charges against the Redds, FAC ¶ 22, spurring media controversy. FAC ¶¶ 22-23; (Exhibit 10 p. REDD-000648). The following January, the Utah Court of Appeals upheld Judge Anderson's decision. FAC ¶ 24. Six months later, the State of Utah re-filled charges against the Redds. FAC ¶ 25. After Judge Anderson dropped the trespassing charges, the State appealed Judge Anderson's ruling to the Utah Supreme Court, which remanded. FAC ¶¶ 26-27. Back at the district court level, Judge

Mary Manley dismissed charges against the Redds for a third time. FAC ¶¶ 27-28. Again, newspaper coverage was largely critical. FAC ¶ 28; (Exhibit 10, p. REDD-000650). And again, the State filed charges. FAC ¶ 29. In November 2002, Jeanne Redd entered an *Alford* Plea in which she admitted no criminal action. She agreed to pay a $10,000 fine. All charges against James Redd were dropped. FAC ¶ 29; (Exhibit 10, p. REDD-000657). Dr. Redd's family remembers that both parents were devastated by the incident and their treatment by the State as well as the BLM during the preceding seven years. FAC ¶ 30.

### The Shumway Bird

Prior to 1979, Kasey Shumway found an effigy bird pendant in Starvation Canyon north of Blanding, Utah. The bird pendant is famous in Blanding and is known locally as "The Shumway Bird." Because it was found prior to 1979, it does not fall under the authority of the laws that the Redds are accused of violating. FAC ¶ 31; 16 U.S.C. 470 ee(e). Jeanne Redd had coveted the Shumway bird for 30 years. FAC ¶ 32. At some point, Kasey Shumway gave the Shumway bird to Shane Shumway, a family member. FAC ¶ 33. Eventually, Shane Shumway passed the bird to another family member, Kevin Shumway. FAC ¶ 34. Thereafter, Kevin Shumway sold the Shumway bird to Ted Gardiner who, at the time, was an informant for Operation Cerberus. FAC ¶ 34.  The Shumway Bird is worth approximately $1,000.00. FAC ¶ 50.

### Operation Cerberus

In October of 2006, the BLM and the FBI began Operation Cerberus, the largest investigation ever into the looting of Native American artifacts on public lands. FAC ¶ 35. Defendant Love planned and headed Operation Cerberus. FAC ¶ 36. The point of Operation

Cerberus was to curb the collection of artifacts in the Four Corners area of the United States. FAC ¶ 36. Operation Cerberus sought to stop *all* collecting of artifacts, not just those illegal collections that occurred on public property or after 1979. FAC ¶ 36; 16 U.S.C. §§ 470 ee (b), (e). Ted Gardiner was a Native American artifacts collector and dealer and had been so for the past 10 years. When he was under investigation by federal law enforcement, Defendant Love turned Mr. Gardiner into a confidential informant. FAC ¶ 37. Mr. Gardiner, who struggled with alcohol abuse and mental health issues, told Defendant Love that he possessed significant sales and transaction experience in the artifacts marketplace. FAC ¶ 38. He spun a tail of kingpins trafficking items illegally obtained from federal or tribal lands. FAC ¶ 38. Despite Defendant Love's knowledge of Gardiner's struggles, Defendant Love took Mr. Gardiner's story at face value. FAC ¶ 39.

Defendant Love bought into Mr. Gardiner's story not because of naivety, but as a result of Defendant Love's wish to prosecute Dr. Redd. FAC ¶ 41. Defendant Love thought that Dr. Redd had escaped a certain felony conviction stemming from the incident at Bluff and wished to see Dr. Redd behind bars. FAC ¶ 41. From March 2007 until November 2008, Mr. Gardiner, acting at the behest of Defendant Love, purchased over $300,000 worth or artifacts, some legal and some illegal, all while garnering over $7,500.00 per month from Defendant Love. FAC ¶ 42. Defendant Love armed Mr. Gardiner with a bottomless supply of taxpayer funds. FAC ¶ 45. Mr. Gardiner utilized these funds in an attempt to entrap individuals into allegedly selling or offering to sell or swap Native American artifacts all while wearing a wire so Defendant Love could listen and tape the transactions. FAC ¶ 44. Defendant Love trained, directed, and encouraged Mr. Gardiner to raise the value he paid for the undercover purchases so he could entrap customers

and artificially raise the alleged market value of the artifacts. With this training, Mr. Gardiner befriended Jeanne Redd. FAC ¶ 46.

Mr. Gardiner targeted the Redds because, in the words of Utah Director of Indian Affairs Forrest Cuch, many federal and state authorities felt that the Redds had been "slapped on the wrist," for the Bluff incident in 1996, "and many of us weren't happy with that." FAC ¶ 47.

On August 30, 2007, Jeanne Redd gave Mr. Gardiner a tour of her native artifacts collection. During the tour, Mr. Gardiner wore a wire whereby Defendant Love could listen to his conversation with Mrs. Redd. FAC ¶ 48. The Defendants learned, via the wire, that Mrs. Redd preferred small objects – beads and pottery shards – over more valuable artifacts normally coveted by collectors. FAC ¶ 48. That day, Defendant Love sent Gardiner to the Redds' home armed with the Shumway bird. Mrs. Redd immediately recognized the bird and swapped two bags of nominally-priced artifacts for it. Almost eight months later, on April 17, 2008, BLM Agent Wilson Gibson found the bags in Defendant Love's vehicle. (Exhibit 11).

On March 27, 2008, Mr. Gardiner, under the direction of Defendant Love, returned to the Redd household in an attempt to purchase artifacts from Jeanne Redd. During the visit, Dr. Redd happened by the home. FAC ¶ 52. He recognized Gardiner from previous visits to the Redd household and offered to show Mr. Gardiner the small bird pendent that he had found on the ground in Pinon, Arizona. FAC ¶ 52. According to Dace Hyatt, the shell that Dr. Redd found is worth $50.00 to $125.00. FAC ¶ 53; (Exhibit 8). Mr. Gardiner was aware of the true price because he had dealt in the artifacts trade during the past decade and had recently bought and sold several similar items from Mr. Hyatt. (Exhibit 8). Nevertheless, Defendant Love instructed Mr. Gardiner to artificially raise the value of the bird to $1,000.00 – the felony threshold and the

7

same value as the Shumway bird. FAC ¶ 54.

## The Raid

A reported 80 or more federal agents, including, but not limited to, the named

Defendants, armed with assault rifles and clothed in flak-jackets, raided and searched Operation

Cerberus Action targets in Blanding, including the Redd home. FAC ¶ 60. The Defendants, as

well as some 140 agents throughout the day, occupied the Redd home from 6:55 A.M. until 5:45

P.M. that evening. FAC ¶ 60. At 6:55 A.M., Dr. Redd was arrested as he returned home from an

early-morning visit to his clinic. FAC ¶ 61. Defendant Barnes sequestered Dr. Redd in his garage

and interrogated him during the next four hours. FAC ¶ 62. Defendant Barnes rebuked, terrified

and humiliated Dr. Redd. FAC  ¶ 63. He accused Dr. Redd of unlawful activity, called Dr. Redd

a liar, and taunted him with the loss of his medical license despite the fact that Dr. Redd had

committed, at worst, a misdemeanor. FAC ¶ 65. Defendant Barnes told Dr. Redd that he would

never practice medicine again. FAC  66. Although he knew that Dr. Redd had never exhumed

remains, Defendant Barnes pointed to Dr. Redd's gardening tools and asked him, "which ones do

you like to dig bodies with?" FAC ¶ 67. At one point, Dr. Redd had to use the restroom.

Defendant Barnes acquiesced to Dr. Redd's request, but directed two agents to follow him to the

restroom. FAC ¶ 68. As Dr. Redd sat on the toilet, two agents stood right off his knees. When

Dr. Redd finished, the agents refused to remove his handcuffs so Dr. Redd could properly clean

himself. FAC ¶ 68.

Although all three Redds were sequestered in different corners of the house and law

enforcement had taken full control of the situation, Defendant Love used his cell phone to speak

with several agents throughout the day. FAC ¶ 69. In every conversation, he urged more and

more agents to come to the Redd household. FAC ¶ 69. Defendant Love eventually revealed to

Jerrica Redd that some 140 agents had trampled through the Redd home throughout the day.

FAC ¶ 69.

 Dr. Redd was arrested on the day of the raid pursuant to an indictment. The indictment

alleged as follows:

> On March 27, 2008, in the Central Division of the District of Utah, JEANNE H.
> REDD and JAMES D. REDD, defendants herein, did receive, conceal, and retain
> property belonging to an Indian tribal organization, with a value of more than
> $1,000 to wit: an effigy bird pendant, knowing such property to have been
> embezzled, stolen, or converted, and did aid and abet therein, all in violation of
> 18. U.S.C. § 1163 and 2.

FAC ¶ 72, (Exhibit 12). Possessing the bird effigy pendant was only a felony if its value

exceeded $1,000. 18 U.S.C. § 1163. Jeanne Redd signed a statement in advance of her guilty

plea acknowledging that the bird effigy pendant was worth $1,000.00. (Exhibit 2). However, at

her change of plea hearing, she refused to acknowledge that the bird was worth $1,000.00.

(Exhibit 1, 5:7-25). In her presentence report, the value of the bird had diminished to $500,

which is not a felony. (Exhibit 3); 18 U.S.C. § 1163. In reality, the bird effigy pendant is worth

approximately $75.00. (Exhibit 8).

 The day following the raid, shaken to the core and overwhelmed by the Defendants'

behavior, Dr. Redd went to his vehicle, hooked a hose to the exhaust pipe of his car, and

asphyxiated himself. FAC ¶ 90.

**ARGUMENT**

**I.      Jeanne Redd's Statement In Advance of Her Guilty Plea Does Not Invalidate Her Husband's Claim**

The Defendant challenges the procedural posture of the First Amended Complaint arguing that it is barred by both *Heck* and the doctrine of judicial estoppel. *Heck v. Humphrey*, 512 U.S. 477 (1994). Neither argument has merit. Although the Court did not specifically address the Defendant's *Heck* argument in its first June 11, 2012 Order, it granted the Plaintiff leave to file an Amended Complaint within twenty-one days. (Dkt 55, at 13). If the Court had found that *Heck* barred this lawsuit, then it would have been impossible for Plaintiff to plead any facts that would state a claim and the Court would not have allowed an amended complaint. The fact that the Court granted the Plaintiff leave to file an Amended Complaint necessarily implies that the Court had denied Defendant's *Heck* argument. Whether the denial is the law of the case or not, denial is appropriate and required by the law as set forth below.

**a.   *Heck* v. *Humphrey* Does Not Extend to Third-Party Challenges**

The *Heck* Court's holding is not as broad as the Government suggests. The *Heck* Court held only that a prisoner, seeking damages stemming from an allegedly unconstitutional conviction, must prove first that the conviction has been reversed or expunged. *Heck*, 512 U.S. at 486. Otherwise, a claim pursuant to 42 U.S.C. § 1983 – of which the U.S. Supreme Court has labeled *Bivens* actions "the federal analog," *Ashcroft v. Iqbal*, 556 U.S. 662, 675-76 (2009) – is not cognizable. *Heck*, 512 U.S. at 483. The Defendant raised the same issue in its previous motion to dismiss. (Dkt. 44, at 25-26). As the Plaintiff illustrated, it lacked merit then for the same reasons that it lacks merit now. (Dkt. 47, at 29-31). Namely, Jeanne Redd's appearance as the representative of her husband's estate is not a collateral attack upon her statement in advance

10

of her guilty plea because the *Heck* Court only addresses plaintiffs who seek to invalidate their own convictions, not those of third parties. *Butler v. Compton*, 482 F.3d 1277, 1279 (10th Cir. 2007).

Second, the *Heck* Court envisioned the scenario presented by this case:

> [I]f the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed[.] For example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced at a state criminal trial resulting in the § 1983 plaintiff's still-standing conviction. Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not *necessarily* imply the plaintiff's conviction was unlawful.

*Heck*, 512 U.S. at 487 n. 7.

If a judge or jury determines that James Redd was innocent of the crimes against him, or that his constitutional rights were violated, such a finding would not *necessarily* imply that Jeanne Redd's conviction was unlawful. It is not the case, as the Defendant implies, that any criminal conviction results in a wholesale foreclosure of a constitutional tort action. *Ashe v. Swenson*, 397 U.S. 436, 444 (1970) ("the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality."); *Thore v. Howe*, 466 F.3d 173, 185 (1st Cir. 2006) (rejecting *per se* rule that judicial estoppel automatically applies to facts admitted during plea colloquy in § 1983 action). Mrs. Redd essentially entered an *Alford* plea. *See* Partial Transcript of Jeanne Redd's Change of Plea Hearing, at 5 (July 6, 2009) (Exhibit 1) ("But Judge, so that we're clear, the government valued [the bird effigy pendent] at more than [$1,000.00] and we accept that value for purposes of today."). That

fact does not supersede the Defendant's use of excessive force or its manufacture of evidence against her husband. *Ballard v. Burton*, 444 F.3d 391, 400-01 (5th Cir. 2006) (finding that district court erred in determining that *Heck* barred §1983 action in case involving *Alford* plea).

It should also be noted that Movants seek to have this Court apply *Heck* not to the Plaintiff's conviction, (the Plaintiff is the Estate of James Redd), but to the conviction of a third party other than the Plaintiff. Plaintiff found one and only one case, outside the Tenth Circuit, that suggested that *Heck* could extend beyond the plaintiff's own criminal conviction: *Beets v. County of Los Angeles,* 669 F.3d 1038 (9th Cir. 2012). *Beets* is inapplicable to the case at bar, and it is contrary to *Heck,* 512 U.S. at 487 n. 7.

In *Beets*, the plaintiffs alleged that a deputy sheriff had used excessive force when he shot and killed their son. 669 F.3d at 1040. A jury had convicted the son's accomplice, and the court agreed that, pursuant to *Heck*, the accomplice's conviction barred the parents' § 1983 suit. Although *Beets* appears at a glance to support the Defendant's argument, the case at bar is distinguishable. The *Beets* jury found the accomplice guilty "under an aiding and abetting theory," meaning the son needed to commit the crime for the jury to find that the accomplice aided and abetted it. *Id*. at 1401. In contrast, the crimes with which Dr. and Mrs. Redd were charged could stand alone. It is not the case, as it was in *Beets*, that the guilt of one compelled the guilt of the other. Second, *Beets* is completely inconsistent with *Heck*, 512 U.S. at 487 n. 7. Last, to the extent Ninth Circuit caselaw is persuasive with this Court, the Ninth Circuit has also recognized the reality that, "[l]ooking into a crystal ball to divine how the trial [of the decedent] might have proceeded in that alternative universe would require nothing short of rank

speculation on our part – an exercise that is the antithesis of the confidence necessary to invoke collateral estoppel." *Cunningham v. Gates*, 312 F.3d 1148, 1156 (9th Cir. 2002). No Court can speculate as to the outcome of James Redd's trial – had it gone forward – and *Heck* does not bar this lawsuit.

The Defendants do not address the third party obstacle and the authority relied upon by the Defendants does nothing to eradicate its third-party hurdle. Defendant cites *Beck v. City of Muskogee Police Dept.*, 195 F.3d 553, 557 (10th Cir. 1999) for the proposition that "*Heck* should apply . . . when the concerns underlying *Heck* exist." (Dkt. 60.1 at 7).  Yet *Beck* discussed § 1983 claims in the context of *pending* charges, not those, such as Dr. Redd's, which have been dismissed. *Beck*, 195 F.3d at 557.  Lastly, and most importantly, the Defendant's brief suffers from the same defect now as it did in the first round of briefing; it cannot direct the Court to a single case reflective of the situation here: that where *Heck* applied to a conviction of anyone other than the plaintiff. For that reason, the Defendant's Motion should be denied.

> **b.  Judicial Estoppel Does Not Apply**

As with *Heck* above, Plaintiff could find no caselaw, and none was cited by the Movants, wherein the doctrine of judicial estoppel invalidated the claim of a third party. In all the Defendant's cited authority, the Plaintiff is the actual Defendant seeking to invalidate his or her own criminal record. In contrast, Mrs. Redd's status as representative of her husband's estate does not place her own criminal record at issue, and in the event that it does, the Plaintiff should be allowed to appoint a different personal representative.

In the event that the Court finds that Mrs. Redd's criminal record *does* impinge the validity of her husband's claim – regardless of whether she proceeds as personal representative –

the Court must heed the Tenth Circuit's warning that the doctrine "be applied with

caution…because of the harsh result attendant with precluding a party from asserting a position

that would normally be available to the party." *Bradford v. Wiggins*, 516 F.3d 1189, 1194 (10th

Cir. 2008) (quoting *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996)). In fact, doubts about

inconsistency should be resolved by siding with the Plaintiff; the Court should assume there is no

disabling inconsistency, so the second matter may be resolved on the merits. *Franco v. Selective*

*Ins. Co.*, 184 F.3d 4, 8-9 (1st Cir. 1999).

Prior to *New Hampshire v. Maine,* the Tenth Circuit refused to apply the principle of

judicial estoppel. *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1068-69 (10th Cir. 2005).

However, in *New Hampshire*, the U.S. Supreme Court "altered the legal landscape," which

forced the Tenth Circuit to "follow the guidance of the Court's binding precedent." *Id*. at 1069.

Although the doctrine of judicial estoppel may not be reduced "to any formulation of principle . .

. several factors inform the decision whether to apply the doctrine in a particular case." *New*

*Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotations and citations omitted). First, "a

party's later position must be clearly inconsistent with its earlier position." *Id*. Second, "courts

regularly inquire whether the party has succeeded in persuading a court to accept that party's

earlier position, so that judicial acceptance of an inconsistent position in a later proceeding

would create the perception that either the first or the second court was misled." *Id*. "Absent

success in a prior proceeding, a party's later inconsistent position introduces no risk of

inconsistent court determinations." *Id*. at 751. The final consideration "is whether the party

seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair

detriment on the opposing party if not estopped."   These factors, however, are "not inflexible prerequisites of an exhaustive formula for determining the applicability of judicial estoppel." *Id*.

When courts choose to apply the doctrine of judicial estoppel, they generally require something more than the pre-printed form that Jeanne Redd signed. (Exhibit 2). In fact, within the Defendant's cited authority, courts relied upon the Plaintiff's actual verbal statements to the judge. *See Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996) ("Specifically, the trial judge, in taking Lowery's guilty plea, asked if Lowery had cut Redd[2] on the face with the metal key holder to escape, and Lowery said that he had. Lowery's present position, however, is that he did not attack Redd with the magnetic key holder prior to the shooting and that Stovall shot him without reason."); *Bradford*, 516 F.3d at 1193.

Mrs. Redd's statements in her criminal proceeding – and the Court's adoption of them – entitle her to her day in court. *Franco*, 184 F.3d at 8-9. Although it is true that this Court, in the FTCA proceeding, arrived at the same conclusion the Defendant urges it to take here, the FTCA Court lacked Mrs. Redd's pre-sentence report as well as the transcripts from her change-of-plea and sentencing hearings. Indeed, to arrive at its conclusion, the FTCA Court relied on her statement in advance of her guilty plea where she acknowledged that the bird effigy pendent was worth more than $1,000. (Exhibit 2). The FTCA Court concluded that "Jeanne Redd, in entering her plea, was required to convince the judge that she actually committed the crime to which she pleaded guilty." FTCA Order at 14. Yet a thorough reading of the documents stemming from Jeanne Redd's criminal case disproves that assumption.

At Jeanne Redd's change of plea hearing, the following colloquy took place:

---

[2] No relation to the Plaintiff

> THE COURT: Count IV, on March 27, 2008, I possessed and displayed an effigy bird pendent to a person I now know to be a confidential source working with the BLM and the FBI. This event took pace in my home in Blanding, Utah. I knew that the pendent was taken without legal authority from the Navajo Indian Reservation, from a location known as Black Mesa, near Kayenta, Arizona. I acknowledge that the pendent is valued in excess of $1,000.00. Is that a true statement?
>
> MR. SNOW: It is the same issue, Judge. We acknowledge that the government values it at more than $1,000.00.
>
> THE COURT: Okay. And as I understand it, Ms. Redd, you did not pay a thousand dollars for it, but you would agree that it has a value in excess of $1,000.00?
>
> THE WITNESS: I did not pay for it, but it does not exceed a thousand dollars in value.
>
> MR. SNOW: But Judge, so that we're clear, the government valued it more than that and we accept that value for purposes of today.

Exhibit 1 at 5:7-25.

In Mrs. Redd's pre-sentence report, the pendant's value had been lowered to "a minimum of $500." *See* Jeanne H. Redd Presentence Report, p. 4 (Aug. 17, 2009) (attached as Exhibit 3). In imposing her sentence, the Court accepted the pre-sentence report and the $500-value of the pendant that it contained. *See* Transcript of Sentencing Hearing, 4:9-10 (Sept. 16, 2009) (attached as Exhibit 4). Since the bird effigy pendant was valued at less than $1,000, its possession was a misdemeanor. *U.S. v. Spoonhunter*, 29 Fed.Appx. 421, 2002 WL 237748 * 1 (8th Cir. 2002) (unpublished). As such, it is not the case, as the Defendant claims, that the doctrine of judicial estoppel bars Jeanne Redd from pleading guilty to possession of the bird effigy pendent, while later claiming that the Defendant inflated the value of it to generate a felony against her husband. She has maintained the same position all along: Even if she possessed the bird-effigy pendant illegally, its nominal value rendered her guilty of – at worst – a misdemeanor. It in no way justified the Defendants' actions on June 10, 2009.

Even if the Court concludes that Mrs. Redd's counsel led her to acknowledge that the bird was worth more than $1,000 in advance of her guilty plea, that fact is not necessarily dispositive:

> Because the conviction of an innocent person as a result of her lawyer's incompetence constitutes one of the most serious infringements of the integrity of the judicial process, our concerns over compromising the "sanctity of the oath" must yield. The judicial process can more easily survive a rule that precludes the use of judicial estoppel to keep intact convictions of innocent persons than it can a rule that purports to preserve judicial sacrosanctity by leaving wrongful convictions in place as a sanction for lying.

*Morris v. State of Cal.*, 966 F.2d 448, 453 (9th Cir. 1991) (cert denied 506 U.S. 831, 113 S.Ct. 96, 121 L.Ed.2d 57).

As shown above, Mrs. Redd's position in her criminal trial and her civil trial are consistent. Second, the Court, in accepting Mrs. Redd's pre-sentence report, accepted her contention today: the bird-effigy pendent was worth less than $1,000; it was not misled. Finally, Mrs. Redd received no unwarranted benefit from her plea agreement, because in imposing her sentence, the Court accepted that the value of the bird-effigy pendant was less than $1,000.

For these reasons, the Defendant's Motion to Dismiss should be denied.

## II.     The Defendants' Conduct Caused Them To Forfeit Their Qualified Immunity

When a governmental official abuses his or her office, "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 813-14 (1982). "For people in Bivens' shoes, it is damages or nothing." *Bivens*, 403 U.S. at 410. Notwithstanding the narrowness of that "only realistic avenue," courts afford

government agents immunity from suit when performing discretionary functions. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Courts, however, temper immunity with concerns for the Constitutional rights of those agents' victims. Government officials may claim immunity, despite the clear existence of a constitutional principle that governs the case, only if a reasonably well-trained officer would not have known that his or her conduct would violate the plaintiff's constitutional rights. *Id*. at 641. To that end, "it is particularly important in such circumstances that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." (Dkt. 55, at 7, quoting *Robbins v. Okla.*, 519 F.3d 1242, 1249-50 (10th Cir. 2008)). Plaintiffs are charged with pleading "with specificity the alleged constitutional violations against each individual Defendant from which they seek damages." *Id*. at 8.

Once a plaintiff meets the burden of specificity, the qualified immunity analysis asks two questions: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? and; (2) Was that constitutional right clearly established at the time of the defendant's misconduct?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first, in light of the circumstances of the particular case at hand." *Pearson*, 555 U.S. at 236.

The assertion that the Defendants acted in good faith has no bearing on whether they are guilty of constitutional violations. *Harlow*, 457 U.S. at 818 (announcing that the Court departed

from the good faith standard articulated in *Pierson v. Ray*, 386 U.S. 547, 557 (1967)). No

qualified immunity exists when a defendant misleads the court to obtain a search warrant:

> If, after all, a claimant is able to prove the necessary deliberate falsehood or
> reckless disregard to impeach a facially valid warrant, the reasonableness inquiry
> has to be resolved against the defendant since no reasonably competent officer
> could believe an arrest legal where it was his deliberate or reckless deception that
> led the magistrate into issuing the warrant.

*Beard v. City of Northglenn*, 24 F.3d 110, 114-15 (10th Cir. 1994). The Defendants are not

entitled to qualified immunity because each of them violated the Plaintiff's clearly established

constitutional right.

### a.  The Plaintiff Has Plead With Specificity

The specificity prong requires that plaintiffs "allege facts sufficient to show . . . that the

defendants plausibly violated their constitutional rights, and that those rights were clearly

established at the time." *Robbins*, 519 F.3d at 1249. "This does not mean that complaints in cases

subject to qualified immunity defenses must include all the factual allegations necessary to

sustain a conclusion that defendant violated clearly established law." *Id*. (quotations omitted).

The Defendants are incorrect that the Plaintiff has no evidence that Defendant Love is

liable under Count I or II. Defendant Love's liability for both Counts is extensive. He possessed

the motive and the capability to generate a felony against Dr. Redd, as well as the knowledge

that he was overvaluing the pendant.

Defendant Love was motivated by his misperception that Dr. Redd had escaped a felony

conviction stemming from the incident at Bluff. FAC ¶¶ 10-30, 41, 47. BLM agent Jim Ragsdale

had discovered an excavation site near Cottonwood Wash littered with human bones. FAC ¶ 11;

(*See* Ragsdale's notes attached as Exhibit 5). Although a witness identified the diggers as three

men with a green van, *Id.*, law enforcement officers – spurred by pressure from local Indian

tribes – attempted to place the blame on the Redds. FAC ¶¶ 19-30. Defendant Love's animosity

towards the Redds stems from his misconception that the Redds had disinterred the remains

found in Cottonwood Wash. As Ted Gardiner's handler, Defendant Love could instruct Gardiner

to place any value on the bird effigy pendant that he wished. In fact, because of the bird effigy

pendant's similarity to the Shumway bird, Gardiner was able to conflate the two values. FAC

¶ 54, (see bird effigy pendant attached as Exhibit 6; Shumway bird attached as Exhibit 7).

Finally, Defendant Love possessed the knowledge that the bird-effigy pendant was worth less

than $1,000. His informant, Ted Gardiner, had sold and purchased several similar items to and

from Dace Hyatt, a noted expert, providing him with a working knowledge of the value of

artifacts such as the bird-effigy pendant. (*See* Affidavit of Dace Hyatt, attached as Exhibit 8).

Without the chance to conduct discovery, the Plaintiff has plead as many facts and provided the

court with as much evidence as may reasonably be necessary to deem the Plaintiff's claim

plausible.

The Defendants are correct that the Plaintiff has no evidence suggesting that Defendant

Barnes played any role in deciding how many agents to send to the Redd household. However,

since Defendant Love headed Operation Cerberus, it is plausible that his organization of the raid

would encompass the amount of agents to send to the Redd household as well as the manner in

which they entered and the dress they donned prior to serving the warrant. In the FTCA

proceeding, the Court found "that the decision to use that amount of force was unreasonably and

therefore nondiscretionary." *See* FTCA Order at 16. In that context, it is even more troublesome

that, despite the fact that all three Redds were secured and posed no danger, Jerrica Redd

witnessed Defendant Love using his cell phone to urge more and more agents to report to the Redd household throughout the day. FAC ¶ 69. Under those facts, it is plausible that Defendant Love used excessive force against Dr. Redd.

It is also plausible that Defendant Barnes used excessive force. Although Defendant Barnes may have genuinely feared for his safety – notwithstanding the presence of 100 armed federal agents to guard a single 60-year-old doctor with no criminal history – there is simply no reason that Defendant Barnes could not remove Dr. Redd's handcuffs to allow him to use the restroom with decency, if not dignity. FAC ¶ 68. Juxtaposed with Defendant Barnes' verbally abusive language – calling Dr. Redd a liar, FAC ¶ 65; taunting him with the loss of his medical license, FAC ¶ 65; accusing him of using his gardening tools to "dig bodies," FAC ¶ 67 – Defendant Barnes' treatment of Dr. Redd produces only one logical conclusion: Defendant Barnes wished only to humiliate Dr. Redd. His conduct was not "objectively reasonable in light of the facts and circumstances confronting him." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (quotations omitted).

As to Count IV, the defect in the Plaintiff's original Complaint was as follows: "Plaintiffs have failed to identify which specific Defendants took the necessary actions with the requisite state of mind to commit the alleged violation. (Dkt. 55 at 10-11). The Court clarified that the Plaintiff must "identify which specific supervisor created, promulgated, implemented, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which violated the equal protection clause." *Id*. at 11 (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)). Here, the affirmative link between Defendant Love's roll as supervisor and the deprivation of the Plaintiff's

constitutional rights is the use of his cell phone to call in agents where none were needed. In the parallel FTCA proceeding, the Court found the presence of some 100 agents in the Redd household "was unreasonable" considering that "Dr. Redd was not accused of a violent crime, was not known to be dangerous or living with dangerous people, and nothing suggested that evidence would be destroyed unless a large force was dispatched." FTCA Order at 16 (Dkt. 25). Defendant Love was responsible for the presence of those officers in the Redd household. FAC ¶ 69. The Fourth Cause of Action against him is therefore plausible.

Finally, Count V is plausible as well. In *County of Sacramento v. Lewis*, the Supreme Court explained that "the touchstone of due process is protection of the individual against arbitrary action of government." 523 U.S. 833, 845 (1998). Generally, police conduct violates a citizen's right to substantive due process when that conduct "shocks the conscience." *Id*. at 846. Although, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level," intent is not always necessary. *Id*. at 849. In some cases, "deliberate indifference" will do. *Id*. at 851. The lower standard applies "only when actual deliberation is practical." *Id*. Not during, for example, the adrenaline-fused context of a high-speed pursuit. *Id*. at 854.

Defendant Barnes' presence in the Redd household stemmed from a search warrant accusing Dr. Redd of possessing an effigy-bird pendant. (Exhibit 6). Yet Defendant Barnes' treatment of Dr. Redd stemmed not from the stated charge, but from Defendant Barnes' belief that Dr. Redd had exhumed bodies. FAC ¶ 67. If Defendant Barnes did not intend to harm Dr. Redd, he was at least deliberately indifferent to Dr. Redd's innocence of that charge. Prior to the day, January 6, 1996, on which a hiker spotted the Redds in Cottonwood Wash, a member of Defendant Barnes'

own agency visited the same site, documented the presence of human bones throughout the site, and spoke with a witness who described grave robbers who looked nothing like the Redds. FAC ¶ 11; (Exhibit 5). In that context, Defendant Barnes' treatment of Dr. Redd – specifically his refusal to let Dr. Redd use the restroom without his handcuffs – shocks the conscience. Likewise, Defendant Love's use of 100-plus heavily armed agents to arrest a single 60-year-old doctor shocks the conscience. The Plaintiff has thus stated a plausible claim that the Defendants violated Dr. Redd's Constitutional right to substantive due process.

**b. The Plaintiff's Fourth Amendment Claims Are Valid**

**i.      Defendant Love Artificially Raised The Value Of The Bird Effigy Pendant**

It is well established that constitutional tort defendants "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If a plaintiff proves that police deliberately submitted false information to obtain a search warrant, the police are not entitled to qualified immunity. *Beard*, 24 F.3d at 114-115. In *Beard*, the Court defined clearly established law in 1994: "Clearly established law indicates that an arrest is valid and does not violate the Fourth Amendment if the warrant underlying it was supported by probable cause at the time of its issuance; this holds true even if later events establish that the target of the warrant should not have been arrested." *Id*. at 114. When officers decide to omit from their warrants information in their possession that is also critical to the showing of probable cause, Courts apply the standard set forth in *Delaware v. Franks*:

> If, after all, a claimant is able to prove the necessary deliberate falsehood or reckless disregard to impeach a facially valid warrant, the reasonableness inquiry has to be resolved against the defendant since no reasonably competent officer

> could believe an arrest legal where it was his deliberate or reckless deception that led the magistrate into issuing the warrant.

*Id*. at 115.

Jeanne Redd's statement in advance of her guilty is a pre-printed form drafted by United States attorneys (Exhibit 2). It states, in part, as follows:

> (Count 4) On March 27, 2008, I possessed and displayed an effigy bird pendant to a person I now know to be a confidential source working with the BLM and the FBI. This event took place at my home in Blanding, Utah. I knew that the pendant was taken without legal authority from the Navajo Indian Reservation, from a location known as Black Mesa, new Kayenta, Arizona. I acknowledge that the pendant is valued in excess of $1,000.

This document provides the Defendant's sole foundation for its statement that "[c]laims that the effigy was worth significantly less than $1,000 are simply not plausible, given Mrs. Redd's own sworn admissions." (Dkt. 60.1 at 13). Unfortunately, it was the only documentation that the Court, in the FTCA proceeding, had to rely upon. Yet, as is established above, the same Court that accepted Mrs. Redd's statement in advance of her guilty plea also accepted her pre-sentence report – which established that the bird was worth less than $1,000. Moreover, Mrs. Redd's own refusal to stipulate in open court to the $1,000 value must override a signature appearing on a statement that she did not draft. Finally, the simple truth is that the bird is not worth $1,000. (*See* Exhibit 8). Defendant's attempt to discredit Mr. Hyatt cannot succeed. The Court may recall that the same case upon which the Defendant relies to discredit Mr. Hyatt, *United State v. Smith*, No. 2:09-CR-243-TS, 2011 WL 83985 (D. Utah March 8, 2011), also upheld his admission as an expert witness, buttressed by 20 years of experience, to value Native American artifacts accurately.

The Defendant's informant, Ted Gardiner, knew that the bird-effigy pendant was worth less than $1,000. (Exhibit 8). Because Mr. Gardiner possessed that knowledge, his handler, Defendant Love, did as well. When Defendant Love elected, despite his knowledge, to proceed with the felony case against Dr. Redd, he violated Dr. Redd's clearly established Fourth Amendment rights against unreasonable search and seizure.

### ii.   The Defendants Both Used Excessive Force

When a citizen alleges that an officer used excessive force, the Court evaluates the claim in light of the Fourth Amendment's reasonableness standard. *Graham*, 490 U.S. at 395. In so doing, the Court will balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Id*. at 396 (*quoting Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). To weigh the government's interest, the Court evaluates three factors through the lens of the reasonable officer confronted with the scene, rather than with the 20/20 vision of hindsight. *Id*. Those factors are the following: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." *Id*.

Furthermore, the Tenth Circuit has noted that "the interests protected by the Fourth Amendment are not confined to the right to be sure against physical harm; they include liberty, property and privacy interests – a person's sense of security and individual dignity." *Holland ex rel. Holland v. Harrington*, 268 F.3d 1179, 1196 (10th Cir. 2001).  Considering the *Graham* factors, the Court should deny qualified immunity to the Defendants because they violated James Redd's clearly established Fourth Amendment righto be free from the use of excessive force.

 

      1.   **Defendant Love's Use of More Than 100 Agents To Raid The Redd Household Constitutes Excessive Force**

In the parallel FTCA proceeding, the Court noted the following:

> Though *Overdorff* does not state how many SWAT team members were present, it is unlikely that the number approached anything close to the 100 plus officers alleged to have been present at the Redds' home. The lack of other indicia of danger further supports the Court's conclusion: Dr. Redd was not accused of a violent crime, was not known to be dangerous or living with dangerous people, and nothing suggested that evidence would be destroyed unless a large force was dispatched.

FTCA Order at 16 (Dkt 25).

The Court, then, has accepted that the presence of 100 plus heavily armed officers in the Redd household violated Dr. Redd's clearly established Fourth Amendment right against excessive force. The defect in the Plaintiff's original Complaint stemmed from its inability, at the time, to "identif[y] which Defendant made the decision to use that amount of force." (Dkt. 55 at 9). The Plaintiff has since learned that Defendant Love masterminded the raid upon the Redd home. And even after all three occupants of the house were secured and posed no threat, Jerrica Redd listened as Defendant Love used his cell phone to urge ever more agents to pour into the Redd household. FAC ¶ 69. None of the three *Graham* factors support such an offensive use of force. Dr. Redd was accused of a crime that, notwithstanding Defendant Love's inflated valuation, was a non-violent misdemeanor. Dr. Redd had never committed, or been accused of committing, any violence towards anybody. Even if his past had appeared checkered, there is no indication that the arrest of a single 60-year-old man for a non-violent crime warrants the reasonable presence of 100 officers.  Finally, Dr. Redd never tried to flee. Given his only chance to do so, he continued down his driveway and willingly subjected himself to custody. FAC ¶ 61.

The Defendant seems to suggest that the three Redds, while sequestered in different corners of their home, should have catalogued the comings and goings of some 100 agents, should have kept track of whether Defendant Barnes' orders were followed and differentiated the agents who arrived from those who were already there. *Iqbal* requires only that the Plaintiff's claim be plausible, not that it conduct discovery prior to the filing of the Complaint: plausibility requires that the allegations of a complaint should "raise a reasonable expectation that discovery will reveal evidence" supporting the elements of the claims, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), and "allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 278 (2009).

Defendant Love's conduct has deprived him of the protection of qualified immunity.

### 2. Defendant Barnes' Interrogation of Dr. Redd Constitutes Excessive Force.

The Defendants' characterization of Defendant Barnes' conduct is too myopic to adequately describe his treatment of Dr. Redd. With the proper context, Defendant Barnes forfeits his qualified immunity. The Defendant argues that "harsh language alone would [not] render a search or seizure unreasonable," Dkt. 60.1 at 17 (*quoting Overdorff*, 268 F.3d at 1194). The unreasonableness of Defendant Barnes' conduct extends beyond his unfortunate diction. In fact, placed in context, the Defendants' cited language from *Overdorff* supports the Plaintiff's position, not the Defendants':

> In evaluating the Fourth Amendment reasonableness of a seizure, the officers' verbal interaction as well as their physical conduct become part of the totality of the circumstances to be considered. While it seems unlikely that harsh language alone would render a search or seizure "unreasonable" verbal abuse may be sufficient to tip the scales in a close case.

> *Overdorff*, 268 F.3d at 1194.

27

The Plaintiff argues not that Defendant Barnes' language alone was excessive force, but that his verbal abuse of Dr. Redd presents a conspicuous circumstance amidst the totality the court must consider. Defendant Barnes did not call Dr. Redd "a bitch and order him to get back in the apartment" after he "largely ignored the officers' commands thereby greatly increasing the volatility of he plaintiffs' encounter with the officers." *Reeves v. Churchich*, 331 F.Supp.2d 1347, 1352 (D. Utah 2004). Rather, Defendant Barnes accused Dr. Redd of committing a crime that Defendant Barnes knew or should have known Dr. Redd did not commit. FAC ¶ 67; (Exhibit 5). He taunted Dr. Redd with the loss of his medical license, FAC ¶ 65, a consequence he knew impossible given the minimal value of the bird-effigy pendant. (Exhibit 3; Exhibit 1; Exhibit 4). *Reeves* is thus distinguishable. But more importantly, Defendant Barnes humiliated Dr. Redd while Dr. Redd used the restroom.

Dr. Redd may have had "no clearly established right to visit the restroom-escort free," but the constitutional violation arose not with the presence of the escorts, but with the degrading treatment Dr. Redd received. Defendant Barnes cannot plausibly claim that he feared losing evidence because, presumably, Dr. Redd had been searched sometime previously during his interrogation. Likewise, there is no evidence that Defendant Barnes knew that Dr. Redd would commit suicide (Dkt 60.1 at 19); if he did, the court should find against him. Nor is there evidence that Defendant Barnes knew that Dr. Redd loved hunting. *Id*. Even with such knowledge, there is absolutely zero correlation between a man who loves to hunt and one likely to commit murder. Finally, despite the existence of some 100 agents throughout the Redd household, Defendant Barnes may have feared for his safety such that he felt that sending agents to accompany Dr. Redd in his use of the restroom was warranted. He may be able to justify that

decision. He cannot justify the agents' presence at Dr. Redd's knees, nor their refusal to remove Dr. Redd's handcuffs to allow him to properly clean himself once he had finished his bowel movement. FAC ¶ 68. Such treatment is simply degrading, and supports no governmental interest.

The Defendants' attempt to allay their mistreatment with case law falls short. *Stewart* involved a mass arrest of a group of abortion protestors. *Stewart v. City of Wichita, Kan.*, 827 F.Supp. 1537, 1538 (D. Kan. 1993). In detention, Stewart asked to use the restroom and was refused; "there was a small number of officers at the center, and [] the officers did not permit individual arrestees to go to the bathroom because to do so would have required decreasing the number of available officers so that escorts could be provided for the persons going to the bathroom." *Id*. at 1538-39. When Stewart did finally choose to relieve herself, "Stewart discovered a green bucket. Screened by some evergreens and hidden behind several other arrestees, who stood with their back to Stewart and sang so as to drown out any embarrassing sounds, Stewart went to the bathroom in the green bucket. No one saw her." *Id*. at 1538. In short, the case bears no resemblance to the one at bar absent the call of nature.

In *Hunter v. Nammany*, an Eighth Circuit case, the Court noted that a person lawfully detained has no constitutional right to use the restroom upon demand. 219 F.3d 825, 831 (8th Cir. 2000). Yet the constitutional violation stems not from Dr. Redd's denial of the use of the bathroom, but from the agents' refusal to allow Dr. Redd the use of his hands to clean himself once they had afforded him the right to use the toilet. FAC ¶ 68. In that context, *Hansen v. Schubert* is of no help to the Defendant either. There, the plaintiff complained only that officers escorted her to the restroom, a claim lacking in the current case. 459 F.Supp.2d 973, 991. And

while it is true that "not every indignity – 'even if it may seem unnecessary in the peace of a

judge's chambers' – rises to the level of constitutional violation, police officers must still be able

to point to some objective reason that the use of handcuffs is necessary. *Silvan W. v. Briggs*, 309

Fed.Appx. 216, 225 (10th Cir. 2009). Noticeably lacking here, "the officers could have been

reasonably concerned for their safety, given their awareness that Cory was a peace officer and

might have been armed." *Id*. at 224. Finally, the rest of the Defendants' authority deals with the

consequences of leaving a detainee alone. Once again, the Plaintiff claims not that Dr. Redd's

constitutional rights were violated when he was escorted to the bathroom, but when the agents

refused to remove his handcuffs to allow him the dignity of cleaning himself. FAC ¶ 68.

     For those reasons, the Court should deny Defendant Barnes qualified immunity.

### b.   The Plaintiff's Fifth Amendment Claims Are Valid

#### i.   The Defendants Violated Dr. Redd's Constitutional Right to Equal Protection of The Laws

     The equal protection clause protects persons, not groups. *Engquist v. Or. Dept. of Agr.*,

553 U.S. 591, 597 (2008) (quotations omitted). A plaintiff charging that he or she "has been

intentionally treated differently from others similarly situated and that there is no rational basis

for the difference in treatment" alleges a successful equal protection claim. *Village of

Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In the paradigm of such a claim, known as a

class-of-one case, "a public official inflicts a cost or burden on one person without imposing it

on those who are similarly situated in material respects, and does so without any conceivable

basis other than a wholly illegitimate motive." *Jicarilla Apache Nation v. Rio Arriba County*,

440 F.3d 1202, 1209 (10th Cir. 2006).

Although *Engquist* differs factually from the case at bar – "Our traditional view of the core concern of the Equal Protection Clause lead[s] us to conclude that the class-of-one theory of equal protection does not apply in the public employment context," *Engquist*, 553 U.S. at 598 – its analysis is nevertheless instructive.

*Engquist* acknowledges that some forms of state action are so inherently discretionary that the Equal Protection Clause "is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." *Id*. at 604. The Defendants illustrate this principle with its citation to the Court's hypothetical about a traffic officer. Yet it does not follow, as the Defendant suggests, that inherently discretionary conduct never violates the Equal Protection Clause. "[T]here is a clear distinction between an exercise of discretion and an arbitrary decision." *Id*. at 12 (Stevens J. dissenting). The hypothetical traffic officer "ha[s] a rational basis for giving a ticket to *every* speeder passing him on the highway. His inability to arrest every driver in sight provides an adequate justification for making a random choice from a group of equally guilty and equally accessible violators." *Id*. at 613 (Stevens J. dissenting). Therefore, when a state officer levels unequal treatment as "the result solely of a vindictive campaign," the conduct violates the Equal Protection Clause. *Esmail v. Macrane*, 53 F.3d 176, 179-80 (7th Cir. 1995).

The Defendants' disproportionate treatment of Dr. Redd has no rational basis; it arose because the Defendants felt that Dr. Redd had escaped a felony conviction stemming from the incident at Bluff. FAC ¶ 41. The genesis of the Defendants' convictions illustrates itself in Defendant Barnes' comments to Dr. Redd. Although Dr. Redd had never been convicted for desecrating a burial site – the charges were, in fact, dismissed – Defendant Barnes nevertheless

insisted that Dr. Redd "d[u]g bodies" and inquired which gardening tool Dr. Redd utilized for that activity. FAC ¶ 67. Defendant Barnes knew these accusations were false because his agency possessed documented proof. (Exhibit 5). That Defendant Love used his cell phone to encourage dozens of agents to report to the Redd household stemmed not from a concern for his own safety but from his animosity towards Dr. Redd. Defendant Love can point to no rational basis for his actions. The house was already swarming with agents and all three Redds were secured in separate parts of the house. FAC ¶ 69. Nor can Defendant Love argue that the agents were needed for inventory. During the aftermath of the raid, Jeanne Redd forfeited 812 items separated throughout 112 boxes. *See* Bill of Particulars attached as Exhibit 9. With some 140 agents in the Redd household throughout the day, there were not even enough boxes to go around. There is no rational reason that Defendant Love required 140 agents to get the job done. Defendant Love has thus forfeited his qualified immunity.

The Defendants rely on *Leverington v. City of Colorado Springs* to note: "where a plaintiff's retaliation claim involves the retaliatory animus of a third-party and the action of another, the plaintiff must show a causal connection between the third-party's animus and the action." (Dkt. 60.1 p. 21). The Defendants' reliance is misplaced. *Leverington* evaluated whether her claim should be evaluated pursuant to *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000), "which applies to First Amendment retaliation claims against defendants other than the plaintiff's employers." *Leverington v. City of Colorado Springs*, 643 F.3d 719, 734 (10th Cir. 2011). It is not instructive here. The Defendants' Motion should therefore be denied.

### ii.  The Defendants Violated Dr. Redd's Constitutional Right To Substantive Due Process

The Plaintiff's due process claim is discussed at *supra* § II(a). For the reasons stated above, the Plaintiff need to prove that the Defendants were deliberately indifferent to Dr. Redd's substantive due process rights such that their conduct shocks the conscience. *Green v. Post*, 574 F.3d 1294, 1301 (10th Cir. 2009) ("When actual deliberation is practical, we will employ a deliberate indifference standard.") (citations and quotations omitted). The Court must "analyze the level of culpability by examining the circumstances that surround the conduct at issue and the governmental interest at stake." *Id*. at 1302 (quotations omitted). The point is to protect private citizens against arbitrary action or "the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice." *Id*. (quoting *Lewis*, 522 U.S. at 845). Courts employ the deliberate indifference standard when, as here, the officers' conduct is "a product of actual deliberation." *Id.* at 1303. Ultimately "liability for deliberate indifference . . . rests upon the luxury . . . of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id*. (quotations omitted). Finally, the officer must be deliberately indifferent to an extremely great risk of serious injury to someone in Plaintiff's position." *Id*.

In *Green* the Court upheld qualified immunity because ultimately, the defendant officer never broke the law. He only sped through an intersection when the light was yellow in response to an emergency. *Id*. at 1303-04. In contrast, Defendant Love, with the aid and assistance of Ted Gardiner, manufactured a felony against Dr. Redd, a charge he knew to be either invalid or inflated. FAC ¶ 75. Had Defendant Love snapped to judgment in the context of a high-speed pursuit, his conduct might not have been so conscience shocking. But Operation Cerberus labored on for nearly three years, FAC ¶ 35, providing Defendant Love with plenty of time and

quiet contemplation in which to fabricate evidence against Dr. Redd. That he ultimately

proceeded with the felony indictment against Dr. Redd in the face of exonerating evidence,

(Exhibit 8), underscores his deliberate indifference towards Dr. Redd's innocence.

Finally, Dr. Redd – even if he had not committed suicide – faced great injury as a result

of Defendant Love's conduct. A felony conviction would have ended Dr. Redd's medical career,

and terminated his dignity. That he committed suicide under the threat of a felony was not tragic

and unforeseen but plausible and preventable. Defendant Love's conduct thus deprived Dr. Redd

of his constitutional right to substantive due process and has thus forfeited his qualified

immunity.

Likewise, Defendant Barnes was deliberately indifferent to Dr. Redd's innocence. If

Defendant Barnes did not know that Dr. Redd was innocent of the charge of exhuming bodies, he

should have known via BLM Agent Jim Ragsdale's report, that the charge was not true. In that

context, his treatment of Dr. Redd should shock the Court's conscience. The Court should also

note the context in which Dr. Redd's detention arose. He had already hassled with the state's

charges during the proceeding decade, charges that brought untold fodder to local newspapers.

(*See* articles attached as Exhibit 10). Ultimately, his wife had plead to a reduced charge the third

time the state brought it in the hopes that he and his family would finally be left alone. In that

context, Defendant Barnes' treatment of Dr. Redd was substantially certain to cause him injury.

Defendant Barnes has thus forfeited his qualified immunity as well.

Dated: November 14, 2012

/s/ Shandor S. Badaruddin
Shandor S. Badaruddin, Esq.