IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF JAMES D. REDD, M.D.,et. al,<br><br>Plaintiffs,<br><br>v.<br><br>DANIEL LOVE, et. al,<br><br>Defendants. | MEMORANDUM<br>DECISION AND ORDER<br><br>Case No. 2:11-cv-00478-RJS<br><br>Judge Robert J. Shelby |

This case arises following the tragic suicide of Dr. James D. Redd after his arrest for trafficking in stolen Native American artifacts, theft of government property, and theft of tribal property. The Estate of Dr. Redd brings this *Bivens* action against Bureau of Land Management (BLM) Agents Daniel Love and Dan Barnes. The Estate of Dr. Redd asserts that Agent Love and Agent Barnes violated Dr. Redd's constitutional rights by: (1) providing false information to obtain a warrant for Dr. Redd's arrest and authorizing a search of his home; (2) using the illegally obtained search warrant to search Dr. Redd's home; (3) using excessive force against Dr. Redd primarily by sending approximately 140 agents, many of whom were heavily armed and

clothed in flak jackets, to raid and search Dr. Redd's home; (4) violating Dr. Redd's equal protection rights; and (5) violating Dr. Redd's right to due process.

Defendants move to dismiss, arguing qualified immunity shields them from Dr. Redd's claims. After careful consideration and for the reasons stated below, the court finds that Agent Love and Agent Barnes are entitled to qualified immunity on Plaintiffs' first, second, fourth, and fifth causes of action because Dr. Redd has failed to allege enough facts to state a claim for relief that is plausible on its face. But, the court finds that Dr. Redd has pleaded facts that, if true, are sufficient to show that officials violated Dr. Redd's clearly established constitutional right of protection against excessive force when Defendants employed between about 80 to 140 agents to raid and search Dr. Redd's home.

Accordingly, the court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss, and DISMISSES Plaintiffs' first, second, fourth, and fifth causes of action.

## RELEVANT BACKGROUND[1]

### I. The Cottonwood Wash Incident

In January 1996, the Redds visited and collected Native American artifacts from an area they believed to be privately owned. Unbeknownst to the Redds, the BLM map they relied on was inaccurately drawn. The Redds were, in fact, collecting Native American artifacts from Cottonwood Wash, a Hopi ancestral burial ground. The Redds were arrested and charged with desecration of a human body. The arrest ultimately resulted in Mrs. Redd entering an Alford

[1] The Tenth Circuit has held that, in analyzing a motion to dismiss, "all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). In view of this standard, the court draws the relevant background from the well-pleaded facts alleged in Dr. Redd's First Amended Complaint.

Plea in which she admitted no criminal conduct, and agreed to pay $10,000 to settle a civil suit related to the act. The state dropped all charges against Dr. Redd.

## II. Operation Cerberus

In October 2006, the FBI and BLM began a joint investigation into the looting of Native American artifacts on public lands dubbed Operation Cerberus. Agent Love was one of the operation's principle architects. As part of Operation Cerebrus, FBI and BLM agents enlisted as a confidential informant Ted Gardiner, a Native American artifacts collector and dealer. The Redds allege that Agent Love used Mr. Gardiner to target the Redds because Agent Love felt the Redds had not been punished for the January 1996 Cottonwood Wash incident. Mr. Gardiner met with Mrs. Jeanne Redd, Dr. Redd's wife, on several occasions to trade artifacts. Dr. Redd was also present for some of the meetings. During those trades, Mr. Gardiner would ask Mrs. Redd to identify where she found her artifacts by pointing out the areas on a map. The government used hidden cameras and recorders to obtain footage and audio of the meetings.

Relying on these statements from Mrs. Redd, which confirmed that she and her husband removed various artifacts from public or Native American lands, federal agents sought a warrant to arrest the Redds and search their property. Dr. Redd alleges that Agent Love's valuation of the artifacts obtained from the Redds played an integral part in the warrant application, and contributed to the severity of the criminal charges filed against the Redds. For example, one artifact obtained from Dr. Redd was a bird pendant shell that Dr. Redd found in Arizona. Dr. Redd contends that Mr. Gardiner and Agent Love willfully inflated the shell's purchase price from between $75 and $100 to $1,000 in order to enhance the charges that could be filed against the Redds.

In total, Operation Cerberus resulted in twenty four arrests. Sixteen of those arrests, including Dr. Redd's, occurred on June 10, 2009 in Blanding, Utah.

## III. The Raid

Agents arrived at Dr. Redd's home in Blanding, Utah around 6:40 a.m. on June 10, 2009. Though the exact number of agents present at Dr. Redd's home is not specified, approximately 80 agents raided targets in Blanding, including Dr. Redd's home. The agents at Dr. Redd's home were armed with assault rifles and clothed in flak jackets.

Dr. Redd returned home from an early morning visit to his clinic soon after the agents arrived. As Dr. Redd exited his car, he was restrained, manhandled, and handcuffed. Agent Barnes then sequestered Dr. Redd in Dr. Redd's garage and interrogated him over the course of four hours. Agent Barnes accused Dr. Redd of unlawful activity, called him a liar, taunted him with revocation of his medical license for felony convictions, and told him that he would never practice medicine again. Also, in an apparent reference to the previous state charges, Agent Barnes pointed to a set of gardening tools and asked Dr. Redd with which shovel he liked to dig up bodies.

At some point during the interrogation, Dr. Redd needed to use the restroom. Agent Barnes ordered two unidentified agents to escort Dr. Redd to the restroom. Although the restroom was spacious, the two agents stood six inches from Dr. Redd's knees while he defecated. After Dr. Redd finished, the agents refused to remove his handcuffs so he could properly clean himself.

## IV. The Search

Meanwhile, the 80 or more agents sequestered the remaining members of the Redd family in separate corners of their home. These agents then combed through Dr. Redd's home looking for and cataloguing artifacts and evidence. In the end, the agents collected 112 boxes of materials. During the raid, Agent Love spoke to other agents on his cell phone and urged them to come to Dr. Redd's home. Dr. Redd alleges that approximately 140 agents came through the home during the raid on June 10, 2009.

## V. Procedural History

Dr. Redd tragically committed suicide the day after he was arrested. His estate and his heirs brought this *Bivens* action against the federal agents involved in Operation Cerberus, alleging that the agents violated Dr. Redd's constitutional rights.

# ANALYSIS

Dr. Redd asserts five causes of action against Defendants Agent Love and Agent Barnes:

1. Agent Love knowingly provided false information in order to obtain a warrant for Dr. Redd's arrest and the search of Dr. Redd's home;
2. The illegally obtained warrant resulted in the illegal search of Dr. Redd's home;
3. Agent Love and Agent Barnes violated Dr. Redd's protections from the use of excessive force;
4. Agent Love violated Dr. Redd's right to equal protection of the laws; and
5. Agent Love and Agent Barnes violated Dr. Redd's right to due process.

Defendants argue that they are entitled to qualified immunity and move the court to dismiss all five causes of action. The court discusses the legal standards relevant to this motion

to dismiss, and then addresses in turn each of the asserted causes of action.

## I. Legal Standards

### A. Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted."[2] The Supreme Court clarified that, in order to survive such a challenge, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."[3] And a complaint must give fair notice to the defendant of "what the claim is . . . and the grounds upon which it rests."[4] Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[5] In determining whether a complaint meets this criteria, a court must "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."[6]

The court does not engage in fact finding at this stage of litigation. Rather, the court considers whether Dr. Redd has sufficiently alleged facts to state a claim on which relief can be granted.

### B. *Bivens* Action

Dr. Redd brings so-called *Bivens* claims, named after a case styled *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). The Supreme Court in *Bivens* recognized an implied private action for damages against federal officers who violate a citizen's constitutional

---

[2] Fed. R. Civ. P. 12(b)(6).
[3] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
[4] *Id.* at 555.
[5] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[6] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). To be clear, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (citing *Iqbal*, 556 U.S. at 678).

rights.[7] This "implied cause of action is the federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983."[8] The analysis for evaluating the viability of a *Bivens* action is analogous to that for a civil rights action under Section 1983.[9] For both *Bivens* and Section 1983 claims "it is particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom,* to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state."[10]

### C. Qualified Immunity

Defendants contend that they are entitled to qualified immunity. Qualified immunity "provides 'immunity from suit rather than a mere defense to liability.'"[11] The Supreme Court, in the context of a *Bivens* action, explained that "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[12] Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[13] In addition, "[w]hen a defendant raises a claim of qualified immunity, the burden shifts to the plaintiff to show that the defendant is not entitled to that immunity."[14]

---

[7] *Iqbal*, 556 U.S. at 675-76.
[8] *Id.*
[9] *Id.*
[10] *Robins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008).
[11] *Mecham v. Frazier*, 500 F.3d 1200, 1203 (10th Cir. 2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).
[12] *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011).
[13] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).
[14] *Douglas v. Dobbs*, 419 F.3d 1097, 1100 (10th Cir. 2005).

## II. Dr. Redd's First Cause of Action

Dr. Redd alleges that Agent Love deliberately and falsely inflated the value of a bird pendant shell. Specifically, Dr. Redd contends that Agent Love knew that the bird pendant shell's actual value was between $75 and $100, which results only in a minor misdemeanor violation. But, as Dr. Redd alleges, Agent Love purposefully inflated the value of the pendant to $1,000 to obtain a felony arrest warrant against Dr. Redd, which enabled Agent Love to raid Dr. Redd's home.

"The Supreme Court has held that it is a violation of the Fourth Amendment to knowingly, or with reckless disregard for the truth, include false statements in the [warrant] affidavit outlining probable cause for an arrest."[15] But submission of a false statement in a warrant application does not itself constitute a violation of Fourth Amendment rights. The Supreme Court instructs that Fourth Amendment rights are violated only "if the allegedly false statement [was] necessary to the finding of probable cause."[16]

Here, Dr. Redd has failed to include in his Complaint information regarding the warrant sufficient to make this determination. For example, although Dr. Redd argues that Agent Love knowingly inflated the bird shell pendant's value, Dr. Redd has failed to point to where or whether that false information was included in the warrant then issued. Dr. Redd has not pled, and this court cannot conclude that, even if false, the information Agent Love included in the warrant application was necessary to the probable cause determination that supported issuance of the warrant. In fact, Dr. Redd has altogether failed to mention the contents of the warrant or the

---

15 *Wilkins v. DeReyes*, 528 F.3d 790, 805 (10th Cir. 2008) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

16 *Franks*, 438 U.S. at 171.

contents of the warrant affidavit. Without this information, the court must conclude that Dr. Redd has not pled a plausible Fourth Amendment violation arising out of Agent Love's warrant application. The court must dismiss Dr. Redd's first cause of action.

## III. Dr. Redd's Second Cause of Action

Related to the first cause of action, Dr. Redd next alleges that the illegal warrant obtained by Agent Love also resulted in the illegal search of Dr. Redd's residence in violation of his Fourth Amendment rights.

Dr. Redd's allegations concerning the search are predicated on his conclusory allegation that Defendants obtained the warrant based on false information. As stated above, the court must dismiss the first cause of action because Dr. Redd failed to allege facts sufficient to show that even if Agent Love provided false information in his warrant application, the false information was necessary to support a probable cause finding. Having made this determination, the court must also conclude Dr. Redd failed to allege facts sufficient to show that Agent Love illegally searched Dr. Redd's residence. The court thus dismisses the second cause of action.[17]

## IV. Dr. Redd's Third Cause of Action

Dr. Redd's third cause of action alleges that Defendants violated his Fourth Amendment protections from the use of excessive force. Specifically, Dr. Redd alleges that (1) Agent Love

---

[17] The court notes that Dr. Redd does not appear to allege any specific conduct of Agent Barnes in relation to the first and second causes of action. The Supreme Court makes clear that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Here, Agent Barnes is not alleged to have had any part in falsely inflating the shell artifact's value, which allegedly resulted in illegal searches, seizures, and arrests. To the extent Dr. Redd intended to assert the first and second causes of action against Agent Barnes, the court dismisses these causes of action as to him as well.

used an excessive number of agents, government vehicles, and weapons when executing the warrant at Dr. Redd's residence; (2) Agent Barnes humiliated Dr. Redd by using harsh language, and accusing him of crimes he knew Dr. Redd did not commit; and (3) Agent Barnes denied Dr. Redd the ability to use the restroom with dignity.

## A. Whether Agent Love Is Entitled to Qualified Immunity for His Actions

Dr. Redd alleges that Agent Love orchestrated a raid of Dr. Redd's home that involved over 80 heavily armed SWAT-like agents. Dr. Redd further alleges that Agent Love called even more agents to the scene during the course of the raid. After the raid, Agent Love allegedly admitted to Jerrica Redd, Dr. Redd's daughter, that close to 140 agents had been through Dr. Redd's house at some point. The court first examines whether Agent Love's actions implicate a constitutional right. The court then examines whether Dr. Redd has sufficiently alleged facts that would support a claim for a violation of a constitutional right. Finally, the court examines whether that constitutional right was clearly established at the time of the challenged conduct.

### 1. Whether Agent Love's Alleged Actions Implicates a Constitutional Right

The court first considers whether Agent Love's alleged conduct implicates Dr. Redd's constitutional rights. *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001), is instructive on this issue. In *Holland*, the La Plata County Sheriff authorized a SWAT team (composed of ten deputies) to serve a warrant on an individual suspected of assault.[18] Plaintiffs alleged that the Sheriff's planning of the arrest, and in particular his decision to employ a SWAT team to make the arrest on a misdemeanor warrant, violated the Fourth Amendment's protection against the use of excessive force. The Tenth Circuit held that, considering the Fourth

[18] 268 F.3d 1179, 1183 (10th Cir. 2001).

Amendment protections against the use of excessive force, it was important to examine whether the Sheriff's planning and decision to deploy the SWAT team were reasonable. The Tenth Circuit explained that "it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out, [thus] the decision to deploy a SWAT team to execute a warrant must be reasonable because it largely determines how the seizure is carried out, thereby determining the extent of the intrusion on the individual's Fourth Amendment interest."[19]

Similar to *Holland*, Dr. Redd alleges that Agent Love's planning to execute a warrant, and in particular his decision to deploy between about 80 to 140 agents to Dr. Redd's home, violated Dr. Redd's Fourth Amendment protections from the use of excessive force. At least in the Tenth Circuit, the court must examine the reasonableness of Agent Love's plan for executing the warrant, his decision to deploy so many heavily armed agents to Dr. Redd's home, and the manner in which the arrests of Dr. Redd and his family were carried out. In short, the allegations here at least implicate a constitutional right.

### 2. Whether Agent Love's Alleged Actions Violated Dr. Redd's Constitutional Rights

Having found that Agent Love's alleged actions implicate Dr. Redd's Fourth Amendment protection from the use of excessive force, the court must determine whether those alleged actions violated that protection. When examining whether an officer employed excessive force, the Supreme Court has held that "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent and motivation."[20] In addition, "[t]he 'reasonableness' of a particular use of

---

[19] *Id.* at 1190 (finding it appropriate to examine whether Sheriff's action violated a constitutional right, but finding that his actions were reasonable).

[20] *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citing *Scott v. United States*, 436 U.S. 128, 137-39 (1978)).

force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[21] In *Graham v. Connor*, the Supreme Court set forth three factors to guide this inquiry: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight."[22] The court will examine these factors in turn.

First, the court is cognizant of the cultural, religious, and historical significance of Native American artifacts. Trafficking in stolen Native American artifacts and theft of tribal property are issues of such importance that Congress has specifically criminalized the behavior. Yet, the single felony charge against Dr. Redd, and the alleged facts underlying the charge, compel the conclusion that in the overall scheme of federal criminal conduct, the crime with which Dr. Redd was charged is of comparatively low severity. For example, in contrast to massive drug-trafficking conspiracies, kidnapping, murder, and child sex offenses, the crime Dr. Redd was accused of committing was nonviolent and posed no immediate threat to anyone. Nothing about the Native American artifact trafficking charge at issue could objectively cause anyone to believe that Dr. Redd had the disposition to engage in a violent standoff with officers. Nothing about the alleged facts underlying the charge would suggest to a reasonable officer that 80 to 140 heavily armed agents in flak jackets were necessary to subdue and arrest Dr. Redd, an aged community physician who had served the Blanding area for over 30 years.

Second, nothing about the alleged circumstances here suggest that Dr. Redd posed an immediate threat to the safety of law enforcement officers or others at the time Agent Love

[21] *Id.* at 396.
[22] *Id.*

decided to execute the warrant. As noted, Dr. Redd was a respected doctor in the community with no known history of violence. Nothing in the record suggests agents believed Dr. Redd was engaged in criminal activity when the warrant was executed in the early morning hours of June 10, 2009. And while Dr. Redd arrived at his home shortly after agents began the raid, he was returning only from a morning visit to his clinic—not from any alleged criminal activity. Defendants point to the fact that Dr. Redd was a hunter who owned firearms. But this alone is not enough to suggest any immediate threat to the officers' safety in this instance.

Finally, there is no evidence at all that Dr. Redd or anyone at his home resisted arrest in any way during the execution of the warrant. At a minimum, it was unreasonable on the facts alleged in the Complaint for Agent Love to call more agents to Dr. Redd's home after he and his family were already sequestered, and posed no danger to anyone.

Viewing Dr. Redd's alleged facts as true, and viewing them in the light most favorable to him, the court must conclude that he has sufficiently alleged facts that support a claim against Agent Love for violation of his Fourth Amendment protection from the use of excessive force.

### 3. Whether Agent Love's Alleged Conduct Violated a Clearly Established Right

Having determined that Dr. Redd has alleged sufficient facts to support a claim against Agent Love for a violation of Dr. Redd's constitutional rights, the court must consider whether that right was clearly established at the time. Defendants contend that "[o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."[23] Defendants argue that Dr. Redd has failed to cite to any

[23] *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (internal quotation marks omitted).

authority establishing that Agent Love could not send 80 heavily armed federal agents to arrest Dr. Redd, and up to 140 agents to search his home.

But the Tenth Circuit has clarified that for a right to be clearly established, "the contours of a right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This means that there need not be precise factual correspondence between earlier cases and the case at hand. . . . A general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful."[24] Moreover, "when an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law."[25]

Here, since the *Graham* factors weigh so heavily in favor of finding a violation of Dr. Redd's constitutional protection against excessive force, it is evident that sending so many heavily armed agents to arrest Dr. Redd and search his home violated the Fourth Amendment. In light of the clarity and force of the *Graham* analysis here, the court concludes that Agent Love knew or should have known, even absent a more factually similar case on point, that his decision to deploy over 80 heavily armed agents in such a raid, and to call more to the scene after agents had already secured Dr. Redd, his family, and his home, would constitute excessive force under the circumstances.

When viewing the factual allegations in a light most favorable to Dr. Redd, the court concludes that Dr. Redd has raised sufficient factual allegations to support a finding that Agent Love's conduct violated a clearly established right.

---

[24] *Anderson v. Blake*, 469 F.3d 910, 913-14 (10th Cir. 2006).
[25] *Morris*, 672 F.3d at 1197.

#### 4. Whether Evidence Gathering Justifies Agent Love's Actions

Agent Love responds that the decision to use so many agents is reasonable because the agents gathered 112 boxes of evidence at Dr. Redd's residence.[26] Admittedly, Agent Love is granted significant discretionary authority to determine how to effectuate an arrest or search warrant. But this discretion is not absolute, and must fit within the Fourth Amendment's confines, namely, that Agent Love's conduct must be "objectively reasonable in light of the facts and circumstances confronting" him.[27]

As stated above, given the nonviolent nature of the crime at issue, the lack of threat to the officers' safety, and the absence of active resistance to arrest, the court finds that sending so many heavily armed agents, even to collect 112 boxes of evidence, violated a clearly established right against the use of excessive force in violation of the Fourth Amendment.

### B. Whether Agent Barnes's Language Violated the Fourth Amendment

Dr. Redd alleges that Agent Barnes violated Dr. Redd's constitutional rights when he called Dr. Redd a liar, accused him of unlawful activity, taunted him with revocation of his medical license for felony convictions, and asserted he would never practice medicine again. In addition, in an apparent reference to the previous state charges, Agent Barnes allegedly pointed

---

[26] Defendants cite *United States v. Sanders*, 104 F. App'x 916 (4th Cir. 2004) in support of their argument. In *Sanders*, the government charged K&C Trucking with conspiracy and making false statements in an attempt to conceal violations of federal highway safety regulations. Forty agents, many dressed in combat gear, searched K&C's office. The agents seized 103 boxes of documents and several computer records. The Fourth Circuit held that the scope of the search "reasonably justified a large number of officers" and "in light of the inherent dangers law enforcement officers face even in their regular duties, [the court found] nothing improper about the officers' choice to carry sidearms (or other weapons) and wear protective gear while they performed the search." *Id.* at 922. But the circumstances in *Sanders* differ significantly from those presented here. First, in *Sanders*, officers raided a business, whereas in this case officers raided a private residence. Second, the crimes at issue in *Sanders* required the collection of vast amounts of documentary evidence, whereas that expectation is absent here. Third, 40 agents were involved in *Sanders*, whereas over two to four times that number of agents were involved here. In sum, the court does not find the circumstances presented in *Sanders* sufficiently comparable to support Agent Love's argument that his actions were reasonable as a matter of law.

[27] *Graham*, 409 U.S. at 397.

to a set of gardening tools and asked Dr. Redd with which of the shovels he liked to dig up bodies.

The Tenth Circuit has held that "[t]he whole course of conduct of an officer in making an arrest or other seizure—including verbal exchanges with a subject—must be evaluated for Fourth Amendment reasonableness in light of the totality of the circumstances. . . . While it seems unlikely that harsh language alone would render a search or seizure 'unreasonable,' verbal abuse may be sufficient to tip the scales in a close case."[28] In *Reeves v. Churchich*, 484 F.3d 1244, 1261 (10th Cir. 2007), the Tenth Circuit held that the use of an expletive directed at a neighbor of the person subject to a search was not a constitutional violation.[29] The Tenth Circuit stated, "Of course, we do not condone [an officer] calling [the plaintiff] a 'bitch.' . . . [E]xpletives communicate very little of substance beyond the officer's own personal animosity, hostility or belligerence. . . . Nevertheless, the use of such single expletive at someone who was not heeding an officer's order does not render the officer's otherwise lawful conduct unreasonable."[30]

In *Wheeler v. Scarafiotti*, 85 F. App'x 696 (10th Cir. 2004), the Tenth Circuit held that an officer "screaming at the defendants to raise their hand, having his hand near his holstered weapon, and threatening possible incarceration [ ] was objectively reasonable" when the officer stopped the defendants in a truck that was driving off of an established road.[31] In addition, in *Martin v. Sargent*, 780 F.2d 1334 (8th Cir. 1985), the Eight Circuit held that generally, "[v]erbal threats are not constitutional violations cognizable under § 1983 [or *Bivens* actions]" in the context of a prisoner action.[32] And, in *Pena-Borrero v. Estremeda*, 365 F.3d 7 (1st Cir. 2004),

---

[28] *Holland ex. rel. Overdorff v. Harrington*, 268 F.3d 1179, 1194 (10th Cir. 2001).
[29] 484 F.3d 1244, 1261 (10th Cir. 2007).
[30] *Id.* at 1261.
[31] 85 F. App'x 696, 699 (10th Cir. 2004).
[32] 780 F.2d 1334, 1339 (8th Cir. 1985).

the First Circuit held that an officer's threat to break down a door and the use of foul language in front of the plaintiff's children did not violate the plaintiff's clearly established rights.[33] Notably, Dr. Redd has pointed to no case law on point, and the court has found none, holding that the actions of Agent Barnes violated Dr. Redd's Fourth Amendment rights.

In view of these cases suggesting that harsh language, threats, and screams directed at individuals do not violate a clearly established constitutional right, the court concludes that the actions allegedly undertaken by Agent Barnes did not violate a clearly established right. Agent Barnes is entitled to qualified immunity.[34]

### C. Whether Agent Barnes Is Vicariously Liable for the Conduct of the Unidentified Agents

Dr. Redd alleges that Agent Barnes violated Dr. Redd's constitutional rights under the theory of vicarious liability when he ordered two unidentified agents to escort Dr. Redd to the bathroom and stand over him. Dr. Redd further alleges that the unidentified agents stood over Dr. Redd while he defecated, six inches off his knees, and then refused to remove his handcuffs while he cleaned himself.

The Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), held that "purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her

---

[33] 365 F.3d 7, 12 (1st Cir. 2004). The Tenth Circuit has consistently held that harsh language alone does not create a constitutional violation. *See, e.g.*, *Williams v. Levansailor*, 153 F.3d 730 (10th Cir. 1998) (unpublished) (stating that an officer's racial jokes made in the presence of an inmate were "deplorable and unprofessional" but concluding that this conduct did not "constitute a violation of plaintiff's Fourteenth Amendment rights"); *Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992) (verbal threats and harassment not actionable in civil rights action for cruel and unusual punishment); and *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (holding that an inmate's allegations that a "sheriff laughed at him and threatened to hang him" were not actionable under 42 U.S.C. § 1983).

[34] *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).

superintendent responsibilities."[35] The Tenth Circuit has held that "government officials may be held responsible for constitutional violations under a theory of supervisory liability. A plaintiff may therefore succeed in . . . a *Bivens* action . . . against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."[36]

To determine whether Agent Barnes was responsible for his subordinates' acts that caused the alleged constitutional harm, the court must first determine whether those acts violated the Constitution. In *Nielsen v. Bixler*, No. 8:04CV583, 2006 WL 1401711 (D. Neb. May 19, 2006), the District Court of Nebraska held that there was no constitutional violation when an officer did not "permit [plaintiff] to use a nearby bathroom or to leave the front seat of the patrol unit . . . [to perform] a feminine hygiene procedure which was immediately required to prevent the leakage of blood through her clothing and into the seat of [the officer's] patrol unit."[37] In *Hansen v. Schubert*, 459 F. Supp. 2d 973 (E.D. Cal. 2006), the Eastern District of California held that there was no constitutional violation when the plaintiff "was escorted when she had to use the bathroom."[38] The court held that "these precautions were not unreasonable because they served the important law enforcement interests of preventing plaintiff from fleeing in the event that incriminating evidence was found, preventing plaintiff from destroying evidence, and preventing plaintiff from obtaining a weapon."[39]

---

35 *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).
36 *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (internal citations omitted).
37 2006 WL 1401711, at *3 (D. Neb. May 19, 2006).
38 459 F. Supp. 2d 973, 991 (E.D. Cal. 2006).
39 *Id.*

While these cases are not factually identical to the case at hand, they provide helpful references. Especially given the lack of contrary authority from Dr. Redd, these cases support the conclusion that officers did not violate Dr. Redd's constitutional rights when they escorted him to the bathroom. The court finds that the unidentified agents' actions did not violate a clearly established right. It necessarily follows that where the unidentified agents did not violate a clearly established right, their supervisor, Agent Barnes, is free from vicarious liability for the alleged constitutional violation. Agent Barnes is entitled to qualified immunity on this claim.

But, even if the court found that the actions of the unidentified agents violated a clearly established right, there is no allegation that Agent Barnes specifically ordered the unidentified agents to stand closely over Dr. Redd while he defecated and to refuse to remove his handcuffs while he cleaned himself. Rather, Dr. Redd alleges only that Agent Barnes ordered the unidentified agents to stand over or escort Dr. Redd while he used the restroom, an act that the weight of authority from other courts establishes to be reasonable. For this independent reason, the court dismisses the vicarious liability claim against Agent Barnes.

At oral argument, the Estate of Dr. Redd appeared to argue that the real issue was that "the use of handcuffs [in this circumstance was] unnecessary."[40] In *Silvan W. v. Briggs*, 309 Fed. App'x 216 (10th Cir. 2009), a cased cited by Dr. Redd, the plaintiffs were arrested for allegedly lying to the police and were later charged with obstruction of justice. Officers handcuffed plaintiffs in full view of neighbors, friends, and others for over an hour, and did not allow one of the plaintiffs to get a drink.[41] The Tenth Circuit, as discussed at oral argument, held that "whether the handcuffing of [plaintiffs] was constitutional depends on the objective

[40] Hearing Transcript at 17:8-16.
[41] *Silvan W. v. Briggs*, 309 Fed. App'x 216, 224 (10th Cir. 2009).

reasonableness of the officers' actions."[42] In determining that there was no Fourth Amendment violation, the Tenth Circuit explained that "while we do not doubt that being detained in handcuffs in public view would be traumatic, not every indignity—'even if it may later seem unnecessary in the peace of a judge's chambers'—rises to the level of a constitutional violation."[43]

Here, Dr. Redd was charged with a felony, a charge more serious than that at issue in *Silvan*. In addition, Dr. Redd was a hunter, and most likely owned firearms, a situation more threatening (although only slightly so) than that encountered by officers in *Silvan*. In view of the Tenth Circuit determination that the handcuffing in *Silvan* (a situation with a less serious charge and with a less threatening situation) was reasonable, the court must conclude that officers did not violate a clearly established right by handcuffing Dr. Redd, and failing to take them off when he used to the restroom.

## V. Dr. Redd's Fourth Cause of Action

Dr. Redd alleges that Defendants discriminated against him as a "class of one" in violation of his equal protection rights. Specifically, Dr. Redd alleges that the Defendants singled him out as part of Operation Cerberus when other alleged artifacts traffickers were not prosecuted and treated as severely.

The Tenth Circuit explained that "[e]qual protection jurisprudence has traditionally been concerned with governmental action that disproportionally burdens certain classes of citizens."[44] But under a class-of-one theory, the court "recognize[s] the existence of an equal protection claim . . . where the plaintiff alleges that she has been intentionally treated differently from others

---

[42] *Id.*
[43] *Id.* (quoting *Mecham v. Frazier*, 500 F.3d 1200, 1205 (10th Cir. 2007)).

similarly situated and that there is no rational basis for the difference in treatment."[45] In order to prevail on a class-of-one claim, "a plaintiff must first establish that others, similarly situated in every material respect, were treated differently. A plaintiff must then show that his difference in treatment was without rational basis, that is, the government action was irrational and abusive, and wholly unrelated to any legitimate state activity."[46]

Here, Dr. Redd has failed to adequately allege any similarly situated individuals were treated differently than Dr. Redd. For example, Dr. Redd alleges in a few sparse, entirely conclusory statements that other individuals arrested as part of Operation Cerberus were not treated the same as Dr. Redd. But Dr. Redd has made no allegations whatsoever identifying any such individuals, explaining how they were similarly situated to Dr. Redd, or stating how they were treated differently. Dr. Redd has failed to plead a plausible class-of-one claim. The court dismisses the fourth cause of action.

## VI. Dr. Redd's Fifth Cause of Action

Dr. Redd asserts in his fifth and final cause of action that Defendants violated Dr. Redd's due process rights under the Fifth Amendment. The Tenth Circuit explains that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to support a claim "for relief that is plausible on its face."[47]

---

[44] *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011).
[45] *Id.* (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).
[46] *Id.* (internal citations omitted).
[47] *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)).

Here, Dr. Redd alleges no particular agents, events, actions, or locations to support the allegation that Defendants violated Dr. Redd's due process rights. Rather, Dr. Redd simply concludes that this violation occurred. The court dismisses the fifth cause of action.

**CONCLUSION**

For the reasons stated, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. (Dkt. 60.) The court DISMISSES the first, second, fourth, and fifth causes of action against Defendants. The court also DISMISSES the excessive force allegation against Agent Barnes in Dr. Redd's third cause of action. As all the causes of action against Agent Barnes are dismissed, the court DISMISSES Agent Barnes from the case.

SO ORDERED this 15th day of October, 2014.

BY THE COURT

ROBERT J. SHELBY
United States District Judge