IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF JAMES D. REDD, M.D.,<br><br>                    Plaintiff,<br><br>v.<br><br>DANIEL LOVE,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:11-cv-00478-RJS<br><br>Judge Robert J. Shelby |

This case arises out of Dr. James D. Redd's tragic suicide the day after federal agents arrested him and his wife for trafficking in stolen Native American artifacts, theft of government property, and theft of tribal property.  Dr. Redd's Estate brought this *Bivens* action against Bureau of Land Management Agent Daniel Love.  The Estate claims Agent Love violated Dr. Redd's Fourth Amendment right to be free from the use of excessive force when Agent Love sent over fifty-three federal agents, many of whom were heavily armed and wearing bulletproof vests, to raid and search Dr. Redd's home.

Agent Love moves for summary judgment, arguing qualified immunity shields him from the Estate's claim.  After careful consideration, the court grants Agent Love's motion.

## BACKGROUND

Because this matter is before the court on a motion for summary judgment, the court views the evidence and draws reasonable inferences in the light most favorable to Dr. Redd's Estate as the nonmoving party to the extent supported by the record.[1]

---

[1] *See Scott v. Harris*, 550 U.S. 372, 378, 381 n.8 (2007) (stating that when a defendant moves for summary judgment on qualified immunity grounds and the parties offer different versions of the facts, "courts are required to

## I.   Operation Cerberus

In October 2006, FBI and BLM began Operation Cerberus, a joint investigation into the illegal trafficking of Native American artifacts in Southern Utah and the Four Corners Region.[2] Agent Love joined Operation Cerberus in December 2006.  He became the lead BLM case agent for the operation by June 2009.

As a result of numerous undercover purchases throughout the Four Corners Region, FBI and BLM obtained several warrants to search and arrest suspected artifact traffickers in Southern Utah.  A few of those search and arrest warrants were for Dr. Redd, his wife, and their home in Blanding, Utah.  FBI and BLM decided to simultaneously execute the search and arrest warrants for Dr. Redd's home and eleven other locations in Blanding on the morning of June 10, 2009. The agencies decided to execute the warrants simultaneously because in the past, when search warrants had been served in Southern Utah, "valuable evidence was lost because subjects received advanced warning of impending search warrants."[3]

FBI and BLM shared many responsibilities in executing Operation Cerberus, but by April 2009, FBI had "assumed lead federal agency status."[4]  For example, FBI "[ran] the search warrants and arrest teams, with assistance from the BLM."[5]  FBI supplied a ten- or twelve-member SWAT team to execute a high-risk warrant at the home of one of the suspects, electronic technicians support, a mobile command post vehicle, and an FBI on-scene commander.  FBI also provided a command post, referred to as "Area Command," at BLM headquarters in Moab, Utah.

---

view the facts and draw reasonable inferences in the light most favorable to the" nonmoving party "to the extent supportable by the record" (citation omitted) (internal quotation marks omitted)); *see also Nelson v. McMullen*, 207 F.3d 1202, 1204 n.3 (10th Cir. 2000) (noting that although the parties dispute many of the facts underlying the plaintiff's § 1983 claim, the court "will resolve any such disputes by viewing the facts in the light most favorable to [the plaintiff] and assuming the events occurred as she described them").

[2] The Four Corners Region consists of the southeastern corner of Utah, the southwestern corner of Colorado, the northeastern corner of Arizona, and the northwestern corner of New Mexico.

[3] April 1, 2009 FBI Elec. Commc'n Re: Cerberus Action (Dkt. 93, exh. 7), at 3.

[4] *Id.*

[5] *Id.*

Area Command was created to monitor the simultaneous execution of the warrants.  It appears Area Command may have moved from Moab to Blanding on or before June 10, 2009.  Agent Love and FBI Special Agent Patrick G. Brosnan were assigned to Area Command.

FBI and BLM assembled several teams to execute the search and arrest warrants.  The teams included FBI and BLM law enforcement officers as well as unarmed cultural specialists.  Each team had a Team Leader—an FBI or BLM law enforcement officer who reported directly to Area Command—and an Evidence Response Team Leader who led the search for evidence.  All the teams involved in Operation Cerberus consisted of between eight to twenty-one federal agents and at least one archeologist.  Most teams, however, consisted of only eight or nine agents.  The teams were warned before executing the warrants that they may find themselves in danger because of hostility from the suspects and other members of the community.[6]

As teams finished their assigned duties at each location on June 10, 2009, Area Command was to reassign them to assist with searches, arrests, and transportation at the other locations as needed.  Likewise, a portion of FBI's SWAT team was to deploy to Blanding after its initial operation to provide backup in any problematic areas.

The team that was initially assigned to serve the warrants on Dr. Redd and his wife included federal law enforcement agents and cultural specialists.  An FBI Special Agent was Team Leader, and a BLM Agent was Assistant Team Leader.  The rest of the team consisted of about eight FBI and BLM law enforcement agents, and one or two unarmed cultural specialists who were assigned to help with evidence-related tasks.  The team was instructed to execute the warrants at Dr. Redd's home; interview the Redds; facilitate the Redds' transport to the BLM office in Monticello, Utah; help search for artifacts identified in the search warrant; collect and

---

[6] Emily Palus Decl. (Dkt. 93, exh. 10), at ¶ 17; *see also id.* at ¶ 18 ("The other cultural specialists and I were concerned that targets of Operation Cerberus or members of the community might retaliate against us for participating in this law enforcement operation.").

inventory evidence; and take photographs.

The team expected to find a high volume of artifacts at Dr. Redd's home.  The team also expected to encounter three adults and a child at the residence: Dr. Redd, his wife, their adult daughter, and the daughter's three-year-old son.  Although Dr. Redd kept firearms in the home, this fact was unknown to the team before June 10, 2009.

## II.  The Raid

Federal agents arrived at Dr. Redd's Blanding home around 6:40 a.m. on June 10, 2009. Mrs. Redd and the Redds' adult daughter were home, but Dr. Redd was not.

Four to six agents approached the home, pounded on the front door, and announced a police search.  Mrs. Redd answered the door and was immediately arrested without incident. Agents then took Mrs. Redd to the kitchen, where they interviewed her until approximately 9:56 a.m.  Dr. Redd's daughter was taken to the piano room upstairs.

Dr. Redd returned home from his medical clinic at 6:55 a.m.  Agents arrested him in the driveway without incident and took him to the garage, where they questioned him until about 9:30 a.m.  Agents then transported Dr. and Mrs. Redd to the BLM office in Monticello for booking at roughly 10:34 a.m.[7]  The parties disagree about the remaining details.

The parties first dispute how many federal agents initiated the raid at Dr. Redd's home. Agent Love offers competent evidence showing that twelve law enforcement agents, including himself, and one unarmed cultural specialist were present when Dr. Redd returned home.  This is reflected in the sign-in log that each FBI and BLM officer signed when entering and leaving the home in accordance with standard operating procedure.  Agent Love submits evidence that a total of eighteen federal personnel had been to the home by the end of Dr. Redd's interview at

---

[7] Once in Monticello, Dr. Redd and his wife were processed and transferred to the custody of the United States Marshal Service.  The Marshals then took Dr. Redd and his wife to Moab, Utah for their initial appearance before a magistrate judge.

9:30 a.m.  Of those eighteen personnel, fourteen were still at the home by 9:30 a.m., and two of the eighteen were unarmed archeologists.  By the time agents removed Dr. Redd from the home at about 10:34 a.m., a total of twenty-two personnel had been to the residence.  Sixteen of those twenty-two personnel were still there at 10:34 a.m., and two of the twenty-two were unarmed archeologists.

Dr. Redd's Estate attempts to paint a different picture in two ways.  First, in a declaration, Dr. Redd's daughter describes a scene in which there "were more agents than [she] could count," many of whom were "coming and going from the . . . house."[8]  She testifies that from the piano room where she was held she could see "several agents" outside each of the room's many windows.[9]  She also testifies that there were agents "inside the house, outside the house, and far away from the house walking around [the] land."[10]  And from the front porch, she could see six to eight agents immediately outside the front door.  Ms. Redd states that agents "were everywhere," many of whom were outside and "never entered [the] home."[11]

Second, the Estate challenges the integrity of the law enforcement sign-in log, arguing it accounts for only those officers who went inside the home, not for all officers who were present throughout the day.  For example, Agent Vander Veer participated in Dr. Redd's interview in the garage from 7:05 a.m. to 9:30 a.m. but did not sign the sign-in log until 9:52 a.m.  According to the Estate, because the interview took place in the garage, which is not inside the home, the most reasonable inference is that FBI and BLM agents did not sign in or out of the log unless and until they entered the home.  And in addition to Agent Vander Veer, there were "lots of agents" who

---

[8] Jericca Redd Decl. (Dkt. 102, exh. 4), at ¶ 4.
[9] *Id.*
[10] *Id.*
[11] *Id.*

did not enter the home—and thus did not sign the log—but were still on Dr. Redd's property.[12]

The Estate has not controverted the evidence put forth by Agent Love concerning the number of agents at Dr. Redd's home between 6:40 a.m. and 10:34 a.m. The testimony of Dr. Redd's daughter is not inconsistent with the sign-in log offered by Agent Love. That there were agents "everywhere" or "more agents than [she] could count" does not mean there were more agents than reflected in the sign-in log. Importantly, the Estate has not provided a competing estimate of how many agents were at the home when Dr. Redd arrived, when Dr. Redd's interview concluded, or when Dr. Redd was taken from his home. Nor has the Estate put forth any competent evidence of how many agents Dr. Redd saw or encountered. Instead, the Estate invites the court to speculate about whether any unspecified number of additional agents were at the home but did not sign the log. Although the court must view the evidence in the light most favorable to the party asserting the injury, the court may not guess or speculate.[13]

The parties also dispute how the agents who first arrived were clothed and armed. BLM policy requires law enforcement officers to wear identifiable clothing and bulletproof vests when serving search and arrest warrants. BLM policy also requires law enforcement officers to carry handguns when performing law enforcement duties in uniform. Similarly, FBI policy requires its agents to wear bulletproof vests and carry handguns when executing arrest warrants. Agent Love offers evidence that the agents at Dr. Redd's home followed these policies.

On the other hand, Dr. Redd's daughter testifies that the agents who first arrived looked more military-like than police-like. She testifies that the agents wore SWAT-like bulletproof

---

[12] Dkt. 102 at 51.

[13] A party asserting that a fact is genuinely disputed must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of facts as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." *Id.* 56(e)(2).

vests, kneepads, and boots, and carried machine guns—not pistols or rifles.  In short, according

to the Estate, the agents who first arrived at the home looked like members of a SWAT team.

## III. The Search

Agents began searching the home after Dr. Redd and his wife were arrested.  As

operations at other locations ended, additional agents arrived at the home throughout the day to

help identify and catalog the large amount of evidence found at the Redd residence.  Dr. Redd's

Estate submits evidence that Agent Love summoned these additional agents multiple times

throughout the day using his cellphone.  Indeed, each time Agent Love gave such instructions,

more agents arrived at the home.  Again, however, the parties dispute many of the details.

The parties dispute how many additional agents arrived throughout the day.  Pointing to

the sign-in log, Agent Love submits that a total of thirty-eight federal agents had been to the

home by noon, and that thirty-two of those agents remained at the home at noon.  According to

the log, Agent Love was one of the agents who left at noon.

The Estate, however, points to the testimony of Dr. Redd's daughter that there "appeared

to be as many as [fifty] agents at any one time" before noon.[14]  Accepting the testimony of Dr.

Redd's daughter as true, it is not competent evidence of the specific number of agents present at

any one time.  In this respect, the evidence supplied by Agent Love that thirty-eight agents had

been to the home by noon is consistent with the testimony of Dr. Redd's daughter that "as many

as [fifty] agents" had been there.  While the additional agents arriving at the home were not as

heavily armed as the initial set of agents, all the additional agents carried guns.

Next, the parties dispute what happened after agents overheard two voicemail messages

left on the Redds' answering machine during the course of the raid.  The first voicemail, left at

11:55 a.m., said: "Is there anybody there?  I know somebody's there.  A whole bunch of you.

---

[14] Jericca Redd Decl. (Dkt. 102, exh. 4), at ¶ 6.

You gonna pick up the phone?  All right.  I'll be in there in a little bit.  Be ready."[15]  The second voicemail, left at 1:13 p.m., likewise said: "Hey, you guys still too scared to answer the phone? Don't touch anything of mine.  Trust me.  You don't want to."[16]

Agent Love offers testimony that the agents believed these messages were left by one of the Redds' adult sons and perceived them as threats.  The Estate argues there is no evidence to support the claim that the agents perceived the messages as threats.  For instance, the messages are not characterized as "threatening" in any government document.  And aside from tracing the telephone numbers to one business in Cedar City, Utah and one cellphone also in Cedar City, the government undertook no additional investigation to determine the identity of the callers.

Agent Love submits testimony that, after hearing the messages, FBI enlisted the assistance of four SWAT team members to protect the home so the other agents could continue searching the home safely.  The four SWAT team members, who were already at the home to assist with the search, then retrieved long guns from their vehicles.  The agents took up tactical positions around the home, and two of the agents went on the roof to get a better vantage point. Agent Love submits that he did not participate in the decision to enlist the assistance of the four SWAT team members, that BLM does not have a SWAT team, and that only FBI had SWAT capabilities that day.

Although the Estate agrees that four SWAT team members were present and took up tactical positions around the home, the Estate claims Agent Love participated in the decision to enlist the assistance of the SWAT team members.  The Estate argues that Agent Love, as the lead BLM case agent in the entire operation and one of two lead officers on the scene, must have had the authority to enlist the help of the four SWAT team members.  Dr. Redd's daughter testifies

---

[15] Typed Notes on Threatening Voicemails (Dkt. 93, exh. 33), at 1.
[16] *Id.*

that Agent Love asked her how to get on the roof to help two of the SWAT team members get there.  And even though the first voicemail came in at 11:55 a.m. and Agent Love left the home at noon, the Estate contends that Agent Love may have stayed at the home long enough to convey the roof access information to the SWAT team members.

Dr. Redd, his wife, and their daughter returned to the home at around 5:00 p.m., after the Redds' daughter retrieved Dr. Redd and his wife from the courthouse in Moab, Utah.  When they arrived, thirty-five federal agents were still at the home.  The Redds waited outside the home until all the agents left at approximately 5:36 p.m.

The sign-in log offered by Agent Love shows that a total of fifty-three federal personnel visited the home over the course of the day.  The Estate argues that, in addition to the fifty personnel that were at the home before noon, lots of other agents were at the home during the day, many of whom are not accounted for in the sign-in log.  No competent evidence is offered in support of this assertion.

The next day, June 11, 2009, Dr. Redd tragically committed suicide.

## IV.  Relevant Procedural History

In August 2011, Dr. Redd's Estate brought this *Bivens* action against Agent Love.[17]  In its Complaint, the Estate alleged that Agent Love violated Dr. Redd's Fourth Amendment right to be free from the use of excessive force when Agent Love sent over eighty heavily armed SWAT-like agents in flak jackets to raid and search Dr. Redd's home.  The Estate also alleged that Agent

---

[17] In *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights."  *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)).  The Court has since recognized *Bivens* actions against federal officers who have allegedly violated an individual's Fourth Amendment right to be free from the use of excessive force.  *See e.g.*, *Saucier v. Katz*, 533 U.S. 194, 198–99 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  Because excessive force *Bivens* claims are the federal analog to excessive force claims against state officials under 42 U.S.C. § 1983, *Iqbal*, 556 U.S. at 675–76 (citation omitted) (internal quotation marks omitted), the court looks to cases in both contexts for guidance as it analyzes Agent Love's summary judgment motion.

Love told Dr. Redd's daughter after the raid that over 140 agents had been through Dr. Redd's home throughout the day.  In October 2012, Agent Love moved to dismiss the excessive force claim against him for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6).  Agent Love also argued that qualified immunity shielded him from liability.

In October 2014, the court denied Agent Love's motion to dismiss, assuming as it was required to do at that stage the truth of the Estate's well-pleaded factual allegations, and viewing them in the light most favorable to the Estate.  Applying that standard, the court concluded the Estate had sufficiently alleged facts in its Complaint that, if true, could support a finding that Agent Love violated Dr. Redd's clearly established constitutional right to be free from the use of excessive force.  The court ruled that on the facts alleged, but not yet established, it would have been objectively unreasonable for Agent Love to send 80 to 140 heavily armed agents in flak jackets to subdue and arrest Dr. Redd, an aged community physician who posed no danger to the agents' safety.  The court also found that, based on the allegations in the Estate's Complaint, a reasonable officer would have known Agent Love's conduct violated a clearly established right.

## LEGAL STANDARD

Following the court's ruling on Agent Love's motion to dismiss the Estate's Complaint, the parties conducted discovery relating to the excessive force claim asserted.  Having completed discovery, Agent Love now moves for summary judgment, again claiming qualified immunity shields him from personal liability.  The court has a much different record before it than when it ruled on Agent Love's motion to dismiss.  The court also must apply a different standard now when assessing Agent Love's motion for summary judgment than it applied when reviewing his motion to dismiss.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and that the movant is entitled to judgment as a matter of law."[18]  A

material fact is one that "might affect the outcome of the dispute under the applicable law,"[19] and

a party must show more than "some metaphysical doubt as to the material facts" to establish a

genuine dispute.[20]

When, as in this case, an individual sues a federal officer under *Bivens*, the officer may

raise qualified immunity as an affirmative defense.[21]  The defense "shields public officials from

damages actions unless their conduct was unreasonable in light of clearly established law."[22]

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

law."[23]  The Supreme Court has emphasized the doctrine's broad protection and explained that

"[q]ualified immunity is an entitlement not to stand trial or face the other burdens of litigation."[24]

When a defendant moves for summary judgment based on qualified immunity, courts

apply a modified summary judgment standard.[25]  In such cases, the burden shifts to the plaintiff

to satisfy a "heavy two-part burden."[26]  First, the plaintiff must establish the facts alleged show

the officer's conduct violated a constitutional or statutory right.[27]  Second, the plaintiff must

---

[18] Fed. R. Civ. P. 56(a).

[19] *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995).

[20] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[21] *Weigel v. Broad*, 544 F.3d 1143, 1151 (10th Cir. 2008).

[22] *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation omitted) (internal quotation marks omitted).

[23] *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[24] *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (internal quotation marks omitted), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

[25] *See Gross*, 245 F.3d at 1155 ("Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions.").

[26] *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citation omitted).

[27] *Attocknie v. Smith*, 798 F.3d 1252, 1255 (10th Cir. 2015); *see also Estate of Booker*, 745 F.3d at 411 (stating that when a defendant moves for summary judgment on qualified immunity grounds, the plaintiff must show that "a reasonable jury could find facts supporting a violation of a constitutional right").

show the "right was clearly established at the time of the challenged conduct."[28]  Unless the

record "clearly demonstrate[s] the plaintiff has satisfied his heavy two-part burden[,] . . . the

defendant[] [is] entitled to qualified immunity."[29]

When evaluating a motion for summary judgment based on qualified immunity, the court

must "view the facts and draw reasonable inferences in the light most favorable" to the party

asserting the injury.[30]  Although "this usually means adopting . . . the plaintiff's version of the

facts," the court will not do so if that version "is blatantly contradicted by the record, so that no

reasonable jury could believe it."[31]  The court, however, will not weigh the evidence, resolve

inconsistent testimony, or determine the credibility of witnesses.[32]  These functions are reserved

for the jury.

## ANALYSIS

Dr. Redd's Estate claims Agent Love violated Dr. Redd's Fourth Amendment right to be

free from the use of excessive force when Agent Love sent over fifty-three federal agents, many

of whom were heavily armed and wearing bulletproof vests, to raid and search Dr. Redd's home.

The court's analysis of this claim proceeds in two parts.  First, the court analyzes whether, under

a favorable view of the facts, Agent Love violated Dr. Redd's right to be free from the use of

excessive force.  Second, the court examines whether that right was clearly established at the

time of the alleged violation.

---

[28] *Attocknie*, 798 F.3d at 1255 (citation omitted).  The court may analyze the two parts of the test in the order it deems best "in light of the circumstances in the particular case at hand."  *Estate of Booker*, 745 F.3d 405, 412 (10th Cir. 2014) (citation omitted) (internal quotation marks omitted).

[29] *Gross*, 245 F.3d at 1156; *see also id.* (stating that "[i]f the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity").

[30] *Scott v. Harris*, 550 U.S. 372, 377–78 (2007).

[31] *Id.* at 378, 380; *see also Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (stating that when opposing a defendant's motion for summary judgment based on qualified immunity, "the plaintiff's factual recitation must find support in the record").

[32] *See Rhoads v. Miller*, F. App'x 289, 291 (10th Cir. 2009) (unpublished) (citing *Allen v. Wal-Mart Stores, Inc.*, 241 F.3d 1293, 1297 (10th Cir. 2001) ("The weighing of evidence, the reconciliation of inconsistent testimony, and the assessment of a witness' credibility is solely within the province of the jury.")).

## I.   Violation Of A Constitutional Right

Before analyzing the Estate's claim, the court addresses two preliminary matters.  First, the court examines the contours of the Fourth Amendment right to be free from the use of excessive force.  Second, the court determines which time frame is relevant to the Estate's Fourth Amendment claim.  The court then considers whether the record submitted by the parties shows that Agent Love violated Dr. Redd's right to be free from the use of excessive force.

### A.   Excessive Force Under The Fourth Amendment

The court first examines the Fourth Amendment right to be free from the use of excessive force.  The court undertakes this analysis to determine whether the Estate's claim adequately implicates a right under the Fourth Amendment.

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable [government] searches and seizures."[33]  As the Supreme Court has made clear, the Fourth Amendment requires courts to examine "the reasonableness of the manner in which a . . . seizure is conducted."[34]  To determine the reasonableness of a seizure, courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[35]

In general, claims of excessive force under the Fourth Amendment usually involve some evidence of physical injury.[36]  But "the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property[,] and

---

[33] U.S. Const. amend. IV.
[34] *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).
[35] *Id.* at 8.
[36] *See, e.g., Graham v. Connor*, 490 U.S. 386, 389–90 (1989) (police officers handcuffed plaintiff's hands tightly behind his back, shoved him face down on the hood of a car, and threw him headfirst into the police car, causing him to suffer a broken foot, cut wrists, a bruised forehead, and an injured shoulder); *Weigel v. Broad*, 544 F.3d 1143, 1149 (10th Cir. 2008) (police tackled the decedent, put him in a choke hold, handcuffed him, and applied pressure to his upper body while he was in a facedown position, causing him to go into cardiac arrest); *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001) (police shot plaintiff approximately five times).

privacy interests—a person's 'sense of security' and individual dignity."[37]  Accordingly, the

Tenth Circuit has declined to adopt a bright line rule limiting excessive force claims to situations

in which the plaintiff suffers physical injury.[38]  Instead, the Tenth Circuit in *Holland ex rel.*

*Overdorff v. Harrington* recognized that a "show of force" could give rise to an excessive force

claim under the Fourth Amendment.[39]

     In *Holland*, a county sheriff authorized a ten-member SWAT team to assist the sheriff in

serving arrest and search warrants on an individual suspected of misdemeanor assault and

reckless endangerment.[40]  The plaintiffs claimed the sheriff's planning of the arrest, including his

decision to deploy a SWAT team, violated their Fourth Amendment right to be free from the use

of excessive force.[41]

     The Tenth Circuit held the sheriff's planning and decision to deploy a SWAT team

"necessarily involve[d] the decision to make an overwhelming show of force" and the decision

had to be "reasonable" under the Fourth Amendment's prohibition on unreasonable seizures.[42]

The court explained, "it is plain that reasonableness depends on not only when a seizure is made,

but also how it is carried out."[43]  Thus, "the decision to deploy a SWAT team to execute a

warrant must be 'reasonable' because it largely determines how the seizure is carried out, thereby

determining the extent of the intrusion on the individual's Fourth Amendment interest."[44]  The

court then concluded that, "[w]here a plaintiff claims that the use of a SWAT team to effect a

seizure itself amounted to excessive force, [courts] review the decision to use that degree of force

---

[37] *Cortez v. McCauley*, 478 F.3d 1108, 1125–26 (10th Cir. 2007) (en banc) (quoting *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1195 (10th Cir. 2001)).
[38] *Holland*, 268 F.3d at 1195.
[39] *Id.* at 1190, 1194.
[40] *Id.* at 1183.
[41] *Id.* at 1186–87.
[42] *Id.* at 1190.
[43] *Id.* (quoting *Garner*, 471 U.S. at 8).
[44] *Id.*

by 'balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'"[45]

Like the plaintiffs in *Holland*, Dr. Redd's Estate claims Agent Love made an unconstitutional "show of force."  The Estate argues Agent Love's decision to deploy numerous agents, many of whom wore SWAT-like armor and carried machine guns, to execute warrants at Dr. Redd's home violated Dr. Redd's Fourth Amendment right to be free from the use of excessive force.  Following *Holland*, the court must evaluate the "reasonableness" of Agent Love's decision to deploy numerous heavily armed agents because "it largely determines how the seizure [was] carried out, thereby determining the extent of the intrusion on [Dr. Redd's] Fourth Amendment interest."[46]  The court must also examine the manner in which the agents carried out Dr. Redd's arrest.  In short, the Estate's claim at least implicates a Fourth Amendment right.

## B.   The Relevant Time Period For Fourth Amendment Analysis

Having determined the Estate's claim implicates a Fourth Amendment right, the court examines which facts in the record are relevant to the Estate's Fourth Amendment claim.[47]

Three constitutional amendments protect against excessive force: the Eighth Amendment, the Fourteenth Amendment, and the Fourth Amendment.[48]  The Eight Amendment's Cruel and Unusual Punishment Clause applies to excessive force claims brought by convicted prisoners.[49]  The Fourteenth Amendment's Due Process Clause applies to claims of excessive force brought

---

[45] *Id.* (quoting *Garner*, 471 U.S. at 8).

[46] *Id.*; *see also Phillips v. James*, 422 F.3d 1075, 1082 (10th Cir. 2005) (holding that "each decision made by the officers that changes the circumstances during [the plaintiff's] seizure is subject to 'reasonableness' scrutiny" (citing *Holland*, 268 F.3d at 1193)).

[47] *See Graham v. Connor*, 490 U.S. 386, 394 (1989) ("In addressing an excessive force claim brought under [*Bivens*], [the] analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.").

[48] *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014).  Because each amendment "carries with it a very different legal test," *id.* at 418–19, it is important to distinguish under which amendment a plaintiff asserts his claim.  Indeed, the Tenth Circuit has instructed that "a district court evaluating an excessive force claim must first isolate the precise constitutional violation with which the defendant is charged because the choice of amendment matters."  *Id.* at 419 (citation omitted) (internal quotation marks omitted).

[49] *Id.*

by pretrial detainees.[50]  And the Fourth Amendment's protection against unreasonable seizures

covers excessive force claims arising out of "[a]ny force used leading up to and including an

arrest."[51]  In general, an "arrest" continues from the time when an individual is arrested to when

formal charges are brought or an arraignment is held.[52]

The Estate brings its excessive force claim under only the Fourth Amendment's

prohibition on unreasonable seizures.[53]  The court must decide when Dr. Redd was no longer an

arrestee to determine which time period is relevant to the Estate's claim.  The Tenth Circuit's

decision in *Estate of Booker v. Gomez* is instructive on this issue.

In *Estate of Booker*, the police arrested the decedent on a warrant.[54]  The police then took

the decedent to a detention center, where he died while in custody.[55]  The decedent's estate

brought a § 1983 claim against the officers, claiming the officers' conduct at the detention center

violated the decedent's right to be free from the use of excessive force.[56]  The court held the

decedent was a pretrial detainee after the officers arrested him and took him to the detention

center for booking.[57]  The Fourteenth Amendment's Due Process Clause therefore governed his

estate's excessive force claim, not the Fourth Amendment.[58]

Here, federal agents arrested Dr. Redd at his home pursuant to an arrest warrant at about

6:55 a.m.  The agents questioned Dr. Redd until 9:30 a.m. and then took him to the BLM office

---

[50] *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 536 (1979)).

[51] *Id.* (citation omitted) (internal quotation marks omitted); *see also Graham*, 490 U.S. at 395 (holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard").

[52] *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010) (citing *Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir. 1991), *abrogated on other grounds by Johnson v. Jones*, 515 U.S. 304 (1995)).

[53] "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  There is no question in this case that federal agents seized Dr. Redd on June 10, 2009, when Dr. Redd returned to his home at approximately 6:55 a.m. and was immediately arrested.

[54] *Estate of Booker*, 745 F.3d at 412.

[55] *Id.* at 409.

[56] *Id.*

[57] *Id.* at 421.

[58] *Id.*

in Monticello for booking at roughly 10:34 a.m.  Dr. Redd returned home at about 5:00 p.m.

The Estate's articulated Fourth Amendment excessive force claim against Agent Love purports to be based on events that occurred at the Redd home throughout the day.  But Dr. Redd was an arrestee from only 6:55 a.m. until he arrived at the BLM office in Monticello for booking. Upon his arrival at the BLM office, Dr. Redd became a pretrial detainee.  And when Dr. Redd returned home later that evening, he was no longer "seized" under the Fourth Amendment—he was free to come and go as he pleased.[59]  The potential reach of the Estate's Fourth Amendment claim legally concluded upon Dr. Redd's arrival at the BLM office, meaning the Estate's claim is necessarily confined to events that occurred before Dr. Redd arrived at the BLM office.  Further, because the Estate's claim focuses only on events that occurred at Dr. Redd's home, the Estate's claim can relate only to events that occurred before Dr. Redd was removed at 10:34 a.m.

In addition, because Fourth Amendment rights are personal rights that cannot be asserted vicariously,[60] the Estate may recover only for the injuries Dr. Redd suffered personally.[61]  This means the relevant inquiry is whether Agent Love violated Dr. Redd's Fourth Amendment right to be free from the use of excessive force while Dr. Redd was at his home but, as explained above, before his Fourth Amendment rights dissipated.  The court is therefore constrained in its review to the events occurring at the Redd home between 6:55 a.m. to 10:34 a.m.

### C.  Violation Of Dr. Redd's Right To Be Free From The Use Of Excessive Force

The court now turns to the first prong of Agent Love's qualified immunity defense.  The sign-in log Agent Love offers shows that thirteen federal personnel were at Dr. Redd's home

---

[59] *See Garner*, 471 U.S. at 7 (stating that a seizure occurs "[w]henever an officer restrains the freedom of a person to walk away").

[60] *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).

[61] *See, e.g.*, *Coleman-Johnson v. Chi., Ill. Police Officers*, No. 95 C 3455, 1996 WL 417568, at *4 (N.D. Ill. July 22, 1996) (holding that two § 1983 plaintiffs could not move forward on their excessive force claims, because the two plaintiffs were not present when the officers executed the allegedly unconstitutional search of a home).

when Dr. Redd arrived at 6:55 a.m.  The log also shows that a total of eighteen federal personnel had been to the home by 9:30 a.m.  And by 10:34 a.m., a total of twenty-two personnel had been to the home, two of whom were unarmed archeologists.  Agent Love also offers testimony that the agents merely wore bulletproof vests and carried handguns.

As noted above, Dr. Redd's Estate challenges the integrity of the sign-in log on which Agent Love relies.  The Estate argues that, because one agent who was at the home by at least 7:05 a.m. did not sign in until 9:52 a.m., there must have been many other agents who were also at the home but did not sign the log.  The Estate also produces testimony from Dr. Redd's daughter that there were as many as fifty agents at the home at once some time before noon, and that twelve of the initial agents wore SWAT-like body armor and carried machine guns.

As explained above, the Estate has not controverted the evidence offered by Agent Love with respect to how many agents were at Dr. Redd's home between 6:55 a.m. and 10:34 a.m.  While the court assumes for purposes of its analysis here that at least twelve agents wore SWAT-like armor and carried machine guns, the court declines the Estate's invitation to speculate about how many agents were at the home while Dr. Redd was there and how many of those agents Dr. Redd personally encountered.  The court concludes the competent record evidence is that thirteen federal personnel were at Dr. Redd's home at 6:55 a.m., eighteen personnel had been to the home by 9:30 a.m., and twenty-two personnel had been to the home by 10:34 a.m.  The court confines its analysis to the following issue: whether Agent Love violated Dr. Redd's Fourth Amendment right to be free from the use of excessive force when Agent Love sent twenty-two federal personnel, twelve of whom wore SWAT-like armor and carried machine guns, to Dr. Redd's

home to execute arrest and search warrants and to begin collecting evidence.[62]  After careful

consideration, the court cannot conclude a violation occurred.

The Supreme Court has instructed courts to analyze excessive force claims under the

Fourth Amendment's objective reasonableness standard.[63]  Courts evaluate the reasonableness of

a seizure by balancing "the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the importance of the governmental interests alleged to justify the

intrusion."[64]  Courts must also analyze the reasonableness of an officer's conduct "from the

perspective of a reasonable officer on the scene,"[65] not "with the 20/20 vision of hindsight."[66]

This fact-specific inquiry "requir[es] careful attention to the facts and circumstances of

each particular case,"[67] without regard to the officer's underlying intent or motivation.[68]  In

*Graham v. Connor*, the Supreme Court highlighted three factors relevant to this analysis: (1) "the

severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety

of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting

to evade arrest by flight."[69]

To be sure, all three factors favor the Estate.  First, while trafficking in Native American

artifacts and theft of tribal property are serious offenses that warrant federal criminal penalties,

the single nonviolent crime with which Dr. Redd was charged is of comparatively low severity,

especially when compared to other types of federal criminal charges, like drug-trafficking

---

[62] The agents who arrived at Dr. Redd's home after 10:34 a.m., and were there solely to search for and catalog the large amount of evidence, are irrelevant to the excessive force analysis because Dr. Redd did not personally experience their presence or conduct.

[63] *Mecham v. Frazier*, 500 F.3d 1200, 1204 (10th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

[64] *Scott v. Harris*, 550 U.S. 372, 383 (2007).

[65] *Gross v. Pirtle*, 245 F.3d 1151, 1158 (10th Cir. 2001) (quoting *Graham*, 490 U.S. at 396).

[66] *Saucier v. Katz*, 533 U.S. 194, 205 (2001) (quoting *Graham*, 490 U.S. at 396), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

[67] *Id.* (quoting *Graham*, 490 U.S. at 396).

[68] *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012) (citing *Graham*, 490 U.S. at 397).

[69] *Graham*, 490 U.S. at 396.

conspiracies, kidnapping, and murder.  Second, there is no evidence to suggest that Dr. Redd posed an immediate threat to the safety of Agent Love or the other agents who were at the home on June 10, 2009.  In fact, the opposite is true.  Dr. Redd was an aged and respected community physician with no known history of violence.  And third, no evidence shows that Dr. Redd or anyone else at the home resisted arrest or attempted to evade the agents in any way.  To the contrary, both Dr. Redd and his wife were arrested without incident.

But that is not the end of the constitutional inquiry.  If it were, the court would effectively be ruling that Agent Love could not have used any show of force to execute the warrants at Dr. Redd's home.  That cannot be so.  Indeed, "[o]ur Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use *some* degree of physical coercion or threat thereof to effect it."[70]  And in the Tenth Circuit, officers may carry weapons or take control of a live situation by displaying those weapons without running afoul of the Fourth Amendment.[71]

What's more, the *Holland* court held that the decision to deploy a SWAT team is not constitutionally unreasonable unless the officer

> decided to use the SWAT team knowing that the SWAT team would use excessive force, intending to cause harm to any person, or . . . instructed the SWAT team to use excessive force while conducting the . . . raid.  Absent such facts, no violation of a constitutional right arising from the decision to deploy the SWAT team to execute the warrants [can be] established.[72]

---

[70] *Id.* (emphasis added).

[71] *Thompson v. City of Lawrence, Kansas*, 58 F.3d 1511, 1516 (10th Cir. 1995).

[72] *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1191 (10th Cir. 2001).  The rule announced in *Holland* governing the reasonableness of decisions to deploy a SWAT team appears to conflict with longstanding Supreme Court precedent.  In *Graham*, the Supreme Court held that "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  490 U.S. at 397.  But the *Holland* rule requires courts to examine whether the decision-making officer chose to use a SWAT team "intending to cause harm to any person."  268 F.3d at 1191.  The *Holland* rule seems to incorporate into the analysis an intent component that the Supreme Court has rejected.  Although the Supreme Court has spoken on excessive force claims generally, it has not spoken directly on the reasonableness of a decision to deploy a SWAT team in the context of an excessive force claim.  The Tenth Circuit in *Holland*, however, did speak directly on the issue.  And in *Whitewater v. Goss*, 192 F. App'x 794, 797–98 (10th Cir. 2006) (unpublished), another panel of the Tenth Circuit

Here, the Estate has not offered evidence showing Agent Love deployed the twenty-two agents knowing the agents would use excessive force.  Nor has the Estate shown Agent Love deployed the agents intending to cause any harm to Dr. Redd or his family.  And the Estate has likewise failed to put forth evidence establishing that Agent Love instructed the team of agents to use excessive force while executing the warrants.

Even without applying the *Holland* rule, Agent Love's conduct was reasonable under the totality of the circumstances.  To start, it was not unreasonable for Agent Love to deploy twelve SWAT-like agents and an unarmed cultural specialist to initiate the raid, execute the arrest warrants, and secure the home for the safety of everyone present.  This is especially true considering he expected to encounter three adults at the home.[73]  Although Dr. Redd and his wife were arrested without incident, the court may not discount the general concern that arrestees of

---

applied the *Holland* rule to consider whether the decision to use a SWAT team was unreasonable under the Fourth Amendment.  There, the majority relied on *Holland* and held that a sheriff's decision to use a SWAT team to execute a search warrant was not unreasonable, because there was no evidence the sheriff "knew the team would use excessive force, intended to cause harm, or instructed the team to use excessive force."  *Id.* at 798.  In dissent, Judge Lucero disagreed with the majority's interpretation of *Holland*.  Judge Lucero interpreted *Holland* as applying the Supreme Court's balancing test and concluding

> that the decision to deploy the SWAT team was reasonable because: (1) the officers knew that the individual that owned the property had a violent criminal history; (2) firearms were suspected to be located at the property; (3) the officers knew that other residents of the property had a history of violence; (4) although unaware of exactly how many residents were located at the property, the officers suspected at least 7–8 adults resided there; and (5) the use of a SWAT team was based on the officers' goal to effectuate a quick and safe execution of the search warrant and prevent the destruction of evidence.

*Id.* at 800 (Lucero, J., dissenting).  Judge Lucero then interpreted the language from *Holland* relied on by the majority to mean that courts cannot hold supervisors "liable for the actions of their deputies based on their decision to deploy the SWAT team because they did not know that the SWAT team would use excessive force, intending to cause harm to any person, or instructed the SWAT team to use excessive force while conducting the raid."  *Id.*  In any event, as a district court, this court must follow Tenth Circuit law absent an intervening Supreme Court decision, even if there may be good reasons for a different rule.  *See United States v. Torres-Castro*, 374 F. Supp. 2d 994, 1019 (D.N.M. 2005).

[73] *See Holland*, 268 F.3d at 1193 (stating that it is not unreasonable for officers "to simply hold[] the[ir] weapon[s] in a fashion ready for immediate use," even when the occupants of a home have "submitted to the officers' show of force without resistance" and there is no reason to believe the occupants pose a danger to the officers or others); *see also id.* at 1194 ("The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." (quoting *Michigan v. Summers*, 452 U.S. 692, 702 (1981)).

even nonviolent crimes may attempt to injure or ambush arresting officers.[74]  Agent Love was also justifiably concerned that the Redds might warn other Operation Cerberus subjects about impending search warrants.

Moreover, the Estate has not shown how many of the initial thirteen personnel arrested Dr. Redd when he arrived at 6:55 a.m.  In fact, the Estate has produced no evidence concerning how many of the thirteen personnel Dr. Redd actually encountered.  Nor has the Estate produced evidence about the nature of those encounters.  All the Estate has shown is that thirteen federal personnel were present somewhere on Dr. Redd's property and an unspecified number of agents arrested Dr. Redd upon his arrival.[75]  The record evidence establishes that at least some of the thirteen officers were with Mrs. Redd, and others were with Dr. Redd's daughter—both of whom were in different locations than Dr. Redd.  The agents' mere presence and proximity to Dr. Redd did not create an excessive show of force, even if the agents wore SWAT-like gear and carried— but did not point—machine guns.

Similarly, it was not unreasonable for Agent Love to summon nine additional personnel to the residence before 10:34 a.m. while Dr. Redd was still sequestered in the garage.  Agent Love summoned these agents to help search the home and catalog the large amount of artifacts discovered—not to arrest or interview Dr. Redd.  Even so, the Estate has again failed to provide evidence showing how many of the additional agents Dr. Redd personally encountered.  And as stated above, the additional agents' mere presence at the home and proximity to Dr. Redd, without more, did not create an excessive show of force.

---

[74] *See* FBI Arrest Policy (Dkt. 93, exh. 18), at 1 ("A person who is being placed under arrest may do one of several things: submit peacefully; attempt to flee; attempt to injure or kill arresting person; commit suicide; [or] effect a rescue by confederates."); *see also Maryland v. Buie*, 494 U.S. 325, 340 (1990) (Brennan, J., dissenting) (agreeing with the majority that "officers executing an arrest warrant within a private dwelling have an interest in protecting themselves against potential ambush by third parties").

[75] Although Agent Love did not argue this point in his briefing, the Memorandum of Dr. Redd's Interview shows that two agents were present when Dr. Redd arrived at the top of the driveway to his home and was placed under arrest.  Memorandum of Interview: Dr. Redd (Dkt. 93, exh. 30), at 1.

Finally, the Estate cites, and the court has found, no case in which the Tenth Circuit held that the decision to deploy a SWAT team or SWAT-like agents to execute a warrant amounted to excessive force.[76] The Estate simply points to the court's analysis in its October 2014 Order without considering the significantly different record now before the court on summary judgment. The Estate has failed to meet its high burden to clearly demonstrate that Agent Love violated Dr. Redd's Fourth Amendment right to be free from the use of excessive force.

The court cannot conclude that Agent Love's conduct was unreasonable under the Fourth Amendment and binding Tenth Circuit authority.[77]

## II. Clearly Established Right

Even if Agent Love violated Dr. Redd's Fourth Amendment right to be free from the use of excessive force, the particular right at issue here was not clearly established as of June 10, 2009.[78]

The Fourth Amendment's prohibition on unreasonable seizures has been part of the Constitution since 1791, and the Fourth Amendment's objective reasonableness standard is well established in the context of excessive force claims.[79] But the 'clearly established' inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."[80] "[T]he right the official is alleged to have violated must have been clearly established in a . . .

---

[76] *See Santistevan v. City of Colo. Springs*, 983 F. Supp. 2d 1295, 1319 (D. Colo. 2013) ("The Court is aware of, and the Plaintiff cites, no cases in which the Tenth Circuit has found that the deployment of a SWAT team to execute a search warrant amounted to excessive force.").

[77] *See Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005) ("What may later appear to be unnecessary when reviewed from the comfort of a judge's chambers may nonetheless be reasonable under the circumstances presented to the officer at the time." (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

[78] *See Kerns v. Bader*, 663 F.3d 1173, 1182 (10th Cir. 2011) (suggesting that the Tenth Circuit will remand a case to the district court for further consideration if the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis).

[79] *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1195 (10th Cir. 2001).

[80] *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

particularized . . . sense."[81]   A plaintiff bears the burden to show "the contours of [the] right

[were] sufficiently clear that every reasonable official would have understood that what he is

doing violates that right."[82]

Ordinarily, "the law is clearly established when a Supreme Court or Tenth Circuit

decision is on point, or if the clearly established weight of authority from other courts shows that

the right must be as plaintiff maintains."[83]   Yet a plaintiff need not show that "the very action in

question has previously been held unlawful."[84]   A plaintiff need only show the unlawfulness of

the challenged conduct is "apparent" in light of preexisting law.[85]   In addition, the Tenth Circuit

has adopted a sliding scale, under which "the more obviously egregious the conduct in light of

prevailing constitutional principles, the less specificity is required from prior case law to clearly

establish the violation."[86]   In the end, the "dispositive inquiry" is "whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted."[87]

Here, the court cannot conclude it was clear to every reasonable officer on June 10, 2009,

that it would be unlawful to deploy twelve SWAT-like agents and an unarmed cultural specialist

to execute a warrant, and then call an additional nine federal personnel to help search a home and

catalog evidence.  As stated above, the Estate cites, and the court has found, no case—in the

---

[81] *Id.* at 202.

[82] *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)); *see also Novitsky v. City of Aurora*, 491 F.3d 1244, 1255 (10th Cir. 2007) ("The plaintiff bears the burden of articulating clearly established law.").

[83] *Attocknie v. Smith*, 798 F.3d 1252, 1255 (10th Cir. 2015) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1206 (10th Cir. 2010)).

[84] *Id.* (quoting *Dodds*, 614 F.3d at 1206); *see also al-Kidd*, 131 S. Ct. at 2083 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."); *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) (stating that a "plaintiff is not required to show . . . that the very act in question previously was held unlawful . . . to establish an absence of qualified immunity" (citation omitted) (internal quotation marks omitted)).

[85] *Attocknie*, 798 F.3d at 1255 (quoting *Dodds*, 614 F.3d at 1206); *see also Mecham v. Frazier*, 500 F.3d 1200, 1206 (10th Cir. 2007) (stating that a plaintiff need only show the facts of a previous case are "sufficiently analogous to satisfy the particularized context necessary to support liability").

[86] *Estate of Booker*, 745 F.3d at 427 (citation omitted) (internal quotation marks omitted).

[87] *Saucier*, 533 U.S. at 202.

Tenth Circuit or otherwise—on point.  But because a case on point is not required, the court examines two analogous Tenth Circuit cases addressing the reasonableness of a decision to deploy a SWAT team to execute a warrant to determine whether it would have been apparent to every reasonable officer that a violation occurred here on the facts presented in light of preexisting law in this Circuit.

First, in *Holland*, the court found reasonable the decision to deploy a SWAT team to execute a misdemeanor arrest warrant at a sixty-acre compound.[88]  The court rested its decision on the fact the officers knew the suspect had a history of violence, knew the seven or eight other people living at the home also had histories of violence, and suspected there would be firearms in the home.[89]  The court also relied on the plaintiffs' failure to show the officers knew the SWAT team would use excessive force, intended to cause harm to any person, or instructed the team to use excessive force while conducting the raid.[90]

Second, in *Whitewater v. Goss*,[91] the court held in an unpublished opinion that a sheriff's decision to use a SWAT team to execute a search warrant for narcotics at the home of the six plaintiffs did not amount to excessive force.[92]  Applying the *Holland* rule, the court concluded the plaintiffs did not present evidence that the sheriff "knew the team would use excessive force, intended to cause harm, or instructed the team to use excessive force.  Without such evidence the mere decision to deploy a SWAT team . . . does not offend the Fourth Amendment."[93]

Against this backdrop, it would not have been clear to every reasonable officer in Agent Love's position that his conduct amounted to a constitutional violation.  That the facts here differ

---

[88] *Holland*, 268 F.3d at 1191.
[89] *Id.*
[90] *Id.*
[91] 192 F. App'x 794 (10th Cir. 2006) (unpublished).
[92] *Id.* at 798.
[93] *Id.*

from those in *Holland*—namely, that Dr. Redd was charged with a nonviolent crime and has no known history of violence—does not mean it would have been clear to a reasonable officer that a different result on the constitutional question would follow in this case. The *Holland* court did not suggest it would have held differently if the suspect was charged with a nonviolent crime and had no history for violence. Nor did the *Holland* court indicate how it would have held if there was a need to collect a large amount of evidence, as was the case here. And in *Whitewater*, the court made no mention of those factors in arriving at its decision. Instead, the *Whitewater* court focused its analysis on the *Holland* rule. Although it is unpublished and non-precedential, *Whitewater*, if anything, shows Agent Love did not violate Dr. Redd's constitutional rights, because, as in *Whitewater*, there is no evidence that Agent Love deployed SWAT-like agents knowing they would use excessive force, intending to cause harm, or with instructions to use excessive force.

Qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force . . . to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."[94] Here, not every reasonable officer would have been on notice that it would be unlawful to deploy twelve SWAT-like agents and a cultural specialist to execute a warrant and then call nine additional agents to help search a home and catalog substantial physical evidence for a nonviolent offense at the home of a nonviolent person. Agent Love is entitled to qualified immunity.

## CONCLUSION

For the reasons stated, the court GRANTS Agent Love's motion for summary judgment (Dkt. 93). The Clerk of Court is directed to close the case.

---

[94] *Saucier*, 533 U.S. at 206.

**SO ORDERED** this 11th day of December, 2015.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge